**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| | § | **Case No. : 3:18-cv-629** |
| **JOHN DOES #1-7 individually and on** | § | |
| **behalf of all others similarly situated** | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | |
| | § | **CLASS ACTION COMPLAINT** |
| **v.** | § | |
| | § | |
| **GREG ABBOTT, Governor of the** | § | |
| **State of Texas, and COLONEL** | § | |
| **STEVEN MCCRAW, Director of the** | § | |
| **Texas Department of Public Safety,** | § | |
| | § | |
| **Defendants.** | § | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS TO U.S.**
**CONSTITUTION (CIVIL RIGHTS), DECLARATORY JUDGMENT RELIEF, AND**
**INJUNCTIVE RELIEF**

Comes now Plaintiffs, John Does #1-7, individually and on behalf of all others similarly situated (collectively "Plaintiffs"), through their attorney, Teri Estes-Hightower, PLLC, complain of the Defendants as follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs, John Does #1-7, individually and on behalf of all others similarly situated, are Texas residents who have been retroactively required to comply with Texas' Sex Offender Registration Plan (hereinafter "TSORP") for the rest of their lives.[1]

2. The Plaintiffs were all charged and convicted before TSORP 2017 came into effect.

3. Under TSORP 2017, the Plaintiffs have been and will be subjected to constant supervision; required to report frequently in person; restricted in their ability to travel; prohibited from engaging in many common occupations of life; limited in their rights to free speech; identified publicly and falsely as dangerous; as well as subjected to a vast array of state-imposed restrictions that encompass virtually every facet of their lives. The Plaintiffs must comply with these extensive

---

[1] *See* Tex. Code Crim. Proc. art. 62.000 et seq., *as amended* (LexisNexis 2017).

restrictions and obligations for as long as they live, or face criminal sanctions of up to 20 years of imprisonment.[2]

4. TSORP 2017 violates Plaintiffs' fundamental rights to travel, work and speak without being narrowly tailored to meet a compelling state interest; and artificially categorizes Plaintiffs into tiers of present dangerousness while imposing varying levels of restraints and disabilities based on those categories without pre- or post- deprivation safeguards.

5. TSORP 2017 imposes such extensive and punitive restrictions on the plaintiffs that it violates the constitutional prohibition on ex post facto laws.

6. Further, many of the provisions of TSORP 2017 are void for vagueness. The plaintiffs are essentially strictly liable for complying with a sweeping and complex law, even though the language of the law does not provide clear notice of what is prohibited or required, either for those subject to it or for those who enforce it, making full compliance with the law impossible.

7. Plaintiffs bring this action under 42 U.S.C.S. §§1983[3] and 1988[4] and seek declaratory and injunctive relief barring application of those provisions that restrict or prohibit the exercise of their fundamental rights.

## JURISDICTION

8. Jurisdiction in this district is proper under 28 U.S.C.S. §§1331[5] and 1343[6] because the plaintiffs seek redress for the deprivation of rights secured by the U.S. Constitution Article III.[7] All Plaintiffs are directly affected by both the Federal Sex Offender Registry as well as the Texas Sex Offender Registry and the accompanying laws for both thereby satisfying the standing requirements for Article III.[8] The Plaintiffs' federal claims are brought under 42 U.S.C.S. §1983.[9]

9. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C.S. §§2201-2202[10], by Fed. R. Civ. P. 57[11] and 65[12], and by the legal and equitable powers of this Court.

10. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C.S. §1391(b)[13].

---

[2] *See* Tex. Penal Code § 22.011(f) (LexisNexis 2017).

[3] *See* 42 U.S.C.S. § 1983 (LexisNexis 2017).

[4] *See* 42 U.S.C.S. § 1988 (LexisNexis 2017).

[5] *See* 28 U.S.C.S. § 1331 (LexisNexis 2017).

[6] *See* 28 U.S.C.S. § 1343 (LexisNexis 2017).

[7] *See* U.S. Const. art. III, § 2.

[8] *See* U.S. Const. art. III, § 2.

[9] *See supra* note 4.

[10] *See* 28 U.S.C.S. §§ 2201-2202 (LexisNexis 2017).

[11] *See* Fed. R. Civ. P. 57.

[12] *See* Fed. R. Civ. P. 65.

[13] *See* 28 U.S.C.S. § 1391(b).

**THE PARTIES**

**John Doe #1**

11. Plaintiff John Doe #1 is a 67-year-old residing in the State of Texas. On or around August 8, 1967, Mr. Doe #1, who was 16 years old and a certified adult at the time, was driving around with friends. As Mr. Doe #1 had been drinking, he fell asleep in the car and when he awoke, a 27-year old female was with them. At the time, he was not sure whether she had consented to having sexual relations with him. According to his friends, she had consented. However, when he asked her, she neither said yes nor no. Mr. Doe #1 later realized that she had most likely been traumatized while he was asleep and therefore had not consented. Mr. Doe #1 pled not guilty to the charges on February 29, 1968 and was sentenced to 99 years in the Texas Department of Corrections. Then on December 3, 1968, he was granted a new trial and spent 5 years in the Dallas County jail system awaiting this new trial, which occurred on March 21, 1972. He was again, found guilty of rape and sentenced to 99 years in the Texas Department of Corrections. His conviction was affirmed on appeal on December 5, 1973. Mr. Doe #1 was given parole in December 1978, after having served 11 years. Mr. Doe #1 has not been arrested or convicted of any crimes since his 1972 conviction and has a very good prison record. Not only that, Mr. Doe #1 has a good parole record as well by regularly meeting with his parole officer after being paroled in 1978.

12. At the time Mr. Doe #1 was convicted, Texas did not have a sex offender registry. He therefore did not receive, and could not have received, any notice that his conviction would subject him to lifetime registration under TSORP. In 2003 Mr. Doe #1 met with his parole officer and was told that he was now required to register as a sex offender. This is the result of the 1997 amendment to TSORP,[14] which applied TSORP retroactively to convictions dating back to 1970. Under TSORP 2017, Mr. Doe #1 is classified as a Tier III offender and required to register annually, in person, for the rest of his life.[15] After his release from prison in 1978, Mr. Doe #1 has gone on to live a productive life. He has gotten married, raised children, and up to 2002, when he was required to register under TSORP, was self-employed in the barber and beauty shop industry. However after Mr. Doe #1 appeared on the registry and information about him and his now 50-year old crime became public over the Internet, he was not able to renew his lease for his then existing barbershop. He has also not been able to obtain a new lease in an existing building, thus becoming unemployed as well as unemployable. Further, since appearing on the registry, Mr. Doe #1 has been unable to obtain new and different housing from that in which he presently lives. On each occasion, Mr. Doe #1's application for a new apartment was rejected, and on more than one occasion, he was asked to leave the grounds of the premises. Now, Mr. Doe #1, in his late 60s, has no choice but to live in a high crime neighborhood. Recently, a stray bullet, fired in the neighborhood, passed through an exterior wall into his apartment, coming to rest in the wall of his living room, a short distance from

---

[14] *See* Tex. Code Crim. Proc. art. 62.000 et seq., *amended by* Act of June 13, 1997, 75th Leg., R.S., ch. 668, 1997 Tex. Gen. Laws, 2253, http://capitolresearch-texas.com/reports/law/sex_1997a.html.
[15] *See* Tex. Code Crim. Proc. art. 62.007(c)(3), 62.101 (LexisNexis 2017).

where he was sitting at the time. Mr. Doe #1, at the age of 69 and clearly not a threat to reoffend, will be required to register under TSORP 2017 for the rest of his life.

**John Doe #2**

13. Plaintiff John Doe #2 is a 68-year old residing in the state of Texas. In 1987, when Mr. Doe #2 was 38 years old and resided in the state of Florida, he owned and operated a chain of health clubs, one of which was located in Madison, Wisconsin. In February 1987, while on business in Wisconsin, Mr. Doe #2 was arrested for second-degree rape and was convicted of sexual assault on June 1, 1988 after a trial. He was sentenced to four years in prison. Mr. Doe #2 was released from prison in or around 1991 before either Wisconsin or Texas had enacted sex offender registries. The state of Wisconsin enacted its sex offender registry in 1993 but did not apply it retroactively so Mr. Doe #2 was not required to register while living in Wisconsin. In 1997, Mr. Doe #2 moved to Dallas, Texas to run 9 women's health clubs. At the time, the version of Texas' sex offender registry that had been enacted did not require him to register because his conviction predated the registry law. Mr. Doe #2, presently 68 years old, led a productive life since his release. He has lived in Texas continuously for the past 21 years, and has been either employed or self-employed until he was forced to retire at the age of 65 because of the registry. The registry has been an obstacle for Mr. Doe #2 to even gain employment outside of the state of Texas. Mr. Doe #2 has not been charged with or convicted of any crime since his 1987 Wisconsin conviction. At the time of Mr. Doe #2's conviction, neither the state of Wisconsin nor the state of Texas had a sex offender registry. He therefore did not receive, and could not have received, any notice that his conviction would subject him to registration on the sex offender registry. In fact, Mr. Doe #2 was unaware that he was required to register as a sex offender in the state of Texas until he was stopped by authorities for a traffic infraction in 2011. Under TSORP 2017, Mr. Doe #2 is classified as a Tier III offender.[16] Having to be on the registry has been humiliating for Mr. Doe #2 as well as for his family. Police officers come out to where he resides to make sure he actually lives there and that creates a scene. The registry has also taken a toll on his ability to use the Internet. The Internet requirements are so burdensome that he gave up on using the Internet. Even though Mr. Doe #2 is 68 years old, he must comply with all TSORP 2017 requirements for the rest of his life.[17]

**John Doe #3**

14. Plaintiff John Doe #3 is a 44-year old residing in the state of Minnesota, but due to the arbitrary and capricious acts of Defendants, is still subject to TSORP 2017. In December 1991, Mr. Doe #3 was 18 years old and living in rural Texas. Although he was 18 years of age, his therapist concluded that he was mentally much younger. Mr. Doe #3 was a senior in high school, at the time, and was dating a local 13-year old girl. Both Mr. Doe #3 and this girl had known each other for years. After attending a Christmas party at the girl's home, they then engaged in sexual relations. Mr. Doe #3 was then arrested and charged with sexual assault. In 1993, Mr. Doe #3 was granted a deferred

---

[16] *See* Tex. Code Crim. Proc. art. 62.007(c)(3) (LexisNexis 2017).
[17] *See* Tex. Code Crim. Proc. art. 62.101 (LexisNexis 2017).

adjudication under the Texas Code of Criminal Procedure section 42.12[18] as part of a plea deal. Under Texas law at the time, the successful completion of a period of community supervision would result in Mr. Doe #3's case being dismissed and his record sealed. Mr. Doe #3's guilty plea was based on the state's promise that his case would be dismissed, under the deferred adjudication statute,[19] and thereafter his record sealed. At no time before his plea, was Mr. Doe #3 ever informed that he was required, or may in the future be required, to register as a sex offender. At no time before his plea was Mr. Doe #3 ever informed that information about his case could be posted on a public Internet-based sex offender registry (which at the time did not exist). In 2003, after Mr. Doe #3 completed 10 years of court ordered community supervision and had his case dismissed, he was informed that he was still subject to the registration as a sex offender. Incredibly, Mr. Doe #3 was required, under TSORP, to register as a sex offender for the rest of his life. The requirement that Mr. Doe #3 register as a sex offender was contrary to all reasonable legal expectations he had when he was granted deferred adjudication in 1993.

15. Notwithstanding, Mr. Doe #3 went on to lead a productive life. He served in both the Naval and Air Force reserves and on active duty in Afghanistan and Kuwait. In 2004 Mr. Doe #3 married and moved to Minnesota and since then has attended college, obtained a Bachelors degree, is in current pursuit of a Masters degree, and has three children. Mr. Doe #3 was required to register as a sex offender in Minnesota until 2006 when his obligation to register was discharged by the state of Minnesota. However, in 2013, Texas placed Mr. Doe #3 back on its Registry due to software updates with TCIC/NCIC FBI Interface. Even after admitting the technical error, the Texas Department of Public Safety refused to remove Mr. Doe #3 from the Registry. This injustice caused Mr. Doe #3 to receive a general rather than an honorable discharge from the Air Force in 2015. It also burdens his family because his children's school is about to implement a program, which will expose his registration in Texas. This will create problems and confusion for him as well as his family since he is not required to be registered in Minnesota. The state of Texas' Department of Public Safety continues to decline to remove Mr. Doe #3 from the state registry and has informed him that the state of Texas will continue to publicly disseminate his information over the Internet, despite Texas having no jurisdiction over him. Because Mr. Doe #3 continues to be publicly registered by the state of Texas as a sex offender, he has been required to depart from the Air Force and has lost other employment. But for the fact that Mr. Doe #3 is publicly listed on TSORP 2017, employers, landlords and the public would be unaware of his dismissed case or its underlying facts, which was the previous deal that was offered to and accepted by Mr. Doe #3 when agreed to accept the deferred adjudication of his case. Mr. Doe #3 has no criminal convictions.

**John Doe #4**

16. Plaintiff John Doe #4, a 42-year old, resides in the state of Texas. On April 19, 1996, Mr. Doe #4 pled guilty to two charges of sexual assault of a child and indecency with a child. Mr. Doe #4 was 19 years old at the time he was charged. The charges alleged that he fondled his two cousins,

---

[18] *See* Tex. Code Crim. Proc. art. 42.12 *repealed by* Acts 2015, 84th Leg., ch. 770, § 3.01, 2015 Tex. Gen. Laws 2299 (LexisNexis 2017).
[19] *See* Tex. Code Crim. Proc. art. 62.301 (LexisNexis 2017).

who at the time were 15 and 11 years old. In or around April 1996 he was sentenced to four years imprisonment. At the time Mr. Doe #4 pled guilty, the existing sex offender registry was not retroactive and Mr. Doe #4 was not informed that he would be required to register as a sex offender upon the termination of his term of imprisonment in 1999. Since the time of his release, Mr. Doe #4 is required to register in person every 90 days at his local police department. Pursuant to Texas law, not only is Mr. Doe #4's personal information made public over the Internet (*e.g.* his name, address and photograph, along with details of his offense) but local police officers also distribute the information, in person, to his neighbors, local school officials, local daycare workers, and others in his community.[20] In addition, should Mr. Doe #4 want to vacation with his family or travel to another state to see his relatives, he not only must inform his local registry officials in person but also upon his arrival at his out-of-state destination must inform the local police of his presence. At the end of his stay, which could be a few days later, Mr. Doe #4 is required to again report to the local police department at his destination and inform them that he is leaving. In turn, his local police department will be informed of him returning. Upon his arrival home, he again is required to report to his local police department to inform the authorities of his return. Further, Mr. Doe #4 is hopelessly unemployed. A former construction worker, Mr. Doe #4 has not been able to find employment, except for a minimum wage job, in the last nine years. The Texas registry prohibits him from taking employment for which he would otherwise be eligible to obtain and the state has not enacted any other legislative qualifications or means for employment besides this registry. Thus, Mr. Doe #4 was not provided with due process of law before the denial of his right to pursue common employment. Upon information and belief, Mr. Doe #4 has not otherwise been arrested or convicted of any other crimes.

### John Doe #5

17. Plaintiff John Doe #5 is a 55-year old construction worker who has never been convicted of a crime nonetheless, is subject to the restraints and disabilities imposed by Chapter 62 of the Texas Criminal Code. Mr. Doe #5 was granted a deferred adjudication in 1992, for sexual indecency with a child/sexual touching. Mr. Doe #5 successfully completed four years of community service and his case was dismissed in 1996. He is required to register as a sex offender for the rest of his life. Mr. Doe #5 is a boilermaker and regularly works on large construction sites around the state of Texas and nationwide. Mr. Doe #5 regularly receives phone calls from his employer directing him to report to work sites around the country to perform specific work tasks at construction sites. Mr. Doe #5's work assignments can last from several days to several months. TSORP 2017 requires Mr. Doe #5 to notify his local police department each time he leaves town to work for more than 48 hours. Mr. Doe #5 is required to inform his local compliance officer where he is going and how long he will be gone. Upon his arrival at his temporary destination, Mr. Doe #5 is required to register, even when he is only at that location for as little as 48 hours. As is the case in many of Mr. Doe #5's work assignments, time is of the essence. In his hurry to fulfill his work obligation, to get from one location to another, he is greatly concerned that he will either negligently fail to register or otherwise not provide the proper notification which would subject him to up to 20 years

---

[20] *See* Tex. Code Crim. Proc. art. 62.056 (LexisNexis 2017).

of imprisonment.[21] The burden that the registry places on Mr. Doe #5 has caused him to reject employment opportunities and constantly subject him to the worry that a police officer of a small town in which he is working will decide to visit his worksite and expose Mr. Doe #5 as a sex offender, costing him either that specific work assignment or his employment in general. On information and belief, but for Mr. Doe #5's 1991 arrest, he has not otherwise been arrested and has never suffered a criminal conviction.

**John Doe #6**

18. Plaintiff John Doe #6 is a 47-year old who was convicted of both sexual assault and aggravated sexual assault on November 10, 1992 on the complaint of his wife. Mr. Doe #6 is categorized as a Tier I offender by TSORP 2017 and is required to report in person every 90 days.[22] Mr. John Doe #6 suffers from a serious bi-polar disorder for which he receives treatment and medication on a monthly basis. As a result of his bipolar disorder, Mr. Doe #6 is 100% disabled and receives Social Security disability benefits. In or around October 2016, Mr. Doe #6 was suddenly evicted from his housing and was forced to take temporary refuge in a storage unit. In the resulting confusion of being uprooted from his home of several years, Mr. Doe #6 lost track of his medication and suffered a psychotic breakdown. As a result of the changes in Mr. Doe #6's living situation, in combination with the temporary but serious change in his mental status, he was eight days late in notifying the authorities of his change of address. Mr. Doe #6 was charged with failing to register and now, after taking a plea deal, is facing 2 years of incarceration. At no time before his October 2016 eviction had Mr. Doe #6 failed to register on time.

**John Doe #7**

19. Plaintiff John Doe #7 is a 42-year-old who now resides in Texas. On September 16, 1997 while living in Oregon, Mr. Doe #7 was charged with as well as pled guilty to Oregon's charges of rape in the third degree, also known as statutory rape.[23] At the time of the offense, Mr. Doe #7 was in college and did not appreciate the youth of the victim who was 16 years old. After his conviction, Mr. Doe #7 received probation for 36 months, or 3 years, and was not required to adhere to the public notification provision in either Nevada or Oregon. However, under TSORP 2017, Mr. Doe #7 is required to comply with the public notification provision[24] and this has publicized his information to third party companies, which in turn is causing him to suffer greatly. It has also resulted in him being listed on the national sex offender registry. In August 2015, Mr. Doe #7 relocated to the state of Texas and, under TSORP 2017, was required to register as a sex offender. After registering under TSORP 2017, Mr. Doe #7 and his family were evicted from the housing they had obtained in Austin, Texas based solely on the fact that he was a registered sex offender. Thereafter, Mr. Doe #7 who had been steadily employed since graduating from college was unable to find work due to his appearance on the sex offender registry and was now required to start his own small business in order to support his family. On two separate occasions, Mr. Doe #7 was

---

[21] *See supra* note 3.

[22] *See* Tex. Code Crim. Proc. art. 62.007(c)(1), 62.058 (LexisNexis 2017).

[23] *See* OR. Rev. Stat. Ann. § 163.355 (LexisNexis 2017).

[24] *See* Tex. Code Crim. Proc. art. 62.056 (LexisNexis 2017).

denied a small business loan by lenders who cited his presence on the sex offender registry as the reason he was denied a loan. Due to Mr. Doe #7 having to register on the National Sex Offender Registry, he is not allowed to enter the school premises for parent-teacher conferences, sport events held at the school, or any kind of school activities. This has damaged his personal life by not allowing him to have any real involvement with his children's education and extracurricular activities. He has been forced to make unnecessary arrangements in order for him to find out how his children are doing in school including having family members meet with his children's teachers. Mr. Doe #7 has no other arrests or convictions.

### John Doe #9

20. Mr. Doe #9 began registering on the Texas Sex Offender Registry on June 6, 2015 and re-registers annually. Registering on TSORP 2017 is part of his parole condition. The offense he has been accused of committing is Sexual Assault back on June 10, 1990. Mr. Doe #9 registers and re-registers at the Dallas Police Station. The process for registering and re-registering is daunting because he cannot read or write and has to have some assistance in filling out the forms. The commute to the police station also adds to it because it can take anywhere from half an hour to an hour depending on traffic. Mr. Doe #9 has to give his identification card every time he goes and he ends up meeting with a different person each time. Not only is the process intimidating, but also whenever he moves or travels outside of where he is registered, he must inform his parole officer. This dissuades Mr. Doe #9 from going anywhere. The registry has also deterred him from trying to rent or buy a house because he is worried about the treatment he will receive. Additionally, having to be on the registry has placed a burden on Mr. Doe #9's family. He has missed out on his daughter's childhood and does not go with family anywhere out of fear that he will be re-arrested. TSORP 2017 Internet requirements do not even permit him access to the Internet so he does not even bother with it. Mr. Doe #9 underwent treatment as part of his criminal sentence and has since been diagnosed with paranoid schizophrenia, ADHD, and bipolar disorder. He is still attending treatment for these.

### John Doe #10

21. Mr. Doe #10 started registering on the Texas Sex Offender Registry on September 30, 1997 and re-registers annually. The offense Mr. Doe #10 committed is sexual assault on January 1, 1989 and discharged from prison on October 28, 1991. Mr. Doe #10 was released from parole on April 28, 2005. Mr. Doe #10 was not initially required to register on the registry until years after his release from parole. He registers and re-registers at Johnson County Sheriff's Department and the DPS. He goes to JCSD once a week by appointment and therefore is forced to make two different trips. Each trip to each location is an hour commute. All changes that Mr. Doe #10 needs to make on his registration has to be done in person including travel plans. Mr. Doe #10 can only go to JCSD on Thursdays. This makes the process extremely difficult and overwhelming. TSORP 2017 requirements have also burdened Mr. Doe #10's family. He is restricted from attending his children's as well as grandchildren's school activities and any activities, extracurricular included, that involve them. Being on the registry has placed a lot of stress on his wife and son. While growing up, his son could never host any sleepovers or have friends over because of him. The registry has brought up issues in family court when Mr. Doe #10's eldest was fighting for custody of his children. The judge in the custody battle found out about Mr. Doe #10 being on the registry and restricted him from being able to see his grandkids. TSORP 2017 Internet reporting requirements are burdensome as well because it has affected the way Mr. Doe #10 communicates to others as well as what he is permitted to do over the Internet. Mr. Doe #10's understanding of TSORP 2017 Internet requirements is that he is not allowed to use it at all. Additionally, as part of his criminal sentence, Mr. Doe #10 underwent counseling and has been declared as cured. TSORP 2017 has forced Mr. Doe #10 to disclose more and more information with each

amendment made. He has even been put on the no-fly list. Mr. Doe #10 did his time but must continue re-registering annually for the rest of his life because of TSORP 2017 amendments made in 2005.

### John Doe #11

22. Mr. Doe #11 began registering on the Texas Sex Offender Registry on January 11, 1999 and re-registers annually. The offense Mr. Doe #11 committed is possession of child pornography back in 1984. He was on probation from 1994 to 2000 and registering was not a condition of it. Mr. Doe #11 was discharged on November 19, 2000 and registers/re-registers at San Patricio Sheriff's Office in Sinton, Texas. In order to meet with an officer to re-register, Mr. Doe #11 must call and make an appointment. TSORP 2017 has had so many amendments made to it that Mr. Doe #11 has no idea what is he must do to stay in compliance. Mr. Doe #11 meets with a Sergeant Ramos who at times treats him like a criminal. She never notified Mr. Doe #11 of changes to TSORP 2017 and when he, for example, notified her about having bought a new vehicle while updating his information she gave him a hard time. Sergeant Ramos gave Mr. Doe #11 a document that needed to be filled out with the new vehicle information which was not a listed document. When Mr. Doe #11 pointed this out to her, Sergeant Ramos got defensive and threatened him with jail time if he did not sign a document, which pretty much stated that he had violated his registered sex offender terms. Sergeant Ramos told Mr. Doe #11 that she would have to report his noncompliance and that it would be considered as "strike one" on his record. Additional hassles of TSORP 2017 for Mr. Doe #11 includes having to report his traveling plans to not only his probation officer but also to the authority in each city that he goes to. Initially, he only had to report this to his probation officer. TSORP 2017 housing requirements have forced him to leave an apartment complex by management when another resident recognized Mr. Doe #11 from the registry. Likewise, TSORP 2017 has given Mr. Doe #11"s wife problems as well. She is not a U.S. citizen and is in the process of trying to get a Green Card but because of the Adam Walsh Act which made Mr. Doe #11's registration public over the Internet, she was denied twice. After attending group counseling, Mr. Doe #11 has been declared as a low risk for reoffending.

### John Doe #12

23. Mr. Doe #12 started registering on the Texas Sex Offender Registry on November 3, 1999 and re-registers annually. He was convicted of Aggravated Kidnapping on or around April 30 and May 5 1999 and was discharged on June 9, 2010. Mr. Doe #12 registers/re-registers at the police department in Odessa, Texas. He meets with a sex offender officer, Officer Candy. TSORP 2017 has hassled Mr. Doe #12's life by forcing him to report every change that occurs in his life setting him back on time and money. Being on the registry has cost him jobs and housing as well as forced him to be treated inhumanely by those who he reports to. The registry has caused Mr. doe #12 to have a strained relationship with his children. Lastly, TSORP 2017 has affected Mr. Doe #12's ability to attend college because of the stigma attached to it. No one wants to associate himself or herself with him even though he has been discharged.

### John Doe #13

24. Mr. Doe #13 began registering on the Texas Sex Offender Registry in 2016 and re-registers every 3 months and when he needs to make an update. He was charged with Sexual Assault back in 2015 and will be discharged in 2022. Registration is part of his parole condition and he registers/re-registers at the Dallas Police Department and meets with a different detective each time forcing him to be subjected to various forms of treatment. TSORP 2017 traveling requirements are so restrictive that Mr. Doe #13 has chosen not to travel at all. TSORP 2017 employment and housing restrictions have cost Mr. Doe #13 jobs and housing. Additionally, TSORP 2017 Internet requirements have affected Mr. Doe #13's ability to take online classes and seek jobs thus compelling him to not use the Internet at all. The stigma of being on the Registry has

made attending college difficult for Mr. Doe #13. He has to register as a sex offender on campus every semester that he wants to attend. However, attending has also been difficult. Mr. Doe #13 has been escorted off campus before because of the registry. As part of his criminal sentence, he is undergoing treatment without a medical diagnosis and has been told by his probation officer that what he has cannot be cured but only treated. The stigma that comes with being on the registry has made it quite impossible to lead a normal life even after serving his time.

## John Doe #15

25. Mr. Doe #15 has been registering on the Texas Sex Offender Registry since 2003 and re-registers annually. The offense he committed is sexual assault back in December of 1992 and discharged the same year he started registering. Mr. Doe #15 registers/re-registers at South Police Station, 8300 Mykawa Road in Houston, Texas. Currently, Mr. Doe #15 meets with officer Edward J. Stringfellow who treats him like a criminal. Having to comply with TSORP 2017 requirements means that Mr. Doe #15 has to report in person at the South Police Station and that is time consuming given the fact that he has to commute close to an hour with traffic for him to get down to the police station. TSORP 2017 traveling restrictions and requirements have forced Mr. Doe #15 to limit his traveling. TSORP 2017 housing and employment restrictions are also problematic for Mr. Doe #15. He has been kicked out of an apartment complex and his job requires him to sometimes work out of state. When he has to work out of state, he must get permission and must also buy a plane ticket to personally meet with a registration officer. The staff Mr. Doe #15 meets with do not make the registration process any easier since they treat him like he is a serial sex offender. TSORP 2017 restrictions have also placed a burden on Mr. Doe #15's family. He has to be accompanied by his wife whenever he goes into schools. The stigma that comes with being on the Texas Sex Offender Registry has affected the way neighbors treat Mr. Doe #15 and his family. TSORP 2017 Internet reporting requirements are also a burden because it has affected the way Mr. Doe #15 communicates with others. The Internet reporting requirements are ambiguous making it difficult for Mr. Doe #15 to know what he is permitted to do over the Internet. The stigma that comes with being on the registry has made it challenging to obtain a job since Mr. Doe #15's name shows up in Internet searches as on the registry. That stigma has also extended to Mr. Doe #15's ability to attend college and has forced him to drop out. Mr. Doe #15 has undergone treatment and been declared as not a threat to reoffend by a psychologist.

## John Doe #16

26. Mr. Doe #16 began registering on the Texas Sex Offender Registry a week after being discharged on October 8, 2015 and re-registers annually. The offense Mr. Doe #16 committed is Aggravated Rape in 1982 and as a condition of his parole; he must register on the registry. Mr. Doe #16 registers/re-registers at the police station on Lamar Street in Dallas, Texas. Every change Mr. Doe #16 makes in his life has to be reported to a police officer. TSORP 2017 in person requirement is extremely time consuming for Mr. Doe #16. The process takes about an hour but the waiting time can take hours. Mr. Doe #16 cannot read or write and needs assistance to fill out registration forms but does not get any help from staff. TSORP 2017 has affected Mr. Doe #16's ability to get a decent job because of the stigma attached to the registry. Mr. Doe #16 has also been prevented from getting a place to stay so he is living with his sister at the moment. The stigma that comes with being on TSORP has made Mr. Doe #16 fearful of losing his current job if word gets out that he is on the registry. Mr. Doe #16's family is also feeling the affects of TSORP 2017. His eldest child will not talk to him and the TSORP 2017 travel restrictions have prevented him from traveling with his family. His sister has also felt the effect of TSORP because officers come to check the house when they want and if Mr. Doe #16 or his sister do not let them then Mr. Doe #16 is threatened with jail time. For this reason, Mr. Doe #16 needs as well as wants to move out of his sister's home but cannot find a place due to TSORP 2017 housing restrictions and requirements. Mr. Doe #16's understanding of the TSORP

2017 Internet restrictions and requirements is that he cannot use the Internet at all which makes it hard for him to stay in touch with family that lives elsewhere. Mr. Doe #16 attends a sex offender class which he is forced to pay for out of his own pocket and this is hard to do since he cannot get a job. TSORP 2017 has made it impossible for Mr. Doe #16 to afford a life.

**John Doe #19**

27. Mr. Doe #19 started registering on the Texas Sex Offender Registry on July 7, 2002 as part of a condition to his parole and has to re-register yearly. The offense he committed is Indecency with a Child in February of 2001. Mr. Doe #19 has to register and re-register at the police department with a crime prevention officer, Curtis Garrett. Registering on TSORP 2017 has cost Mr. Doe #19 employment and has forced him to find work that is quite a commute from where he lives. The commute is now over an hour each way and TSORP 2017 has made finding housing closer problematic. TSORP 2017 has burdened Mr. Doe #19's family life by not allowing him to have contact with his youngest. This has definitely affected his child's rearing since he cannot live at home. Mr. Doe #19 completed counseling as part of his criminal sentence on October 7, 2012 but is still required to be on the registry which has hassled him in more ways than one.

**John Doe #20**

28. Mr. Doe #20 began registering on the Texas Sex Offender Registry on October 19, 2017 and has to re-register annually. The offense he committed is Online Solicitation of a Minor in February 2017. Mr. Doe #20 registers as a condition of probation at Erath County Sheriff's Office. Mr. Doe #20 meets with Sergeant Woodruff who treats him poorly and disrespectfully, which makes the registration process even harder. TSORP 2017 traveling restrictions and requirements have burdened Mr. Doe #20 as well. He used to report his traveling information to a Lisa Lambert in Hamilton County when he initially started probation. However, Mr. Doe #20 does not live in Hamilton County, he lives in Erath County and had to wait 3 months for them to transfer to Erath County. He now reports to a Shannon Feuge at Erath County Annex Building who is nothing but rude to him. Mr. Doe #20 is not allowed to go anywhere outside of Erath County overnight unless he gets prior written permission to do so. The stigma of being on the registry has gotten Mr. Doe #20 fired from his job of 20 years and now must work at a job that does not have access to the Internet. TSORP 2017 in person registration requirement is a monthly hassle for Mr. Doe #20 and forces him to take off work all day, costing him that day's pay and monthly fees. TSORP 2017 restrictions and requirements have also burdened Mr. Doe #20's family. He has 2 children and 1 in the process of adoption. Due to having to be on the registry, Mr. Doe #20 is getting a divorce and his children stay with their mom an hour away from him. He is also unable to be a part of the adoption process and will not be able to be a part of that child's life. TSORP 2017 has restricted all of his activities with his family including attendance at church without gaining permission from his probation officer. Additionally, CPS has been involved in almost all aspects of Mr. Doe #20's family life. TSORP 2017 Internet reporting requirements are also a burden as well because he is not allowed to use it at all. This limits the types of jobs he can apply for and get. It also prevents Mr. Doe #20 from paying bills online and he must do everything by postal mail. From what Mr. Doe #20 has understood, he is not permitted to do anything on the Internet because of the TSORP 2017 Internet reporting requirements making it very hard for him to live in the modern world where everything is done over the Internet. Mr. Doe #20 has been forced to attend weekly counseling paying for it himself and has been told that it will take anywhere from 6 months to 2 years for me to be "cured."

**John Doe #22**

29. Mr. Doe #22 re-registers yearly. The offense he committed is Indecent Behavior with a Juvenile in Louisiana in late 1999-2000. Mr. Doe #22 was discharged in 2007 but has to register on the registry since moving to Texas. He registers/re-registers at Rusk County Sheriff's Office. In order to comply with TSORP 2017 registering/re-registering in person requirement, Mr. Doe #22 must commute anywhere from half an hour to 8 hours depending on if he is going from home or work. Not only is this time consuming but so is the registration process itself. Mr. Doe #22 has to take off from work and if he cannot then he has a difficult time of it with the commute taking up more than the process. Furthermore, TSORP 2017 housing and employment requirements and restrictions have made it impossible for Mr. Doe #22 to have stability in either. In addition, the stigma of being on the registry has caused Mr. Doe #22 much stress and anxiety because most people, including those he reports to, have already prejudged him and treat him differently. Mr. Doe #22's family have also been affected by TSORP 2017 by not allowing Mr. Doe #22 to attend activities with them, having joint custody of his son but not allowing him to live with his son. TSORP 2017 Internet requirements are also a hassle since Mr. Doe #22 is not permitted to access the Internet making it harder to do anything in this day and age. Mr. Doe #22 underwent treatment and is considered a low risk.

### John Doe #23

30. Mr. Doe #23 began registering on the Texas Sex Offender Registry in September 2011 and re-registers every year. The offense he committed is Aggravated Sexual Assault of a Minor in the summer of 2010. Mr. Doe #23 is currently on probation and must register as a condition of his probation. Mr. Doe #23 registers and re-registers at Ward County Sheriff's Department in Monahans, Texas. He discloses his travel plans to his probation officer. The stigma of being on the registry has taken an emotional toll on him since he never knows how people are going to react once they find out. Additionally, that very stigma forced Mr. Doe #23 to face eviction from a college dorm. As part of his criminal sentence, Mr. Doe #23 had to participate in group counseling but his probation officer did not believe it was helping. TSORP 2017 has been amended so many times and has forced Mr. Doe #23 to comply with each new amendment including having to take a polygraph preventing him from reintegrating back into society.

### John Doe #24

31. Mr. Doe #24 began registering on the Texas Sex Offender Registry in July 2008 and has to re-register every 3 months. The offense he committed is Sexual Assault of a Child in January 2008. He was given 5 years deferred probation in July 2008 and completed it on January 11, 2013. The excitement of being released caused him to forget to go and register with Southlake Police Department. This put him in violation of TSORP  for which he went to prison for 2 years that October and was discharged on October 1, 2015. Mr. Doe #24 registers and re-registers at the Fort Worth Downtown Police Department. TSORP 2017's in person requirement forces Mr. Doe #24 to take time out of his schedule and coordinate with his work schedule to re-register every 3 months. The commute for him is about an hour and a half round trip.

TSORP 2017 travel requirements are problematic as well for Mr. Doe #24. If he wants to go out of state, he needs to inform the state that he plans to travel toabout his plan if his stay will be longer than 7 days. Additionally, if Mr. Doe #24 wants to travel internationally, he must inform Detective Sabo so Detective Sabo can inform US Marshalls of Mr. Doe #24's plans to travel that way they can take him off the Do Not Travel list. Some countries do not allow sex offenders entry which makes this procedure more of a hassle since Mr. Doe #24 has to call the US Embassy in that country to see if he is allowed entry. This has caused him to miss vacation trips with his family if he is not permitted into that country. TSORP 2017 reporting requirements are also a hassle for Mr. Doe #24 because he must make all changes in person. Additionally, TSORP 2017 requirements have cost him housing and created problems for his family when it comes to his children. Mr. Doe #24 completed treatment and was determined to not be a risk.

**John Doe #28**

32. Mr. Doe #28 started registering on the Texas Sex Offender Registry on May 24, 1999 and has to re-register once every year for the rest of his life. The offense he committed is Indecency with a Child – Sexual Contact on June 15, 1998 and was discharged from prison on August 7, 2007. Mr. Doe #28 registers and re-registers at Odessa Police Department and TSORP 2017 requirements restrict his ability to do pretty much anything. Additionally, TSORP 2017 Internet requirements are so restrictive so Mr. Doe #28 does not even bother using the Internet. His biggest burden is TSORP 2017 in person registration requirement since he must come in physically to disclose new information within 7 days.

**John Doe #31**

33. Mr. Doe #31 began registering on the Texas Sex Offender Registry in May 2009 and re-registers annually for the rest of his life. The offense he committed is Aggravated Sexual Assault- Indecency with a Child in November of 2008. Mr. Doe #31 registers and re-registers at the city police station and get his driver's license renewed at the DPS. Registration is part of his condition for probation. The city police station has someone assigned to handle all offenders and that is whom Mr. Doe #31 meets with. The officer at the police station does not treat Mr. Doe #31 respectfully and looks at him with disgust. The person he meets with at the DPS varies and the staff at the DPS do not permit Mr. Doe #31 his rights. For instance, they tried to change Mr. Doe #31's voter status to deny him his right to vote. Additionally, as a Veteran Mr. Doe #31 should qualify for free renewals of his driver's license but that has been denied by the DPS as well. TSORP 2017 in person requirement is burdensome for Mr. Doe #31 because he must take off of work in order to go to both places with the process itself taking about 3 hours total. TSORP 2017 traveling requirements hassle Mr. Doe #31 by requiring him to report in person his travel plans within 7 days prior to traveling. Furthermore, Mr. Doe #31 must report this to his probation officer in the original probation office where his original court was held. He must also report to the probation office in the county where he currently lives. Not only does Mr. Doe #31 report to these two places but he must also report to the city office and DPS. This is a total of four places he must personally go to in order to obtain permission for anything. These requirements have severely restricted Mr. Doe #31's movement since he must get permission from two probation officers and with the new law in place, he must also report to the city police department whenever he plans to travel. The hassle of all of this has caused Mr. Doe #31 to give up traveling altogether which has distanced him from family and friends. TSORP 2017 housing requirements have restricted Mr. Doe #31's ability to get decent housing. Moreover, the stigma that surrounds the registry not only affects Mr. Doe #31 but also his family. Along with the stigma, TSORP 2017 restrictions prevent Mr. Doe #31 from attending his son's school activities even though he is a single parent and is on probation. TSORP 2017 restrictions make it difficult for Mr. doe #31 to pick up his son from school when need be. For instance, his son got sick and even though the school gave Mr. Doe #31 permission to come and pick up his son, Mr. Doe #31's probation officer told him that if he went he risked violating his probation which would revoke it. TSORP 2017 Internet requirements have forced Mr. Doe #31 to not use the Internet in order to maintain his privacy. This has prevented him from keeping in touch with family and friends. TSORP Internet requirements make it hard for Mr. Doe #31 to use the Internet for work thus forcing him to turn down better paying jobs because they required Internet usage. Mr. Doe 31 attended three group therapy sessions and a one on one with a therapist every month as part of his criminal sentence. These sessions lasted the duration of his probation and once complete, he was to be declared as "cured." Mr. Doe #31 actually switched counselors and the new counselor did not believe that it will take 10 years of counseling to become cured and released Mr. Doe #31 after a few years declaring him as "cured." The disconnect between the probation departments and the changing of the laws has caused much confusion for Mr. Doe #31 on what is required of him and makes him anxious that he may be in violation of a law and

not even know it. Additionally, since he must report to two different probation offices, both locations interpret the laws differently making it even more difficult to be in compliance. Mr. Doe #31 was never convicted of his offense and was only deferred.

**John Doe #32**

34. Mr. Doe #32 began registering on the Texas Sex Offender Registry on July 21, 2016 and re-registers annually. The offense he committed is Online Solicitation of a Minor- Sexual Conduct and discharged from prison on July 12, 2016. Registration is part of Mr. Doe #32's condition of parole and he registers and re-registers at the Midland's Sheriff's Department. Mr. Doe #32 reports to Detective Wendy Welch who is rude does not treat him as if he is a person. The registration process is extremely time consuming and can take Mr. Doe #32 one to two hours to complete all the forms which requires a good amount of recollection. Moreover, Mr. Doe #32 has to report to two different people whenever he plans to travel, parole officer Jay Stevens and Detective Welch. TSORP 2017 traveling restrictions have limited Mr. Doe #32's ability to travel anywhere. In addition, TSORP 2017 housing and employment restrictions have burdened his ability to have stable housing and a job. Mr. Doe #32 is also affected by TSORP 2017 Internet requirements as it prevents him from staying in touch with family and friends. Mr. Doe #32 was required to see a therapist and no longer needs therapy nor needs to continue attending sex offender treatment.

**John Doe #34**

35. Mr. Doe #34 started registering on the Texas Sex Offender Registry in 2006 and will have to re-register every year until he reaches the age of 41. The offense he has been accused of committing is Attempted Aggravated Sexual Assault in 2005/2006. Mr. Doe #34 registers and re-registers at Seagoville Police Department with a front desk worker. TSORP 2017 traveling requirements require Mr. Doe #34 to notify Seagoville PD 2 weeks earlier if he is moving and if he is going out of town for more than 24 hours he must check in with the police department where he is staying and also report to Seagoville PD when he gets back. TSORP 2017 housing and employment restrictions have also been a hassle for Mr. Doe #34 by preventing him from getting good jobs as well as renting out a residence. Due to this, he is currently living with his mother burdening her. Mr. Doe #34's son is also affected by TSORP since his dad is not allowed to attend his school activities and can only see him once a year. Mr. Doe #34 does not use the Internet due to TSORP 2017 Internet restrictions and the stigma surrounding the label of sex offender has prevented him from attending college.

**John Doe #38**

36. Mr. Doe #38 began registering on the Texas Sex Offender Registry in December 2015 and has to re-register annually. The offense he committed is one count of lewd behavior with a minor on or around October 1984. He has to register and re-register at Montgomery County Sheriff's Department and makes an appointment with Ms. Allen. For Mr. Doe #38, the process of registering and re-registering is not daunting physically but does take an emotional toll because of the stigma surrounding the label of sex offender. He is constantly stressed and afraid whenever he must go in to report. Not only does the process emotionally drain Mr. Doe #38 but so does the thought of having to change jobs or even moving because of the registry requirements which are extremely restrictive of Mr. Doe #38's movements. The stigma of being labeled as a sex offender has been the sole cause of Mr. Doe #38 being denied jobs. Having to be subjected to TSORP 2017 and its restrictions and requirements has been extremely humiliating for Mr. Doe #38 and has affected his ability to lead an effective life.

**John Doe #39**

Class Action Complaint Page 14 of 55

37. Mr. Doe #39 began registering on the Texas Sex Offender Registry on March 4, 2010 and has to re-register annually for life. The offense committed is Indecency on November 17, 1993 and was discharged on October 19, 2012. Registration was a condition of his sentencing but not a condition of parole. Mr. Doe #39 has to register and re-register at 8300 Mykawa Rd., Houston, Texas 77073. It takes him an hour to get to this location and he meets with whichever deputy is on duty. The process itself, takes about 45 minutes. Whenever Mr. Doe #39 moves or travels outside of where he is registered, he must inform Harris County. The re-registration process and all the disclosures that he is forced to make to be in compliance with the law are difficult to follow and have also make living life difficult. As part of Mr. Doe's criminal sentence, he underwent treatment and has since been declared as cured. Yet, he still has to be on the registry and comply with the registry laws.

**John Doe #40**

38. Mr. Doe #40 began registering on the Texas Sex Offender Registry on or about October 19, 1999 and has to re-register annually. The offense committed is Indecency with a Child on or around August 1999. Registering was a condition for his deferred adjudication probation, which was discharged on October 18, 2007. Mr. Doe #40 has to register and re-register at the Irving Police Department in Irving, Texas. He currently meets with Detective Dennis Johnson who is the one who told Mr. Doe #40 about deregistration which the previous detective never informed me about. The registration process itself is not bad but it is definitely an inconvenience. He has been denied renting an apartment years ago but his wife and Mr. Doe #40 have owned a home now for almost 10 years. He was also denied several jobs in the past because of the registry. His current employer, he believes, is not aware that he is on the registry. So there is a fear that they will find out and Mr. Doe #40 will lose his current job of 7 years. Having to be on the registry has also placed a burden on his family. In order for Mr. Doe #40 to attend certain activities that his children participated in, he had to have an approved chaperone with him. Traveling internationally has recently become an issue for him since a new law has been implemented that requires a symbol on a registered sex offender's passport. This symbol allows the government to contact authorities in another country that Mr. Doe #40 may be travelling to in order to put them on alert about his arrival and of his status as a sex offender. He recently was forced to come back from Thailand because he did not have this symbol on his passport and had traveled there since his wife is from that country. Mr. Doe #40 and his wife both went there in November of 2017 and the moment they landed they were taken into custody, denied entry, and forced to return to the U.S. the next day. The Internet requirements have forced Mr. Doe #40 to notify when he changes email addresses or get a new one for work. He also must give his password to his Facebook account and report any other social media accounts that he has. Mr. Doe #40 did go back to school to get college degrees, which he has a Bachelors and a Masters. He had to register with the campus police. As part of his criminal sentence, he underwent group therapy under the sex offender treatment program for the duration of his probation. At the end of the treatment program, it was determined that since he had completed all requirements of the program he no longer needed group therapy. Having done his time and completing all that has been required of me, Mr. Doe #40 does not understand why he is still forced to be on the registry.

**John Doe #43**

39. Mr. Doe #43 began registering on the Texas Sex Offender Registry in May 1999 and has to re-register yearly. The offense was discharged on May 24, 2005 and as an order by the judge.  He has to register and re-register at Fort Bend County Police Station, which is about 20 minutes away from his house. He meets with Officer Don Kimble. Not only is the process daunting, but also whenever he moves or travels outside of where he is registered Mr. Doe #43 must inform the sex offender officer of his whereabouts. This has restricted his ability to take trips with family and spend time with them. Due to the registry his house has been egged and the neighbors watch his movements around his house.  He cannot attend family gatherings

and feels uncomfortable going anywhere without his wife by his side. Being on the registry has also cost Mr. Doe #43's wife her life as well. Neighbors have also given her dirty looks. As part of his criminal sentence, he underwent therapy but was kicked out after 5 years because he would not admit to doing something Mr. Doe #43 says that he did not do. He was forced to take a polygraph each year and every year he passed it.

**John Doe #44**

40. Mr. Doe #44 began registering on the Texas Sex Offender Registry on October 27, 2009 and has to re-register every 90 days. The offense committed is Sexual Assault of a Minor in April 2007. Registration is part of his condition to parole and was discharged on October 27, 2014. He has to register and re-register at the Houston Police Department, 8300 Mykawa Rd., Houston, Texas 77033. The commute takes him 45 minutes to an hour and he meets with a registration officer. The process itself takes about half an hour but he has to update each time there are changes to his information. He has not been able to rent an apartment and has been forced to buy a home in an area that is rough to live in. The registry has taken a toll on his job as well. He cannot be promoted because of the registry and it has prevented him from traveling for work purposes as well. Additionally, the staff at the police department do not make the process easier. For instance, whenever Mr. Doe #44 calls to make an appointment they do not pick up and often times he is told to just come by in person and wait rather than set up a time for him. Having to be on the registry has also placed a burden on his family. He is not allowed to attend any of his son's school activities and cannot attend parent-teacher meetings. As part of his criminal sentence, he underwent treatment for 5 years and completed the program.

**John Doe #55**

41. Mr. Doe #55 began registering on the Texas Sex Offender Registry on July 27, 2005 as a condition of his probation and have to re-register annually for life. The offense he committed is Sexual Assault of a Child and has to register and re-register at Chambers County Sheriff's Office where he meets with a Sheny Wilcox. The registration process is a hassle mainly because of how time consuming. Mr. Doe #55 has to commute for a couple of days to get to this location and then the registration process itself takes about an hour. Whenever he moves or travels outside of where he is registered, he must inform Sheny Wilcox. The registry has cost him both housing and a job. Having to be on the registry has also placed a burden on his family. It has been difficult to attend school events and go on trips with his children. The registry affects all aspects of Mr. Doe 55's life including the inability to attend college. Due to the stigma of being on the Registry, he was forced to not attend. As part of his criminal sentence, Mr. Doe #55 underwent treatment for 7 years. Since his initial registration, he has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry

**John Doe #62**

42. Mr. Doe #62 began registering on the Texas Sex Offender Registry on in the later part of February of 2002 right after being discharged on February 14, 2002. He has to re-register annually. The offense committed in 1989. He has to register and re-register at Rusk County Sheriff's Department and meet with the receptionist or an officer. The process takes a while and can only be done on Tuesday or Thursday after getting one's driver's license renewed. The process is a hassle because Mr. Doe #62 has to take leave from work in order to re-register. At times he is turned away because the person who does the registration is not there forcing him to come another day. He reports his traveling plans to Rusk County Sheriff's Department. He has been denied several jobs. Mr. Doe #62 finally landed a job and worked hard to become a manager only to have to step down because of being on the registry. Having to be on the registry has also placed a burden on his family. Even though his children are all grown, their names appear on the Internet through

websites that obtain their information from the registry as well. Since his initial registration, Mr. Doe #62 has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry. What started out as a 10- year registration post discharge was changed to a lifetime sentence.

**John Doe #63**

43. Mr. Doe #63 began registering on the Texas Sex Offender Registry on September 26, 2014 and has to re-register annually. The offense committed was in 2014. He has to register and re-register at Ward County Sheriff's Department and meet with Sheriff Diesler. He reports his travel requirements to Sheriff Diesler and his probation officer. The process is difficult mainly because of how it affects his life. The registry has caused Mr. Doe #63 to be denied a job. Having to be on the registry has also placed a burden on his family. Mr. Doe is not allowed to be with his children. As part of his sentence, he has been ordered to take classes.

**John Doe #64**

44. Mr. Doe #64 began registering on the Texas Sex Offender Registry around 2012 and will be discharged in 2037. He has to re-register once every year and having to register was not part of a condition for parole when convicted. The offense committed is Aggravated Sexual Assault in 1992. He has to register and re-register at Houston Police Department on Mykawa Road. He meets with a police officer and this process can take all day or as long as 5 hours. Not only does it take long, but the officers talk down to him and do not treat him respectfully. Whenever he moves or travels outside of where he is registered, he must inform his parole officer. The requirements have restricted his movements greatly. Mr. Doe #64 has been denied housing as well as several jobs because of the registry. He has lost a job and residence because of being on the registry. Mr. Doe #64 also has to report his Internet usage.  Additionally, due to the stigma of being on the Registry attending college has been difficult for him. As part of his criminal sentence, he underwent treatment.

**John Doe #68**

45. Mr. Doe #68 began registering on the Texas Sex Offender Registry in 1994 the same year he was discharged, as a condition of his parole and re-registers annually. He has to register and re-register in downtown Dallas with an officer and parole officer. Some of the officers are nice and some are not. The process is mainly time consuming since the commute takes him about half an hour with the process only taking about 5 minutes and it is also demeaning. Not only is the process an issue, but also whenever Mr. Doe #68 moves or travels outside of where he is registered, he must inform the officers and parole officer. Having to disclose his information and being on the registry has made it very difficult to find places to live and interact with the community. He has been denied as well as lost housing and jobs because of being on the registry. Having to be on the registry has also placed a burden on his family. He cannot do anything with them. He is also restricted in the activities and events he can participate in within his Church.

**John Doe #69**

46. Mr. Doe #69 started registering after being released and re-registers annually. The offense committed is Sexual Assault on May 24, 1994. He has to register and re-register at the Local DPS and reporting office. Whenever he moves or travels outside of where he is registered, Mr. Doe #69 must inform his parole officer. Being on the registry has also limited what kind of jobs he is able to get and has been a hindrance in his ability to get hired. As part of Mr. Doe #69's criminal sentence, he was required to attend a class with a clinical psychologist and was declared no longer a threat and "cured."

**John Doe #71**

47. Mr. Doe #71 began registering on the Texas Sex Offender Registry on November 2005 while on deferred probation and re-registers annually as a condition of his parole. He was discharged September 9, 2017. He has to register and re-register at 1102 E. Kilpatrick Suite A, Cleburne, TX 76033. He reports to Detective James Novian and the process takes about half an hour to an hour. As part of Mr. Doe 71's criminal sentence, he underwent treatment and has since been declared as a low risk.

**John Doe #72**

48. Mr. Doe #72 began registering on the Texas Sex Offender Registry in 1996 after his 5 years of probation and re-registers annually. The offense committed is Indecency with a Child in 1991 and he was discharged in 2001. He has to register and re-register at the Johnson County Sheriff's Office and meet with a James Novi. The process takes about half an hour. Whenever he moves or travels outside of where he is registered, Mr. Doe #72 must inform James Novi. Having to notify every time he wants to move or travel has limited his ability to move around freely. The registry has also denied him housing and jobs. It has also cost him both housing and a job. When it comes to Mr. Doe #72's children, he cannot attend any of their school events making him miss out on everything happening in their school lives. Mr. Doe #72 currently lives alone and his landlord does not know about the registry. Mr. Doe #72 is afraid that if his landlord finds out he will be evicted. Furthermore, the registry became an issue in family court involving Mr. Doe #72's visitation rights. The Internet requirements are also an issue because he cannot communicate with his family online without officials knowing about it. The registry has definitely been a problem getting a job. Due to the stigma of being on the Registry, attending college has also been difficult for Mr. Doe #72 and he is no longer allowed to attend. He was told that he could not attend any further. As part of his criminal sentence, he underwent counseling once a week. He also had to take several polygraphs as part of this counseling. He passed every polygraph test and was declared to not be a danger to re-offend. Since his initial registration, He has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry including but not limited to giving out his own parents' information, which is a violation of their privacy. Officials have also come out to verify his information by taking pictures, which is something they did not do before. He is under constant surveillance though he has been declared as not a threat. The registry is not just a hassle but an invasion of his right to privacy.

**John Doe #74**

49. Mr. Doe #74 began registering on the Texas Sex Offender Registry on January 30, 2005 and has to re-register annually. The offense committed is Indecency with a Child on September 30, 2004. He was discharged 10 years later on September 30, 2014. Registering is a condition of his deferred adjudication and he has to register and re-register at Parker County Sheriff's Office. He meets with Deputy Kurt who treats him like a criminal. The process takes about 45 minutes and the commute is just as long making the process a hassle. Whenever Mr. Doe #74 moves or travels outside of where he is registered, he must inform Deputy Kurt. This disclosure has limited Mr. Doe #74's movement and it is extremely embarrassing for him. He has been denied a job because of the registry. The Internet requirements have affected his job due to the reporting requirements. As part of his criminal sentence, he underwent treatment and has since been declared as rehabilitated and not a threat to society. Since Mr. Doe #74's initial registration, he has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry including but not limited to his vehicle information.

**John Doe #75**

50. Mr. Doe #75 began registering on the Texas Sex Offender Registry on or around June 30, 2004 and has to re-register once a year. The offense committed in September 2003. His probation began June 24, 2004 and was discharged June 23, 2014. He has to register and re-register at police headquarters 911 North

Raynor, El Paso, TX 79903. It takes him about half an hour to get to the police department and meet with what is known as the SORT department in the basement of the building. The process is difficult because it is so much personal information to disclose and they take his fingerprints and picture so it feels like being arrested all over again. Whenever Mr. Doe #75 moves or travels outside of where he is registered, he must inform the SORT department. The traveling and residential requirements have made it hard for him to move around freely and has restricted where he can live. He has been denied renting of a more suitable apartment. Mr. Doe #75 has been denied three jobs because of the registry. It also cost him a job at the El Paso Community College where he was hired and then fired because he had to report to the campus police. Due to the stigma of being on the Registry, attending college has also been difficult because fellow peers do not talk to him once they find out he is on the registry. The stress from this caused his grades to suffer.  As part of his criminal sentence, Mr. Doe #75 underwent therapy.

**John Doe #76**

51. Mr. Doe #76 began registering on the Texas Sex Offender Registry on or about July 2, 2010 and has to re-register annually. The offense he was charged with is Aggravated Sexual Assault of a Child around May 5, 2008. Registering is a condition of his probation, which he is set to discharge on July 1, 2020. He has to register and re-register at the Pecos Police Department and meet with Anna the Chief of Police Secretary. The process is a hassle because it is time consuming. It takes close to half an hour to get to Pecos PD and then about half an hour filling out the forms. Whenever he moves or travels outside of where he is registered, Mr. Doe #76 must inform both Pecos PD and the Community Supervision and Corrections Department. The restrictions from the registry have not only limited his ability to move around freely but have also caused him to lose jobs and housing. Additionally, having to be on the registry has placed a burden on Mr. Doe 76's family. He cannot attend any of his daughter's school activities and cannot attend family trips or anything without getting permission. He also cannot have a social media account due to TSORP 2017 Internet restrictions and requirements. As part of his criminal sentence, he must take counseling classes.

**John Doe #77**

52. Mr. Doe #77 began registering on the Texas Sex Offender Registry in July 2015 and has to re-register once a year. The offense committed is Indecency with a Child on August 9, 1985. He was discharged from probation March 27, 1992. He has to register and re-register at Johnson County Sheriff's Office and meet with Detective J. Novian who always talked down to him. It takes about 45 minutes to get to the sheriff's office and the process itself can take anywhere from an hour to an hour and a half. While there, Mr. Doe #77 has to get his picture taken and the officers verify if there are any new marks on his body. In addition, whenever he moves or travels outside of where he is registered, Mr. Doe #77 must inform Detective J. Novian. The traveling requirements have restricted his movement greatly. The registry has also been a problem for Mr. Doe #77 when it comes to housing and getting a job. He has lost both and been denied both. As part of his criminal sentence, Mr. Doe #77 underwent treatment and was released.

**John Doe #79**

53. Mr. Doe #79 began registering on the Texas Sex Offender Registry on August 9, 2011 and has to re-register annually. The offense committed is Aggravated Sexual Assault on September 1, 1997. He was discharged on August 8, 2011 and registering is a condition of his parole. He has to register and re-register at Dawson County Sheriff's Office and meets with Josh Peterson.

**John Doe #83**

54. Mr. Doe #83 began registering on the Sex Offender Registry in 1998 as soon as he was released that same year. He had to re-register annually for 10 years only while in Kansas. However, since moving to Texas, he now must register for life. The offense committed is a 1996 case. Registering was a condition of his probation but he completed it in Kansas and was sent a letter from the state of Kansas stating that they released him from the registry.  He has to register and re-register at the Haltom City Police Station in Haltom City, Texas and meets with Detective Barton. The registry has made it hard for him to move freely and has been hard for him to find stable housing forcing Mr. Doe #83 to live in a hotel for some time. The registry also cost him jobs by denying him job opportunities as well as making him lose a job when his registry information was listed in the newspaper. When his employer at the time saw it, they fired him. Mr. Doe #83 could not even collect unemployment. The registry has made even attending church a problem.  He has attended the same church for more than 20 years and this year Mr. Doe #83 was required to sign a release about his status. Due to the stigma of being on the Registry, attending college has also been difficult for him. He has attended treatment as part of his criminal sentence. When it comes to complying with the new amendments, Mr. Doe #83 never knows about the new laws until he is accused of violating them. For example, Mr. Doe #83 did not know that he had to renew his driver's license every year. Since his initial registration, he has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry.

**John Doe #85**

55. Mr. Doe #85 began registering on the Texas Sex Offender Registry on September 10, 2009 and has to re-register annually for life. The offense committed occurred on June 5, 2007. He took a plea bargain agreement and was released on October 4, 2016. Mr. Doe #85 has to register and re-register at Houston Southeast Jail 8300 Mykawa Rd. Houston, TX 77048 and meets with a police officer after scheduling an appointment. The commute takes about half an hour with the process itself taking about 2 to 3 hours because of the waiting time before. Whenever he moves or travels outside of where he is registered, Mr. Doe #85 must inform his probation officer as well as the police department. His movements have been restricted severely and forced him to not take vacations longer than 2 days. The registry has also burdened his ability to have a stable home. Mr. Doe #85 actually purchased a house after getting permission from Harris County for it and then was prevented from living there because a new city ordinance had passed which would not allow him to live there. Mr. Doe #85 went through the proper channels and sent the paperwork from Harris County to Galena Park Police Department and was told by Galena Park PD that if he was caught on the residence, they would press charges. He has to live in a trailer home with his father and is still paying mortgage on a house that he cannot live in. Additionally, he has also lost a job because of the registry. As part of his criminal sentence, Mr. Doe #85 underwent treatment and successfully completed it.

**John Doe #87**

56. Mr. Doe #87 began registering on the Texas Sex Offender Registry on March 26, 2003 the day after he was discharged and has to re-register annually. The offense committed is Sexual Assault on February 7, 1993. Registration is a condition of parole and he has to register and re-register at the Houston Police Department on Mykawa Road. Mr. Doe #87 discharged parole in 2003. He understood that at the time of his plea bargain agreement the Texas registry law only gave him 10 years to register after his discharge. However, after being discharged Mr. Doe #87 was placed on a lifetime registry. The commute takes about half an hour and then he has to wait for some time before an officer will see him. He is disabled and does not work. As part of his criminal sentence, he underwent treatment and has since been declared as low risk. He is a disabled veteran with an honorable discharge.  Mr. Doe #87 cannot live with his wife and instead lives with his cousin to keep from being homeless.  He continues to be harassed by officers who threaten to arrest him for Failure to Register.  The officers treat his time to re-register as a game and continually

threaten him.  Mr. Doe #87 has shown up to register and was given different dates. This confusion led to Mr. Doe #87's failure to register charge.

**John Doe #89**

57. Mr. Doe #89 began registering on the Texas Sex Offender Registry in January 2005 and have to re-register annually. Registration is a condition of my parole and was discharged from parole on January 7, 2013. The offense committed is Solicitation of a Minor with the Intent to Commit Indecency with a Child by Contact on July 23, 2003. He has to register and re-register at Tyler Police Department and speak to a detective. The initial registration took hours. The registration process is time consuming. The residential requirements are also a pain. Officers sometimes come out to make sure that he resides at his listed residence.  This is problematic and humiliating as they come by at any time of the day or night.  Whenever Mr. Doe #89 moves or travels outside of where he is registered, he must inform Tyler PD. Being on the registry has also been an issue because of neighbors posted up the sex offender postcards that had his picture on it so those in the neighborhood would know that he was on it forcing his family to live in less reputable places. Mr. Doe #89 has been denied several good jobs and lost several good jobs because of the registry. As part of his criminal sentence, he is undergoing treatment and has been told that treatment will be lifelong. The registry as it is right now is extremely burdensome and restrictive.

**John Doe #90**

58. Mr. Doe #90 began registering on the Texas Sex Offender Registry on October 31, 2015 and has to re-register annually for the rest of his life. The offense committed is Sexual Assault of a Child in 2014. He has to register and re-register at Alice Police Department and DPS and meets with Officer Lando Hasso to complete the re-registration process, which takes about an hour. This process is difficult and is not made easier since he has to report when he travels or moves. He has lost a job as well as been denied several jobs because of being on the registry. There is so much stigma surrounding the label of sex offender that once people find out that he is on the registry, they start talking about him and making him feel uncomfortable. Having to be on the registry has also placed a burden on his family. Mr. Doe #90 cannot go anywhere with his children without permission and cannot attend any of his children's school activities. The Registry's Internet reporting requirements are also a burden because they are so intrusive. He has to disclose his online accounts as well as the passwords to those accounts. As part of his criminal sentence, he is currently undergoing treatment through the sex offender treatment program.

**John Doe #92**

59. Mr. Doe #92 began registering on the Texas Sex Offender Registry in May 1997 as a condition of his probation and re-registers annually. The offense committed is Indecency with a Child on May 12, 1997. He was discharged in May 2007 and has to register and re-register at Fort Bend County in Richmond, Texas. Mr. Doe #92 meets with the Deputy Constable. The process for registering and re-registering takes about an hour with the commute included. He reports his traveling and moving requirements to Fort Bend County as well. The registry has cost him many customers. Mr. Doe #92 is part owner of an oil and gas service company and competitors use this against his company. This has lost the company much revenue and employees as well. Not only are Mr. Doe #92's partners and employees affected by him being on the registry, but also his family has been affected.  His wife gets harassed at work, his children are bullied at school, and he cannot attend any of their sport activities or school activities. The registry has burdened Mr. Doe #92 and his family a great deal. Due to the stigma of being on the Registry, attending college has also been difficult for him. As part of his criminal sentence, he also underwent treatment.

**John Doe #93**

60. Mr. Doe began registering on the Texas Sex Offender Registry on October 25, 1996 as a condition of his parole, which he was discharged from in October 2006. He re-registers annually for the offense he committed which was having sex with a minor on February 10, 1993. Mr. Doe #93 was 17 at the time and was intimate with someone 3 years younger than him. He has to register in Belleville, Texas at the local sheriff's office and re-register in Wallis, Texas where he goes to renew his driver's license. Whenever he goes to the sheriff's office, he meets with a detective who does the registrations for the county. The detective treats him like a criminal and a second class citizen. In addition, whenever Mr. Doe #93 moves or travels outside of where he is registered, he must inform the detective about it. The registry has also burdened his ability to have a stable home by denying him places to stay as well as the buying of a home. The registry has also cost Mr. Doe #93 jobs. Additionally, having to be on the registry has also placed a burden on Mr. Doe #93's family. This has burdened his children greatly because they cannot have their father come eat lunch with them at school nor have their friends over. Due to so much stigma surrounding the registry as well as Mr. Doe #93's label as a sex offender, both he and his family have had to move to the country side because so many apartments in town are close to schools. Furthermore, the Registry's Internet reporting requirements are a burden because he is not allowed to use it and can only do so when his wife supervises. As part of his criminal sentence, Mr. Doe #93 underwent treatment and has since been declared as "cured."

**John Doe #94**

61. Mr. Doe #94 began registering on the Texas Sex Offender Registry on May 2, 2003 as a condition of his probation and re-registers annually. The offense he committed is Indecency with a Child by Sexual Contact on May 8, 2002 and was discharged on May 18, 2010. Mr. Doe #94 registers/re-registers at Haltom City Police Department in Haltom City, Texas and meets with Detective Barton and the process takes about half an hour to 45 minutes. Mr. Doe #94 has to report whenever traveling outside of the US so Detective Barton can inform other countries of his travel plans. Additionally, having to be on the registry has placed a burden on Mr. Doe #94's family. Due to the Internet restrictions, he uses the Internet as little as possible and only uses it at work where it is needed. As part of his criminal sentence, Mr. Doe#94 underwent treatment and therapist.

**John Doe #96**

62. Mr. Doe #96 began registering on the Texas Sex Offender Registry in December 2008 as a condition of his parole and re-registers annually. The offense he committed is Indecency with a Child in December 1991 and was discharged in 2002. He has to register and re-register at Midland County Sheriff's Office and meet with someone who works in Records who deals with those who live outside of the county. The process is time consuming and can take anywhere from an hour to two hours depending on the individual that he sees. Mr. Doe #96 reports his traveling information to the person who works in Records as well. He has lost jobs and been denied jobs because of the registry. The process is difficult mainly because of the stigma surrounding the label of sex offender. The Registry's Internet reporting requirements are also a burden because it has affected his ability to stay in touch with family and friends. As part of his criminal sentence, Mr. Doe #96 underwent treatment and has since been declared as not a threat for re-offending.

**John Doe #104**

63. Mr. Doe #104 began registering on the Texas Sex Offender Registry in December 1998 as a condition of his probation and has to re-register every 90 days for life. The offense he committed is Sexual Assault of a Child on March 23, 1998 and was discharged November 22, 2006. Mr. Doe #104 has to register and re-register at the Harris County Sheriff's Office at the Houston Police Department Southeast Station. The commute to this location makes the process more of a hassle because it can take up to an hour depending on traffic to get there. Mr. Doe #104 meets with a deputy by appointment only and the wait time is time

consuming. It can take 30 to 40 minutes including the wait time. Additionally, whenever he moves or travels outside of where he is registered, Mr. Doe #104 must inform his probation officer by preparing a typed letter that is to be presented to the judge for approval. The typed letter has to include his reasons for traveling. Mr. Doe #104's family has been impacted by the registry as well. Mr. Doe #104 has missed out on his children's school and community activities. Furthermore, during his 8 years of probation, he lost thousands of dollars because he was not allowed to leave Harris County forcing him to miss conferences, conventions, and seminars that were held outside of Harris County. Mr. Doe #104 has attended classes every week for 8 years and paid for each session out of his own pocket. He has successfully completed the course.

**John Doe #105**

64. Mr. Doe #105 began registering on the Texas Sex Offender Registry in October of 2007 after transferring from Michigan and has to re-register annually. The offense committed is Assault to Commit Great Bodily Harm- Criminal Sexual Assault 2nd Degree in 1993. Mr. Doe #105 was discharged in 1998 and registers and re-registers at the Fannin County Sheriff's Department where he meets with Sheriff Deputy Peggy Hicks who treats him like a criminal. Whenever Mr. Doe #105 moves or travels outside of where he is registered, he must inform County Sheriff's Department. The restrictions and disclosures of the registry are so constraining and have cost him a lot. It even cost Mr. Doe #105 his trailer home.

**John Doe #106**

65. Mr. Doe #106 began registering on the Texas Sex Offender Registry on April 1, 2000 and has to re-register annually. The offense committed is Burglary of a Habitation with the Intent to Commit Another Felony in October 1982. Mr. Doe #106 was discharged on May 13, 2013 and registers/re-registers at the local police station with a designated officer whose treatment of him varies on the officer he sees. The commute can be long since the police station is about 10 miles from him and the process itself can take half an hour making it time consuming. It is also difficult to get an appointment with the police station, which must be done before he can go and personally re-register. Whenever he moves or travels outside of where he is registered, he must inform a designated officer. This has limited his movement greatly and has also burdened his ability to have stable housing and a job. Mr. Doe #106 has lost and been denied both because he is on the registry. The Registry's Internet reporting requirements have also affected him. As part of his criminal sentence, he underwent treatment and was declared as okay.  When he was forced to start registering in 2000, Mr. Doe #106 had to go through the treatment program once again in 2006.

**John Doe #110**

66. Mr. Doe #110 began registering on the Texas Sex Offender Registry on February 28, 2002 as a condition of his probation and has to re-register every 90 days. The offense committed is Aggravated Sexual Assault in November of 2000 with a discharge on February 28, 2007. Initially, he had to register at the police department but now registers and re-registers at the sheriff's department. The process at the police department took up to 2 hours while at the sheriff's it takes close to an hour. At both locations, the officers treat him disrespectfully. Having to disclose his traveling plans and moving plans has also been a hassle. The moving restrictions have limited where he can live and before Mr. Doe #110 can travel, he must notify the sheriff's department as well as the probation office. Additionally, he has to report this information to the DPS as well. Being on the registry has cost Mr. Doe #110 both jobs and housing making it even more burdensome for him. Furthermore, having to be on the registry has placed a burden on his family by not permitting him to attend his children's school activities without permission. Sometimes officers come banging on his door to make sure he lives there and this causes a scene. As part of his criminal sentence, he attended counseling twice a week for 5 years and completed the course.

**John Doe #111**

67. Mr. Doe #111 began registering on the Texas Sex Offender Registry in October 2002 as soon as he was discharged and has to re-register annually. The offense committed is Indecency with a Child when he was 19 with a 15 year old who he was in a relationship with. The offense was then changed by the court to Sexual Assault and occurred in 1988. He has to register and re-register at Fayette County Sheriff's Office and meet with Barbara Anders, the secretary. This year they changed whom Mr. Doe #111 sees and he now meets with Detective Angela Lala. The whole process including the commute takes about an hour. Additionally, whenever he moves or travels outside of where he is registered, he must inform the same person he re-registers with. The registry has cost Mr. Doe #111 jobs. For instance, he had been hired and then fired once the paperwork had been done because they found out about his name being on the registry. Having to be on the registry has also placed a burden on his family with ambiguous restrictions. Mr. Doe #111 was told as long as he checked in with the school office, it is fine for to be on the school campus. However, another time he was told he was not allowed to attend any school functions. He was also told that he can attend after school functions but school functions had to be approved of by the school.

**John Doe #112**

68. Mr. Doe #112 began registering on the Texas Sex Offender Registry after being released from parole. Registering is a condition of his parole and he has to re-register annually. He registers and re-registers at Lamar County Sheriff's Office in Paris, Texas and meets with the sheriff deputy in charge of sex crimes and these guys are normally not very nice and treat him callously. Whenever he moves or travels outside of where he is registered, he must inform the sheriff deputy and the sex offender registration officer. The registry has made it hard for Mr. Doe #112 to do his job as well. His jobs are in random locations and he has to report every job and every location. This makes it hard for him to notify the sheriff's department and change his status in time in order to accept or refuse a job. He has been forced into the countryside to make sure he stays in compliance. Mr. Doe #112 has lost jobs as well by losing businesses because of the registry. Additionally, having to be on the registry has also placed a burden on his family by limiting the amount of activities he can attend and participate in with them. As part of his criminal sentence, he underwent treatment and his counselor wrote a letter to the judge requesting that he no longer be required to attend as the counselor believed Mr. Doe #112 was no longer a threat.

**John Doe #113**

69. Mr. Doe #113 started registering on the Texas Sex Offender Registry on May 5, 2011 and has to re-register annually. The offense committed is Aggravated Criminal Sexual Abuse on January 5, 2002. He has to register and re-register at Medina County Sheriff's Department in Hondo, Texas and renew his driver's license at the DPS in Castroville, Texas. Since he has to go to different locations in two different towns, Mr. Doe #113's commute is quite time consuming. The DPS itself is 25 miles from his home. When he goes to re-register, he meets with the sex offender registration clerk, Cindy Sandoval, who treats him poorly. Renewing his driver's license is humiliating for Mr. Doe #113 as well because he has to do it yearly and the clerks know it is because of the registry status. The traveling requirements are burdensome as well because it is difficult for him to take his children on vacations or to visit family. Additionally, the registry has cost Mr. Doe #113 one of his training facilities. A client found out he was on the registry and made it their mission to tell other customers of his about it. Mr. Doe #113 lost a month's worth of income from that incident. Since his initial registration, Mr. Doe #113 has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry statute including but not limited to now having to submit his DNA specimen and fingerprints.

**John Doe #115**

70. Mr. Doe #115 began registering on the Texas Sex Offender Registry in August 1986 and has to re-register annually. The offense committed occurred in 1978 and he was discharged in February 1982. He has to register and re-register at the sheriff's office and meet with a sheriff deputy who treats him poorly. Mr. Doe #115's commute is about an hour and the process takes about 30 minutes making it time consuming. Mr. Doe #115 also reports traveling and moving information to the sheriff deputy. The traveling requirements have affected him by restraining his movements greatly. Furthermore, the registry has cost Mr. Doe #115 jobs and housing.

**John Doe #123**

71. Mr. Doe #123 began registering on the Texas Sex Offender Registry the day after he was discharged on April 7, 2006 and has to re-register annually. The offense he committed is Aggravated Sexual Assault of a Child in January 1999. He has to register and re-register at the sheriff's office in Bowie County, Texas and meet with the sheriff's secretary. Whenever he moves or travels outside of where he is registered, Mr. Doe #123 must inform the sheriff's office. The traveling requirements have limited his ability to travel for work as well as for vacations or even weekend trips. The registry has also been a burden when it comes to renting or buying residences because it limits where he is able to rent and buy. It has also affected what jobs he can be hired for. Mr. Doe #123 cannot apply for state and federal jobs.

**John Doe #124**

72. Mr. Doe #124 began registering on the Texas Sex Offender Registry on July 20, 2014 as a condition of his parole and have to re-register annually. The offense committed is Aggravated Sexual Assault in October 1990 and was discharged on July 17, 2014. He has to register and re-register at Harlingen Police Department and meet with a detective. The whole process including commute takes him about an hour to complete. Whenever he moves or travels outside of where he is registered, Mr. Doe #124 must inform the parole office and give a detailed description of the routes he takes. His parole officer has to approve the routes and he can only go to approved places that are deemed necessary. For instance, his medical and necessities can be bought in Walmart and Lowes however he is not allowed to go to Sam's Club and HEB. He also has time restraints when he goes shopping and can only go for 2 hours. The Registry's Internet reporting requirements are a burden as well because it has affected the way he communicates to others as well as what he is permitted to do over the Internet. As part of Mr. Doe #124's criminal sentence, he took 4 years of monthly therapy sessions. Since his initial registration, Mr. Doe #124 has had to disclose more and more information with each amendment made to the Texas Sex Offender Registry including but not limited to the restrictions on Mr. Doe #124's medical and necessity businesses making the registry extremely intrusive.

**John Doe #125**

73. Mr. Doe #125 began registering on the Texas Sex Offender Registry on February 21, 2007, a few days after being discharged on February 15 of that same year and re-registers annually. The offense committed is Sexual Assault on September 8, 1993. Mr. Doe #125 registers and re-registers at the police station at 8300 Mykawa Road in Houston, Texas 77048 and meets with an officer on duty who acts indifferently. The total time for the process and commute is about an hour. The process can be easy or difficult depending on the officer's mood. Whenever he moves or travels outside of where he is registered, he must inform the sex offender unit making it a hassle. The registry has also limited Mr. Doe #125's activities with his family.

**John Doe #126**

74. Mr. Doe #126 began registering on the Texas Sex Offender Registry on March 3, 2010 and has to re-register annually for life. Originally, it was for 10 years and then changed to Lifetime by the El Paso Police Department. When asked why, the officer told him that their boss made them change it. The offense committed is Indecency with a Minor-Exposure on April 17, 2007 with a discharge on January 5, 2015. Initially, Mr. Doe #126 had to register in Houston, Texas then it was El Paso, Texas. Currently, Mr. Doe #126 registers in Fort Bend County where he meets with the sheriff. The entire process has always been time consuming for Mr. Doe #126. The treatment received while registering was so bad that it made Mr. Doe #126 uneasy whenever he had to go in and register.  The registry has also caused Mr. Doe #126 problems when it comes to housing by getting him evicted from a rental property. Additionally, the registry also created a rift between Mr. Doe #126 and his family. The stigma surrounding the registry has caused him much humiliation as well. Cars have actually stopped in front of his house in order to take pictures and his neighbors making things worse by not being friendly.

**John Doe #127**

75. Mr. Doe #127 began registering on the Texas Sex Offender Registry on March 13, 2013 a few days after he was released and has to re-register annually for the rest of his life. The offense was a Sex Offense and when he was released, he was released with a good amount of stipulations since the registry was a condition of parole. Mr. Doe #127 registers in Dallas, Texas with the whole process taking about 2 hours. Whenever Mr. Doe #127 moves or travels outside of where he is registered, he must inform law enforcement, his parole officer, and law enforcement of the place he is traveling to. It is a burden to have to report to so many people. The registry has also been a hassle when it comes to having stable housing and a job. He has lost both and been denied both. Once, Police officers showed up at his work place just to inform his boss that Mr. Doe #127 is on the registry. His boss then fired Mr. Doe #127. Having to be on the registry has also placed a burden on his family. He has grandchildren and cannot go near them. He is also not allowed to attend events with his family and school activities. He has also been forced to vacate his apartments because of the registry. The registry Internet requirements do not allow him to use the Internet at all. As part of his criminal sentence, Mr. Doe #127 took a sex offender class and attended once a week for 4 years paying out of his own pocket everything that was required in order to complete it.

**John Doe #129**

76. Mr. Doe #129 began registering on the Texas Sex Offender Registry as soon as it started and has to re-register annually. The offense he committed is Indecency with a Child on April 1, 1988 and was discharged March 5, 1999. He has to register and re-register at the police department in Paris, Texas and meet with the Investigator, Curtis Garrett. Mr. Doe #129 reports his traveling information to him as well. The registry has not only cost Mr. Doe #129 a job but his spouse has also lost her job. Additionally, having to be on the registry has also placed a burden on Mr. Doe #129's children. Mr. Doe #129 was not able to attend his children's activities while they were growing up and now can't attend his grandchildren's school events. As part of his criminal sentence, Mr. Doe #129 underwent counseling and paid for it out of his own pocket as a condition of his probation. Since the initial registration, Mr. Doe #129 has had to disclose more and more information with each registry statute amendment as well as comply with whatever new requirements the registry imposes. Recently, he went in to re-register and was told that he had to renew his driver's license annually.

**John Doe #132**

77. Mr. Doe #132 began registering on the Texas Sex Offender Registry on March 30, 1999 and has to re-register annually. The offense he committed is Sexual Assault on February 20, 1993 and was then discharged on February 20, 2000. Mr. Doe #132 has to register and re-register at the Midland Police

Department and meets with an officer who treats him degradingly. Mr. Doe #132 also reports his traveling plans to Midland Police Department. Having to report everything has slowed things down when it comes to traveling anywhere or moving anywhere. The registry has also cost him jobs and housing as well as placed a burden on his family.

**John Doe #133**

78. Mr. Doe #133 began registering on the Texas Sex Offender Registry somewhere in 1998 and has to re-register annually. The offense committed is Indecency with a Child 2nd Degree in 1998. He has to register and re-register at Tyler County Sheriff's Department and meets with whoever is assigned to the registration desk. The officers treat Mr. Doe #133 rudely and are demeaning. The process is difficult because he is uneducated. Mr. Doe #133 must also report his travel plans to Tyler County Sheriff's Department and because of this, he limits traveling as much as he can. The registry has also cost him jobs and housing. As part of his criminal sentence, he has completed counseling. For Mr. Doe #133, the registry is difficult both physically and mentally.

**John Doe #135**

79. Mr. Doe #135 began registering on the Texas Sex Offender Registry in 2007 as a condition of his parole and has to re-register annually. The offense he committed is Sexual Assault in 2007 and was discharged November 11, 2013. He has to register and re-register at the sheriff's office in Lubbock, Texas and meets with Criminal Analyst Rebecca Entringer who is stern when dealing with Mr. Doe #135. Mr. Doe #135 reports his travel plans to not only Ms. Entringer but also to a sex offender officer as well. Having to disclose all of this information has affected Mr. Doe #135's ability to have stable housing and a job. The reporting process is emotionally draining for Mr. Doe #135. Additionally, having to be on the registry has placed a burden on Mr. Doe #135's family by not permitting him to attend any of his children's activities. The registry restrictions take it even further by not allowing Mr. Doe #135 to see his children without approval and getting that approval is not easy. Once Mr. Doe #135 gets that approval, he is forced to stay in one place, such as the children's home and cannot take them anywhere. The Registry's Internet reporting requirements are also a burden because it has affected Mr. Doe #135's ability to use social media since everyone who knows him has to know his situation. Furthermore, the Internet requirements have affected his ability to gain employment. As part of his criminal sentence, Mr. Doe #135 took classes and had to obtain certifications stating that he was cured.

**John Doe #136**

80. Mr. Doe #136 began registering on the Texas Sex Offender Registry on September 16, 2003 as a special condition of parole and has to re-register annually. The offense was on August 9, 1979 discharged on September 13, 2003 and will be discharged from mandatory supervision on October 1, 2019. Mr. Doe #136 has to register and re-register at Houston Police Department and meet with the police officer assigned to the sex offender division. The registration process can be difficult because it is time consuming and can take about 2 hours with the commute time. Not only is the registration process daunting, but also whenever he moves or travels outside of where he is registered, Mr. Doe #136 must inform his supervising parole officer. Getting a decent residence has also been an issue because even low income housing are doing background checks and have denied his applications. Mr. Doe #136 has also lost jobs, good jobs, because of the registry. Having to be on the registry has also placed a burden on his family by not allowing Mr. Doe #136 to attend any of his  daughter's activities. He does not want his daughter to be associated with the registry in anyway so he has been deterred from attending anything that deals with her and her school. Mr. Doe #136 is also not allowed to leave the county without permission making things even more burdensome. The Registry's Internet reporting requirements are a burden because it has affected the way he

communicates to others as well as what he is permitted to do over the Internet. Mr. Doe #136 attends counseling classes as part of his criminal sentence.

**John Doe #137**

81. Mr. Doe #137 began registering on the Texas Sex Offender Registry in 1991 and has to re-register annually. The offense committed is Indecent Exposure in 1984 with a discharge in 1998. Registering is not a condition of Mr. Doe #137's parole. He has to register in Cleburne, Texas and meets with a detective who treats him like a criminal. The location is 26 miles away from Mr. Doe #137 and therefore makes the process time consuming. Whenever Mr. Doe #137 moves or travels outside of where he is registered, he must inform the detective. The registry has cost him a job that he had for 12 years as a supervisor. Mr. Doe #137 has undergone counseling and completed it.

**John Doe #139**

82. Mr. Doe 139's disposition date was in 1990 and registers at the Harris County Sheriffs Office, 8300 Mykawa Road, Houston, Texas 77048. There continues to be miscommunication between officers in Houston and Pearland when he requested to move making the registry process quite difficult. Registration is difficult because registration officers in Houston and Pearland always provide Mr. Doe #139 with conflicting requirements for registration. He was told one thing about visiting and his friend was told something totally different. These discrepancies make traveling anywhere nearly impossible. Mr. Doe #139 has been denied renting or buying of a house because of the registry. He lived on his brother's property for 9 years renting a room but was forced to leave because of the registry. Specifically, because there were complaints from other tenants on this property about his risk level and sex offender surveillance and tracking. Every move of Mr. Doe #139 made from waking to going to sleep was monitored. Neighbors and police would use the Nextdoor app to communicate his movements. The registry and all the constant surveillance has created this huge network of people who know of his whereabouts making the harassment quite obvious. Mr. Doe #139 has been suffering extreme stress because of the constant harassment he faces. This stress has, in fact, been a catalyst in creating more health related issues for Mr. Doe #139. Additionally, the registry has caused Mr. Doe #139 to lose a job of 10 years as well as his residence all because he visited a residence in Pearland, Texas more than 9 times in one year. No sex offender treatment was required upon release because Mr. Doe #139's entire sentence was served before release. However, he went to a professional on his own and was evaluated for a year with the professional determining that he was not a risk to the public. Yet, after more than 30 years later his risk level was just recently lowered from High Risk to Moderate. According to a Risk Assessment Officer who worked in Texas prisons, Mr. Doe #139 should never have been identified as High Risk.

**John Doe #140**

83. Mr. Doe #140's disposition date was in 1987 for sexual assault. He began registering August 8, 2000 as a condition of his parole. Mr. Doe #140 registers annually at the Jim Wells County Sherriff's Office in Alice, Texas. The process is difficult for Mr. Doe #140 because he has to go into work late when he has to register and his work site is 58 miles from his house. Mr. Doe #140 misses approximately 4-6 hours of work whenever he goes to re-register. He is also required to go to the Texas Department of Public Safety Driver License and renew his driver's license prior to registration each year which can also be time consuming depending on whether the computers are working and the number of people at the office. Mr. Doe #140 can easily spend one to two hours at the DPS because of this. The meeting with the Jim Wells officer is approximately 45-60 minutes. Not only is the registry process a hassle for Mr. Doe #140 but those he encounters do not make things easier. Whenever Mr. Doe #140 goes to the DPS, DPS workers act rudely, degradingly, and insultingly towards him. Additionally, the registry has burdened Mr. Doe #140's family

by not allowing Mr. Doe #140 to spend quality time with his children. His family has had to suffer ridicule and unfair treatment because of his offense. Mr. Doe #140 has also been denied renting or buying of a house because of registry. The registry has also affected jobs of his. For instance, an employer refused to pay him or even talk to him concerning his wages due to him disclosing that he was on the registry. As a pro rodeo rider  it has been difficult for Mr. Doe #140 to participate as there are often no places to register. The stigma surrounding the registry has affected Mr. Doe #140 and his family in devastating ways. He has had people drive up and curse at him and his family. His children have also been bullied and degraded to the point where they both attempted suicide. Mr. Doe #140 has participated in several groups for sex offender treatment.

**John Doe #143**

84. Mr. Doe #143's disposition was in 1993 and was discharged for Indecency with a Child, wherein he received Deferred Adjudication and registers annually. He has had to register with the Upshur County Sheriff and Red River County Sheriff.  Registration in Upshur takes about 15-minutes and 3 hours in Red River County. The registration process is easy in Upshur and scary in Red River County. The registry disclosure affects everything that Mr. Doe #143 does. He has been denied renting or buying of a house and has lost a job as well. The registry affects Mr. Doe #143's attendance with family at non-school related sports, family trips, church etcetera since he is not allowed to be around children. Mr. Doe #143 was also not allowed to raise his children nor allowed to attend their school activities. Additionally, the registry has affected Mr. Doe #143's usage of Internet at work because he cannot use the computer and can only text. Mr. Doe #143 has attended sex offender treatment.

**John Doe #144**

85. Mr. Doe #144's disposition date was in April of 1991 before the Texas Sex Offender Registry was enacted. The state made registering a condition of his parole. He was discharged in 2007 and still has to register.  Mr. Doe #144 registers at the Delta County Sheriff's Department in Cooper, Texas. As a result of the registry's 90 day registration requirement, Mr. Doe #144 lost a job at Covidien in 2008. Mr. Doe #144 participated in sex offender treatment with Cline T. Davis a licensed professional counselor/ licensed sex offender treatment provider.

**John Doe #145**

86. Mr. Doe #145's disposition was in 1993 and was discharged in 2001 for Indecency with a Child and annually registers in Fort Worth, Texas. The registration process takes about 30-minutes and is difficult. The registry disclosure affects everything that he does. He has been denied renting or buying of a house because of the registry. Mr. Doe #145 has also lost a job because of the registry. Additionally, the registry affects Mr. Doe #145 attendance with his family at school events, non-school related sports, family trips, church etcetera. Mr. Doe #145 cannot even use the Internet for work purposes because of the registry's Internet restrictions and requirements.

**John Doe #150**

87. Mr. Doe #150 was discharged in 2006 and has to register annually at 7200 Mykawa Rd in Houston, Texas with a Harris County Sheriff. The registry process takes about 30-45 minutes and is very restrictive for Mr. Doe #150. He has been denied renting or buying of a house and employers have made the disclosure requirements shameful and intimidating. Mr. Doe #150 also cannot participate in school activities with his child because of the registry. Not only that but the registry has affected attendance with his family at non-school related sports, family trips, and church etcetera. Mr. Doe #150 even lost visitation rights when the

status as a sex offender was brought up in family court. The registry has also limited his Internet usage. While in prison, Mr. Doe #150 received sex offender treatment and was rated as a low risk.

**John Doe #151**

88. Mr. Doe #151's disposition was October 3, 1991 and discharged on September 2, 2002 for the charge of Indecency with a Child-Third Degree. He started registering annually on the Texas Sex Offender upon release on July 23, 1994. Once home, Mr. Doe #151 started registering at Bastrop Police Department until he moved in 2018. On January 1, 2018, he was told by Marble Falls Police that he must have a release/transfer form from Bastrop before registering in Marble Falls or risk trouble with the Texas Sex Offender Registry. He did not know, so he quickly went in Bastrop to get what was needed to comply with the registry and then re-register in Marble Falls as required. The Marble Falls officer told him that he needed the paper work for the transfer to happen so a sudden trip to Bastrop to get a release/transfer form, was 2 hours there and 2 hours back to Marble Falls to re-register. Mr. Doe #151 meets with a Sex Offender Officer at the police department whenever he goes in to register. Additionally, Mr. Doe #151 has had some issues regarding the new change requirements and restrictions added every legislative session such as the requirement of renewing State ID or driver's license at 7 times the rate before registration. Furthermore, while on parole, Mr. Doe #151 was required to attend and abide by Sex Offender Treatment, and was told by Mr. Harris that the treatment should last 18-24 months.  Upon release of parole, Mr. Doe #151 had to do 21 more months of sex offender treatment with an ex-probation officer. The registry travel requirements require Mr. Doe #151 to report whenever he stays longer than 7 days at any given location triggering the requirement to notify both at home and at the point of destination when he goes and when he returns. This can take hours before he is allowed to actually leave. Upon arriving at his destination, he must travel to the local police department and report there which can take hours as well. The process of notifying has ot be repeated upon his return which takes up his vacation time. Furthermore, the registry has affected his ability to gain employment. No jobs were available that fit the requirements set for sex offenders forcing Mr. Doe #151 to take on a dangerous job resulting in him falling and breaking his back. He is currently disabled. The registry has also affected his family and what he can and cannot do with his children. With his daughter, there was nothing he was allowed to do with her school after the offense. With his son, very limited, the only thing he was involved with was teacher/parent conferences.

**John Doe #152**

89. Mr. Doe #152 began registering on the Texas Sex Offender Registry in 1999 after being discharged that same year and has to re-register annually as a condition of probation. The offense committed is Indecency with a Child in 1989. He has to register and re-register at Kerrville Police Department and meets with a detective. The process for registering and re-registering is time consuming since it takes 30 minutes. Additionally, whenever Mr. Doe #152 moves or travels outside of where he is registered, he must inform Kerrville PD. The registry has forced Mr. Doe #152 to move about 4 times since being on probation. Every time he has moved, Mr. Doe #152 had to let the local police department know that he was moving and complete paperwork on where he was moving to. After moving, he had to report to that local PD within 7 days of moving and register with them. The registry has burdened Mr. Doe #152's ability to have stable housing and has forced him to live with someone. He has also lost jobs and been denied jobs because of the registry. As part of his criminal sentence, Mr. Doe #152 underwent group counseling during his 10 years

of probation. The entire registration process is so degrading and frustrating. Each year the amendments get tighter and tighter making it harder for him to really do anything and the process just gets more difficult.

## THE DEFENDANTS

### Governor Greg Abbott

90. Defendant Greg Abbott is the governor of Texas. He is being sued in his official capacity.

91. Pursuant to Article IV of the Texas Constitution, as governor, the executive power of the state vests in Defendant Abbott.[25] The Texas Constitution further provides that the governor shall take care that applicable federal and state laws are faithfully executed.[26] Defendant Abbott is ultimately responsible for the enforcement of the laws of the state and for supervision of all state departments, including the Texas Department of Public Safety.

92. The Governor is an appropriate defendant in a case challenging the constitutionality of a state statute.

### Colonel Steven McCraw

93. Defendant Colonel Steven McCraw is the director of the Texas Department of Public Safety (hereinafter "DPS"). He is being sued in his official capacity.

94. The DPS maintains Texas' Sex Offender Registration Plan.[27] The DPS' responsibilities include enforcing TSORP 2017, maintaining the state's database of sex offenders, maintaining an online public sex offender registry, registering offenders (along with other law enforcement agencies), developing registration forms, providing statutorily required notices to registrants, and coordinating with national law enforcement as well as the national sex offender registry.[28]

95. The director of DPS is an appropriate defendant in a case challenging the constitutionality of Texas' Sex Offender Registration Plan.

## FACTUAL ALLEGATIONS: HISTORICAL EVOLUTION OF TSORP 2017

96. Texas passed its first sex offender registry law in 1991.[29] Before that time, Texas did not require anyone to register as a sex offender for any purpose.

97. The 1991 statute established a private database containing basic information about individuals convicted of sex offenses.[30] Registration information was available only to law enforcement, was

---

[25] *See* Tex. Const. art. IV (LexisNexis 2017).

[26] *See* Tex. Const. art. IV, § 10 (LexisNexis 2017).

[27] *See supra* note 1.

[28] *See id.*

[29] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, § 1, 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

[30] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

exempt from all public disclosure, and a person who disclosed registry information to the public was guilty of a class B misdemeanor.[31]

98. The statute did not require regular verification or reporting. After completion of the initial registration, the only additional obligation was to notify local law enforcement within seven days of a change of address, which did not need to be done in person.[32]

99. The duty to register, under the statute, ended on the day the person was discharged from parole or probation.[33]

100. The statute applied only to individuals whose convictions or adjudication occurred after the statute was enacted on September 1, 1991, but only if they were still incarcerated, on probation or parole, or under juvenile probation.[34] The failure to register was a misdemeanor.[35]

101. Since that time, TSORP has been repeatedly amended, with each amendment imposing a stricter regime with new burdens on registrants, and covering more people and conduct.[36]

102. In 1995, the legislature amended the statute to require law enforcement agencies to notify the public of the presence of certain offenders in the community by newspaper, while continuing the policy of the registrants' anonymity.[37]

103. In 1997, the statute was amended to apply retroactively to persons who had been convicted of a reportable offense since 1970, both in Texas and out-of-state.[38]

104. In 1999 the lifetime registration requirement for certain offenses came into effect under Subchapter C of Chapter 62, Expiration of Duty to Register, stating that the duty to register under Texas Sex Offender Registry expires at the death of that person.[39] This lifetime registration applies for those who have a reportable conviction or adjudication for a (1) "sexually violent offense;" (2) prohibited sexual conduct, compelling prostitution by a child under 18, or possession or promotion

---

[31] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, § 5, 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

[32] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, § 8(a)-(b), 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

[33] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, § 9(a)-(b), 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

[34] *See supra* note 19.

[35] *See* Act of May 25, 1991, 72nd Leg., R.S., ch. 572, § 7(b), 1991 Tex. Gen. Laws 2029-32 (*codified at* Tex. Rev. Civ. Stat. Ann. art. 6252-13c.1).

[36] *See* Acts of 2015, 84th R.S. ch. 770, 2015 Tex. Gen. Laws 2299.

[37] *See* Act of May 19, 1995, 74th Leg., R.S., ch. 258, § 1, 1995 Tex. Gen. Laws 2197.

[38] *See* Act of June 1, 1997, 75th Leg., R.S., ch. 668, § 1, 1997 Tex. Gen. Laws 2253, 2269.

[39] *See* Acts 1999, 76th Leg., 444, Sec. 5(c), *re-enacted by* Acts 2005, 79th Leg., ch. 1008, § 1.01, 2005 Tex. Gen. Laws, *amended by* Acts 2011, 82nd Leg., R.S., ch. 1, § 2.11, 2011 Tex. Gen. Laws, *and in* Acts 2017, 85th Leg., R.S., ch. 685, § 18, 2017 Tex. Gen. Laws.

of child pornography; (3) indecency with a child; (4) unlawful restraint, kidnapping, or aggravated kidnapping; (5) or obscenity.[40]

105. In 2005, amendments to the statute were made to dispense with the confidentiality protections contained in the 1991, 1995 and 1997 versions of the act and allowed for registry information to become available to the public on the Internet.[41]

106. New in-person reporting requirements were imposed, with registrants being required to report quarterly or yearly, depending on their numeric risk level.[42]

107. In addition, the 2005 amendments expanded the list of offenses for which registration was required as well as the categories of individuals required to register for life; categorized registrants based on levels of present dangerousness; lengthened the penalties for registration-related offenses; required registrants to maintain a driver's license or an identification card that had to be renewed annually; made registration information on certain juveniles public; and required fingerprinting as well as digitized photographs of the registrants.[43] The amendments also mandated registration for out-of-state students, people working in the state, and anyone convicted of a listed offense who are already required to register in another state or county.[44] Further, the amendments require registrants to report all locations they visited on at least three occasions in a month for 48 hours or more.[45]

108. The 2005 amendments also required registrants to provide a DNA sample upon request and imposed an in-person reporting requirement when a registrant enrolled, dis-enrolled, worked, or volunteered at institutions of higher learning.[46]

109. The 2005 amendments also required law enforcement to notify the public and school administrators, in person and/or through printed notification, when a registrant categorized as a Tier III danger moves into the area.[47]

---

[40] *See* Acts 1999, 76th Leg., 444, Sec. 5(c), *re-enacted by* Acts 2005, 79th Leg., ch. 1008, § 1.01, 2005 Tex. Gen. Laws, *amended by* Acts 2011, 82nd Leg., R.S., ch. 1, § 2.11, 2011 Tex. Gen. Laws, *and in* Acts 2017, 85th Leg., R.S., ch. 685, § 18, 2017 Tex. Gen. Laws.

[41] *See* Act of May 26, 2005, 79th Leg., R.S., ch. 1008, 2005 Tex. Gen. Laws 3385, 3387.

[42] *See* Tex. Code Crim. Proc. art. 62.058 *amended by* Acts 2005, 79th Leg., ch. 1008, § 1.01, 2005 Tex. Gen. Laws.

[43] *See* Acts 2005, 79th Leg., ch. 1008, 2005 Tex. Gen. Laws.

[44] *See id.*

[45] *See id.*

[46] *See id.*

[47] *See supra* note 14.

110. Further, Texas' Sex Offender Registration Plan was extensively amended by Acts of 2009,[48] 2013,[49] and 2015[50] to comply with the Federal Sex Offender Registration and Notification Act (SORNA), which is Title I of the Adam Walsh Child Protection and Safety Act of 2006.[51]

111. Although states were required to comply with SORNA by July 27, 2011, or lose federal law enforcement funds, to date, only 15 states have substantially complied. The vast majority of states have elected not to comply because they are concerned about the cost and effectiveness of the federal SORNA requirements.[52]

112. As outlined in more detail below, since the U.S. Supreme Court decision in *Smith v. Doe*[53] approving Alaska's offender registry, TSORP has fundamentally changed by categorizing registrants into tiers; requiring in-person reporting of vast amounts of personal information; retroactively lengthening the registration for most registrants; and prohibiting registrants from engaging in broad areas of employment.

113. In sum, TSORP, which began as a private law enforcement database in 1991, has changed radically in the last 20 years. TSORP subjects registrants to obligations, restraints, disabilities, and punishment of a different character and different order of magnitude than the original sex offender registry.

## FACTUAL ALLEGATIONS: TIER CLASSIFICATION AND RETROACTIVE APPLICATION OF TSORP 2017

114. TSORP 2017 classifies registrants into tiers.[54] A registrant's tier-classification is based on his present level of dangerousness and, to an extent, determines the length of time that a person must register as well as the frequency of reporting.[55]

115. Tier I registrants are classified as low risk offenders.[56] Some Tier I offenders are only required to register and comply with all obligations imposed by TSORP 2017 for 10 years.[57] Tier II registrants are classified as moderate risks[58] and must register as well as comply for life.[59] Tier III

---

[48] *See* Acts 2009, 81st Leg., R.S., 2009 Tex. Gen. Laws.
[49] *See* Acts 2013, 83rd Leg., R.S., 2013 Tex. Gen. Laws.
[50] *See* Acts 2015, 84th Leg., R.S., 2015 Tex. Gen. Laws.
[51] *See* Adam Walsh Child Prot. & Safety Act of 2006, Pub. L. No. 109-248, 42 U.S.C. § 16901 et seq. (2006).
[52] *See id.*
[53] *See Smith v. Doe*, 538 U.S. 84, 100 (2003).
[54] *See* Tex. Code Crim. Proc. art. 62.007(c) (LexisNexis 2017).
[55] *See* Tex. Code Crim. Proc. art. 62.101 (LexisNexis 2017).
[56] *See* Tex. Code Crim. Proc. art. 62.007(c)(1) (LexisNexis 2017).
[57] *See* Tex. Code Crim. Proc. art. 62.101(b) (LexisNexis 2017).
[58] *See* Tex. Code Crim. Proc. art. 62.007(c)(2) (LexisNexis 2017).
[59] *See* Tex. Code Crim. Proc. art. 62.101(a) (LexisNexis 2017).

registrants are classified as high risk offenders[60] and must register as well as verify registration in person every 90 days[61] for life.[62]

116. Tier classifications are based solely on the offense(s) of conviction.

117. Tier classifications are not based on, and do not correspond to, a registrant's actual risk of re-offending or the danger any registrant poses to the public. There is also no individualized determination about their risk classification or whether the span of their registration is warranted.

118. Although Plaintiffs John Does #1 and #5-7 are each classified as low risk to reoffend, the state of Texas requires each of them to register until they die.

119. Further, under TSORP 2017, even upon the clearest proof that the Plaintiffs are not dangerous, there is no mechanism in the statute that would allow the Plaintiffs to have their registration obligations eliminated or reduced.

120. In addition, TSORP 2017 is not limited to convicted individuals but requires registration and reporting by individuals like John Does #3 and #5 who were never convicted of a crime.

### FACTUAL ALLEGATIONS: IMPACT OF TSORP 2017 ON THE PLAINTIFFS

121. TSORP 2017 imposes extensive obligations, disabilities, and restraints upon its registrants.

122. TSORP 2017 subjects the Plaintiffs to continuous reporting, surveillance, and supervision. It also severely limits the Plaintiffs abilities to find housing and employment, get an education, travel, engage in free-speech activities, be free from harassment and stigma, and to understand what is required of each of them under the statute.

123. Finally, registration under TSORP 2017 triggers a vast array of additional obligations, disabilities, and restraints under other federal, state, and local laws and ordinances. It also triggers private policies and rules barring or limiting registrants from numerous activities such as: the directing of the upbringing of their children and access to property, goods and services available to the public.

### A. Reporting, Surveillance, and Supervision

124. TSORP 2017 also requires the Plaintiffs to provide a current photograph,[63] fingerprints,[64] DNA specimen[65], and palm prints.[66] If a Plaintiff's appearance changes, he must also update the photograph.[67]

---

[60] *See* Tex. Code Crim. Proc. art. 62.007(c)(3) (LexisNexis 2017).

[61] *See* Tex. Code Crim. Proc. art. 62.058 (LexisNexis 2017).

[62] *See* Tex. Code Crim. Proc. art. 62.101(a) (LexisNexis 2017).

[63] *See* Tex. Code Crim. Proc. art. 62.051(c)(2) (LexisNexis 2017).

[64] *See id.*

[65] *See* Tex. Code Crim. Proc. art. 62.061 (LexisNexis 2017).

[66] *See* 34 U.S.C.S. § 20914(b)(5) (LexisNexis 2017).

[67] *See supra* note 60.

125. In addition to reporting in person at regular intervals, the Plaintiffs must report in person within seven days whenever certain information changes.[68] The immediate in-person reporting requirement is triggered whenever the Plaintiffs:

- change their residence;[69]
- begin, change, or discontinue employment;[70]
- enroll or dis-enroll as a student;[71]
- change their name; and
- establish or change an email address, instant message address, or other Internet username;[72]

126. There are no good cause exceptions to the reporting requirements or to the "immediate" notification requirements. Regardless of illness, injury, transportation problems, or other emergencies, the Plaintiffs must report in person within seven days or face criminal charges.[73]

127. TSORP 2017's reporting, surveillance, and supervision requirements are similar to the reporting, surveillance, and supervision that the Plaintiffs experienced while serving their sentences or on probation, parole or community supervision.

128. Under TSORP 2017, the Plaintiffs must report the same, if not more, information than what they were required to report while they were serving their sentences on probation, parole or community supervision.

129. TSORP 2017's requirement that minor changes be reported in person within three business days is a level of reporting that far exceeds what the Plaintiffs experienced while they were serving their sentences on probation, parole or community supervision.

130. As a result of TSORP 2017's immediate reporting requirements, having to report either annually, quarterly or monthly along with the reporting requirements for travel and temporary visitation, the plaintiffs must report for life in person to law enforcement with a frequency that is similar to their reporting obligations when they were on probation, parole or community supervision.

131. For the Plaintiffs, the lifetime surveillance imposed by these reporting requirements is not only intrusive, but burdensome. The time required to register or update information varies depending on where and when the Plaintiffs report. Each registration can take up to an hour-and-a half, not including travel time.

**B. Housing**

132. Registering on TSORP 2017 also severely limits the Plaintiffs' access to housing.

---

[68] *See* Tex. Code Crim. Proc. art. 62.051 (LexisNexis 2017).

[69] *See* Tex. Code Crim. Proc. art. 62.055 (LexisNexis 2017).

[70] *See* Tex. Code Crim. Proc. art. 62.051(c)(6), 62.051(i), 62.152(d) (LexisNexis 2017).

[71] *See id.*

[72] *See* Tex. Code Crim. Proc. art. 62.0551 (LexisNexis 2017).

[73] *See supra* note 59.

133. Because sex offender registry information is public and accessible over the Internet, many landlords refuse to rent to registrants since these properties can then be easily identified on the registry.

134. When Mr. Doe #7 moved to Texas, he was required to register as a sex offender for the first time on the National Sex Offender Registry. Neither his state of conviction, Oregon, nor his state of residence prior to his move, Nevada, required him to register. Upon his move to Texas with his family, they rented an apartment in Austin, Texas, and even though he disclosed to the management company the fact of his prior conviction, he and his family were evicted upon his registration as a sex offender.

135. Mr. Doe #1 was convicted of his offense in 1971. He has not been arrested or convicted of a crime in the last 10 years and the neighborhood in which he lives has deteriorated making it a dangerous place to live. Although Mr. Doe #1 has looked for other housing, he cannot find another apartment because he is on the registry.

136. Mr. Doe #4's status as a registrant has likewise prevented him from finding housing. When looking for apartments, Mr. Doe #4 has been rejected numerous times because he is a registrant.

137. Mr. Doe #4 has been unable to secure housing under his own name and instead is leasing a house under his wife's name.

138. Mr. Doe #6 has had severe problems in finding housing due to his name being on the registry.

139. Whenever Mr. Doe #6 has tried to rent an apartment, each time, a landlord would tell him that they will not rent to anyone who is on the sex offender registry.

140. For a time, Mr. Doe #6 rented a room at a private home. However, after several years, the owner suddenly told him to leave. Thereafter, he could not find another apartment and became homeless. Having no other choice, Mr. Doe #6 began living in his car at a storage facility.

141. Mr. Doe #6 is now homeless.

142. Mr. Doe #11 was forced to leave an apartment complex by management because a neighbor had recognized him on the Internet as being on the registry. Likewise, Mr. Doe #15 was kicked out of an apartment complex once it became known that he is on the registry.

143. Mr. Does #2, 7, 13, 19, 22-24, 3-32, 34, 38, 55, 64, 68, 72, 75-77, 83, 89, 93, 106, 110, 115, 123, 126-127, 132-133, 135-136, 140, 143, 145, and 150 have had a difficult time of getting and keeping housing. Mr. Doe #19 has been forced to live elsewhere in order to comply with TSORP 2017 and that has made it difficult for him to reside in the same place where he works. Mr. Doe #34 lives with his mother since that is the only available housing for him.

144. Mr. Doe #40 has been denied renting an apartment but he and his wife have owned a home for almost 10 years now.

145. Mr. Doe #44 has not been able to rent an apartment and has been forced to buy a home in an area that is rough to live in.

146. Mr. Doe #85 actually purchased a house after getting permission from Harris County for it and then was prevented from living there because a new city ordinance had passed which would not allow him to live there. Mr. Doe #85 went through the proper channels and sent the paperwork from Harris County to Galena Park Police Department and was told by Galena Park PD that if he was caught on the residence, they would press charges. He has to live in a trailer home with his father and is still paying mortgage on a house that he cannot live in.

147. Mr. Doe #87 cannot live with his wife and lives with his cousin instead to keep from being homeless.

148. Mr. Doe #105 lost his trailer home due to TSORP 2017 restrictions and requirements.

149. Mr. Doe #112 has been forced into the country side to make sure he stays in compliance.

150. Mr. Doe #126 was evicted from a rental property.

151. Mr. Doe #139 lived on his brother's property for 9 years renting a room but was forced to leave because of the registry. Specifically, there were complaints from other tenants on this property about his status as a sex offender. Every move made by him was monitored by neighbors and other tenants.

152. The registry has forced Mr. Doe #152 to move about 4 times since being on probation. Every time he has moved, Mr. Doe #152 had to let the local police department know that he was moving and complete paperwork on where he was moving to. After moving, he had to report to local PD within 7 days of moving and register with them.

## C. Employment

153. TSORP 2017 bars the Plaintiffs from working, or offering to work, in common employments such as bus, taxi or limousine drivers; working at amusement parks; or even working in residential properties of any type.[74]

154. Mr. Doe #1 has repeatedly lost employment opportunities because of his status as a registered sex offender. When he was first released from prison, he entered the field of barber and beauty shop management and flourished.

155. However, after owning a barbershop for over two decades, Mr. Doe #1 lost his highly successful shop through a divorce. By this time the registry was posted on the Internet and despite his best efforts, Mr. Doe #1 has been unable to open up another shop ever since. The owners of commercial real estate, or their agents, have repeatedly refused to lease him commercial space because he is on the registry.

156. Mr. Doe #2 has also been harmed in his ability to earn a living. For years, Mr. Doe #2 was employed in the health and wellness industry managing and consulting in the operation of health clubs. Mr. Doe #2 has worked in this area as an employee, owner, and consultant all of his adult life. However, once Mr. Doe #2 was required to register as a sex offender, he became unemployed because the public can now easily access information about his 29-year old conviction and the health and wellness industry is quite sensitive to such information.

---

[74] *See* Tex. Code Crim. Proc. art. 62.063 (LexisNexis 2017).

157. Individuals in the health club industry who are familiar with Mr. Doe #2 have indicated their willingness to employ him, but dare not because of the registry.

158. Mr. Doe #4 lives in a small Texas town. Upon his release from prison, he worked for a family business until its collapse. Thereafter, Mr. Doe #4's status as a registered sex offender has prevented him from finding or holding a job. Mr. Doe #4 has been unemployed since 2010.

159. Further, Mr. Doe #4, who is trained in various areas of construction work, cannot even accept odd jobs to support his family by performing home repairs, remodeling, or even housecleaning because of TSORP 2017's bar to common employment.[75]

160. Mr. Doe #4 has had great difficulty finding work because so few employers will hire registrants.

161. Mr. Doe #4 is presently unemployed and has no source of income.

162. Mr. Doe #7's status as a registrant has also impaired his ability to find work. Mr. Doe #7 recently moved to Texas from Nevada and was required to conform, for the first time, to the public notification provision under TSORP 2017.[76] While residing in both Nevada and Oregon, he was not required to register as a sex offender and had been classified as low-risk, allowing him to be employed full-time and maintain an excellent work record. However, after being required to register in Texas, Mr. Doe #7 has been unable to obtain employment because of his status as a registrant and is now looking to open up his own small business instead.

163. Nonetheless, despite having excellent credit, Mr. Doe #7 is hampered in attempting to open up a business because he is unable to obtain a bank loan. In response to his applications, the banks inform him that they do not believe his business will succeed because he is a registered sex offender.

164. Likewise Mr. Does #5, 9, 12, 13, 16, 22, 32, 34, 38, 40, 44, 55, 63-64, 69, 72, 74, 76-77, 85, 89, 90, 93, 96, 106, 110, 115, 123, 132-133, 135-136, 143-145, and 152 have all been affected by TSORP 2017 employment restrictions and requirements and have a very difficult time in gaining employment or even maintaining one.

165. Mr. Doe #19 has been fortunate to find employment but must commute a long way in order to keep his job.

166. Mr. Doe #20 was fired from his job of 20 years due to being on the registry and now must work at a job that does not have access to the Internet.

167. Mr. Doe #62 has been denied several jobs. He finally landed a job and worked hard to become a manager only to have to step down because of being on the registry.

168. Mr. Doe #75 has been denied three jobs because of the registry. It also cost him a job at the El Paso Community College where he was hired and then fired because he had to report to the campus police.

---

[75] *See supra* note 40.

[76] *See supra* note 23.

169. Mr. Doe #83 has been denied job opportunities and lost a job because his registry information was listed in the newspaper. When his employer at the time saw it, they fired him. Mr. Doe #83 could not even collect unemployment.

170. The registry has cost Mr. Doe #92 many customers. Mr. Doe #92 is part owner of an oil and gas service company and competitors use this against them. This has lost them much revenue and employees as well.

171. Mr. Doe #111 was hired and then fired once the paperwork had been done because they found out about having to register.

172. Mr. Doe #112's jobs are in random locations and he has to report every job and every location. This makes it hard for him to notify the sheriff's department and change his status in time in order to accept or refuse a job. This has forced him to lose several jobs.

173. Mr. Doe #113 lost one of his training facilities due to being on the registry. A client found out he was on the registry and made it their mission to tell other customers about it. Mr. Doe #113 ended up losing a month's worth of income.

174. In Mr. Doe #127's case, police officers showed up at his work place just to inform his boss that Mr. Doe #127 is on the registry. His boss then fired Mr. Doe #127.

175. The registry has not only cost Mr. Doe #129 a job but also his spouse lost her job once her employer found out about her husband's status as a sex offender.

176. The registry has cost Mr. Doe #137 a job that he had for 12 years as a supervisor.

177. Mr. Doe #139 lost a job of 10 years because of the registry when he visited a location he was not permitted to stay in because of the proximity of the residence to a park in Pearland, Texas more than 9 times in one year.

178. In Mr. Doe #140's case, an employer refused to pay him or even talk to him concerning his wages due to him disclosing that he is on the registry.

179. Mr. Doe #151 was forced to take a dangerous job since no jobs were available that fit the requirements set for sex offenders. This has resulted in him falling and breaking his back becoming  disabled.

**D. Travel**

180. The Plaintiffs' status as a registrant has severely restricted their ability to travel.

181. The Plaintiffs must provide advance notice if they travel outside the U.S. for more than seven days.[77]

182. In addition, if the Plaintiffs travel, they must also comply with any applicable sex offender registration laws in other jurisdictions. Because sex offender laws are exceedingly complex and vary from state to state, it is extremely difficult to obtain accurate information about either

---

[77] *See* International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders, Pub. L. No. 114-119 (Sept. 5, 2017), *available at* https://www.congress.gov/114/bills/hr515/BILLS-114hr515enr.pdf.

affirmative reporting obligations (*e.g.* registering one's presence in another state) or prohibitions on ordinary behavior (*e.g.* visiting a library or park) in other jurisdictions.

183. Mr. Doe #1 does not visit friends and family for more than six days at a time because, otherwise, he would be required to notify law enforcement in person about his travel plans.

184. Mr. Doe #2 has lived on the East Coast, in Florida, and in the Midwest, and has friends all over the country and all over the world. In order for him to personally see his friends, he needs to be able to freely travel.

185. Although Mr. Doe #2 would like to take extended trips to visit his friends and family, he does not do so and instead limits his trips to less than seven days.

186. Mr. Doe #2 would like to travel internationally to see Europe. In or around 2010, Mr. Doe #2 and his wife planned to vacation in Europe. However, he and his wife were unable to take this trip because he was informed by his compliance officer that the countries he intended to visit in Europe had not established a method of complying with his registry requirements. Therefore should Mr. Doe #2 go to Europe; he would be in violation of the statute.[78] Further, Mr. Doe #2 is also concerned that he cannot comply with the restrictions on international travel relating to where he will be staying at each stage of his trip.[79] This is information that he cannot know in advance, given the nature of such travel.

187. Mr. Doe #4's status as a registrant has also impaired his ability to travel. Mr. Doe #4's in-laws live in a small mid-western town. He has traveled with his wife to visit them on two occasions in the past. However, the requirements of the registry require him to inform law enforcement of his anticipated travel seven days before he travels. He then must also register in the town where his in-laws reside upon his arrival. Additionally, before returning, Mr. Doe #4 must inform the compliance officer of the town where he was visiting that he was leaving. Then upon his return home, he must again inform law enforcement. Because of these required, constant, in person check-ins, which take approximately an hour and a half to complete, Mr. Doe #4 is reluctant to travel anymore and has not visited his in-laws in a number of years.

188. Mr. Doe #5's status has limited his travel as well. Mr. Doe #5 works in the construction industry and as such is required to travel both within the state of Texas and nationally. On each occasion that Mr. Doe #5 works on a site in Texas, outside of his hometown for more than six days, he must personally disclose the address of his worksite to his local compliance officers. He must also personally disclose this address to compliance officers in the town where the worksite is located. This process is repeated each time Mr. Doe #5 works on an out-of-state site as well; no matter how many days he will be there. Consequently, the registration process has become even more burdensome and has led to the rejection of out-of-state work by Mr. Doe #5. This is ultimately harming his ability to provide for his family.

---

[78] *See id.*

[79] *See* International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders, Pub. L. No. 114-119 § 6 (Sept. 5, 2017), *available at* https://www.congress.gov/114/bills/hr515/BILLS-114hr515enr.pdf.

189. Mr. Doe #9 cannot travel anywhere without informing his parole officer thus deterring him from going anywhere. Mr. Doe #10, likewise, is affected by the in person reporting requirement making it difficult for him to travel since he must inform in person every time he wants to go somewhere. Similarly, Mr. Doe #11 has to report not only to his probation officer when he wants to travel but also must report to the authority in the city that he wants to travel to. Mr. Doe #13 has also chosen not to travel at all because of the travel restrictions imposed.

190. Mr. Does #7, 15-16, 19-20, 23, 31, 34, 39, 43-44, 55, 62, 64, 68-69, 72, 75-77, 85, 93, 96, 105, 110, 111, 112, 113, 115, 123, 125, 127, 129, 132-133, 136-137, 139, 150-151 have all limited their traveling to ensure that they are in compliance with TSORP 2017 traveling requirements.

191. If Mr. Doe #24 wants to go out of state, he needs to inform the state that he plans to travel to about his plan if his stay will be longer than 7 days. Additionally, if Mr. Doe #24 wants to travel internationally, he must inform Detective Sabo so Detective Sabo can inform US Marshalls of Mr. Doe #24's plans to travel that way they can take him off the Do Not Travel list. He also must call the US Embassy in that country to see if he is allowed entry. This has caused him to miss vacation trips with his family if he is not permitted into that country.

192. Mr. Doe #40 is affected when it comes to traveling internationally ever since a new law was implemented that requires a symbol on a registered sex offender's passport. This symbol allows the government to contact authorities in another country that Mr. Doe #40 may be travelling to in order to put them on alert about his arrival and of his status as a sex offender. He recently was forced to come back from Thailand because he did not have this symbol on his passport and had traveled there since his wife is from that country. Mr. Doe #40 and his wife both went there in November of 2017 and the moment they landed they were taken into custody, denied entry, and forced to return to the U.S. the next day.

193. Mr. Doe #94 has to report whenever traveling outside of the US so Detective Barton can inform other countries and put them on alert that he is planning to travel there.

194. Whenever Mr. Doe #104 moves or travels outside of where he is registered, he must inform his probation officer by preparing a typed letter that is to be presented to the judge for approval. The typed letter has to include his reason for traveling.

195. Whenever Mr. Doe #124 moves or travels outside of where he is registered, he must inform the parole office and give a detailed description of the routes he takes and his parole officer has to approve the routes. He can only go to approved places that are deemed as necessary.

**E. Speech & Internet**

196. TSORP 2017 severely restricts the Plaintiffs' ability to speak freely on the Internet. The Plaintiffs not only must provide law enforcement with all electronic mail addresses, instant message addresses, log-in names, or other identifiers that are assigned and routinely used by them,[80] but must also personally report within three days whenever they establish any electronic mail address, instant message address, or other designation used in Internet communications or postings.[81]

---

[80] *See* Tex. Code Crim. Proc. art. 62.058 (LexisNexis 2017).
[81] *See* Tex. Code Crim. Proc. art. 62.0551 (LexisNexis 2017).

197. The Plaintiffs are concerned about using the Internet because TSORP 2017 is unclear about whether they must report immediately and in person for mundane tasks such as setting up an online account to pay their taxes, registering with Netflix, purchasing or reviewing products on Amazon, or using an online bulletin board.

198. Mr. Doe #4 does not use the Internet because he would be required under TSORP 2017 to register all emails and Internet identifiers. He would also need to report constantly in order to use different websites with different usernames.

199. Mr. Doe #4 would like to communicate with his family and friends on Facebook, but does not do so because he would have to register information about his account.

200. Mr. Doe #7's status as a registrant similarly restricts his freedom to use the Internet. In the past, Mr. Doe #7 has previously established a Facebook account, but now has deleted it because he does not want to be constantly concerned with registering his usernames etc. at the risk of imprisonment. Mr. Doe #7 was using his Facebook account to communicate with friends and family. He is now unable to do so.

201. In addition, Mr. Doe #7 is afraid that because he must provide all email and Internet identifiers pursuant to TSORP 2017, his Internet use will be monitored.

202. Mr. Doe #10's, 16's, 22's, 28's, 127's, 143's understanding of the Internet usage requirement of TSORP 2017 is that they are not permitted to use it at all and thus cannot communicate with friends and family through it.

203. Mr. Doe #13's ability to take online classes and to seek jobs have been affected by TSORP 2017 Internet restrictions as well thus compelling him to not use the Internet at all.

204. To maintain his privacy, Mr. Doe #31 does not use the Internet at all and that has cost him to turn down better paying jobs.

205. Mr. Does #2, 32, 34, 44, 55, 64, 71-72, 74-77, 85, 89, 94, 96, 110, 124, 129, 135-136, 139, 145, 150-152 all find the Internet requirements so restrictive that they do not bother using it all and this prevents them from keeping in touch with those who matter in their lives.

206. Mr. Does #40 and 90 have to provide login information as well as account information in order for them to use the Internet making it a hassle to even use it.

207. The Registry's Internet reporting requirements are a burden for Mr. Doe #93 because he is not allowed to use it and can only do so when his wife supervises.

## F. False Information and Public Stigmatization

208. Because the sex offender registry is publicly available, several companies also distribute their own "version" of the sex offender registry, which bandies about various labels such as "predator" and "sexual predator" to individuals on the registry. Mr. Doe #2 was convicted of a sex offense over 29 years ago and has not been convicted of a crime since, but still is subject to being labeled as a "sexual predator."

209. The Texas Department of Public Safety tolerates the various websites that publicly and falsely label Mr. Doe #2 as a "sexual predator," which he is not.

210. Further, TSORP 2017 publicly and falsely labels Mr. Doe #3 and Mr. Doe #5 as "convicted sex offenders," which they were not, as both of their cases were dismissed and neither was convicted of a crime.

211. TSORP 2017 does not simply provide a registry of sex offenders, as past versions of TSORP have done. TSORP 2017 publicly labels and categorizes registrants by tiers, corresponding to "levels of present dangerousness," which stigmatizes them and falsely identifies them as dangerous sex offenders on the registry. Although there may be some registered sex offenders who will reoffend, majority of them will not reoffend. Thus TSORP 2017 wrongly labels them as a risk to the public.

212. Because Plaintiffs are stigmatized as sex offenders over the Internet, Plaintiffs and their families are subjected to harassment, social ostracism, and even threats of violence. John Does #7, 16, 28, 43-44, 55, 64, 72, 74-75, 83, 87, 105, 110, 112, 113, 136, and 150 all are facing this very predicament.

213. For example, Mr. Doe #4 has been frequently subjected to anonymous threats of violence and his house has been targeted by acts of vandalism. Mr. Doe #4 has also been called a "child molester" and "pervert" on the street.

214. Mr. Doe #13 has been unable to attend college because of the stigma associated with the Registry because every semester he must register on campus as a sex offender.

215. Mr. Doe #15's neighbors do not treat him nor his family well because they can now find him online and see that he is on the registry. This stigma has also extended to Mr. Doe #15's ability to attend college and has forced him to drop out.

216. The stigma of being labeled as a sex offender has been the sole cause of Mr. Doe #38 being denied jobs. Having to be subjected to TSORP 2017 and its restrictions and requirements has been extremely humiliating for Mr. Doe #38 and have taken an emotional toll on him.

217. Mr. Doe #89's neighbors posted up sex offender postcards that had his picture on it so those in the neighborhood would know that he was on it.

218. Mr. Doe #92's wife gets harassed at work and his children are bullied at school. Mr. Doe #92 cannot attend college because of the stigma surrounding TSORP.

219. Due to so much stigma surrounding the registry and him being labeled as a sex offender, Mr. Doe #93's family and he, have had to move out into the country because so many apartments are close to schools.

220. Mr. Doe #126 has been humiliated quite a bit because of the registry. Cars have even stopped in front of his house in order to take pictures and neighbors are not friendly.

221. Mr. Doe #140 has had people drive up to his house and trespass onto his yard to curse at him and his family once they are aware of his status as a sex offender. His children have also suffered by being bullied and degraded to the point where they both attempted suicide.

### G. Vagueness, Strict Liability, and Impossibility of Compliance

222. The Plaintiffs have been further harmed because the restrictions and obligations of TSORP 2017 are either so vague that the Plaintiffs are unable to know whether or not they are in violation of the law, or are so extensive and pervasive that the plaintiffs are literally unable to comply with the law. Moreover, different law enforcement agencies in different places across the state apply the requirements of TSORP 2017 differently.

223. TSORP 2017's requirements for reporting personal information are so vague that the Plaintiffs do not understand what information must be reported, or what changes in information subject them to the in person immediate reporting requirements.

224. For example, TSORP 2017 requires Plaintiffs to register any address they temporarily visit on three or more occasions for 48 hours or more within a 30-day period.[82]

225. Mr. Doe #5 frequently works out of town on construction sites. On many occasions, he will be asked to perform a simple inspection of an installation that should not take longer than 48 hours. If he is asked to revisit the site to monitor an ongoing installation, or if the task he is monitoring runs into a complication, he must decide whether he is required to return home and register or run the risk that he is out of compliance with the statute.

226. Similarly, Mr. Doe #5 is directed to perform the installation of equipment on the premises of a multifamily residential complex. To date, he is unaware whether he could stay on the premises if the other workers assigned to this job are required to temporarily leave without him.

227. Further, the Plaintiffs who use the Internet are also unable to determine what information they must report under the statute.

228. In discussing this case with counsel, the Plaintiffs learned of many obligations and restrictions of which they were previously unaware of. All the Plaintiffs are concerned that they will inadvertently violate TSORP 2017's requirements because they do not understand what they are.

229. Finally, TSORP 2017 imposes criminal liability despite the impossibility of compliance. TSORP 2017 imposes liability regardless of whether illness, injury, or practical difficulties make compliance impossible.

230. For example, Mr. Doe #6 suffers from a severe bipolar disorder. Through no fault of his own, he became homeless during a psychotic episode and was therefore unable to comply with his reporting requirements. Currently, Mr. Doe #6 is serving 2 years imprisonment after taking a plea for his failure to report.

231. Mr. Doe #6, and the other Plaintiffs, fear that despite their best efforts to understand and comply with the law as well as despite the absence of any intention to violate the law, they will be held strictly liable for any failure to comply.

---

[82] *See* Tex. Code Crim. Proc. art. 62.059 (LexisNexis 2017).

232. Mr. Doe #11 bought a new vehicle but did not know that he had to notify Sergeant Ramos when he bought that vehicle. He believed that it was okay to report it when he went in for his annual re-registration. Due to his failure to report this when he made the change, Sergeant Ramos gave him a warning and told him it was a "strike one."

233. Additionally, the Internet reporting requirements are ambiguous making it difficult for Mr. Doe #15 to know what he is permitted to do over the Internet.

234. For Mr. Doe #16, TSORP 2017 is vague and impossible to comply with because cannot read or write and needs assistance to fill out registration forms but does not get any help from those who are meant to be of assistance when he goes in to register.

235. The disconnect between the probation departments and the changing of the laws has caused much confusion for Mr. Doe #31 on what is required of him and makes him anxious that he may be in violation of a law and not even know it. Since he must report to two different probation offices, both locations interpret the laws differently. This makes it difficult for Mr. Doe #31 to be in compliance.

236. Mr. Does #39, 92, 112, 125, 139 all find TSORP 2017 laws to be difficult to understand and therefore challenging to comply with.

237. Mr. Doe #87 was given different dates to re-register and has shown up at different times to do so and due to the confusion has been charged with failure to register.

238. Mr. Doe #151 has had some issues regarding the new change requirements and more restrictions added every legislative session such as the requirement of renewing State ID or driver's licenses at 7 times the rate before registration.

239. TSORP 2017 imposes penalties of up to 20 years imprisonment for violations of the statute.[83]

## H. Impact on Children

240. TSORP 2017 effects go beyond affecting the lives of those on the sex offender registry. It also affects the lives of the children of those on the sex offender registry. Many of those who register have a family of their own which includes offspring. Their children do not get to have a stable environment to grow up in which affects their upbringing greatly.

241. Mr. Does #2 and #5 both have children whom they cannot be around because of the registry. Likewise, Mr. Doe #3's children have been affected because their school is implementing a program that will expose Mr. Doe #3's registration in Texas and create problems for him where currently there is none. Mr. Doe #7's children's school lives have been affected by TSORP 2017 by not allowing Mr. Doe #7 to attend parent-teacher conferences and not allowing him to have any real involvement in the raising of his children.

242. Mr. Doe #9 has missed out on his daughter's childhood and will not go on family trips out of fear that he could get arrested again for somehow violating TSORP 2017. This has affected his ability to be a father. Mr. Doe #10's son could never have friends over while growing up and now Mr. Doe #10's grandchildren are feeling the effects of TSORP 2017 by not allowing them to have

---

[83] *See supra* note 3.

their grandfather around them. Similarly, Mr. Doe #12's children do not really want much to do with him and therefore he shares a strained relationship with them.

243. Mr. Doe #15 is not allowed to attend any of his children's events unless he is accompanied by his wife.

244. Mr. Doe #19 is not allowed to have contact with his youngest. This has definitely affected his child's rearing by not permitting him to live to home.

245. Mr. Doe #20 has 2 children and 1 in the process of adoption. The registry has caused Mr. Doe #20 to not be able to live with his children and they now stay with their mom an hour away from him. He is also unable to be a part of the adoption process and will not be able to be a part of that child's life. TSORP 2017 has restricted all of his activities with his family including attendance at church without gaining permission from his probation officer. Additionally, CPS has been involved in almost all aspects of Mr. Doe #20's family life.

246. TSORP 2017 does not permit Mr. Doe #22 to attend activities with his children. He is permitted to have joint custody of his son but is not allowed to live with his son.

247. Mr. Does #24 are not allowed to participate in any activities that involve their children be it school or extracurricular.

248. TSORP 2017 restrictions prevent Mr. Doe #31 from attending his son's school activities even though he is a single parent and is on probation. It also makes it difficult for Mr. Doe #31 to pick up his son from school when need be. His probation officer has made it clear that if he attempts to pick up his son even with the school's permission, he will be violating his probation and risks revocation.

249. Mr. Doe #34's son is also affected by TSORP since his dad is not allowed to attend his school activities and can only see him once a year.

250. In order for Mr. Doe #40 to attend certain activities that his children participated in he had to have an approved chaperone with him.

251. Mr. Doe #92's children are bullied at school because of their father being on the registry.

252. Mr. Doe #93's children have been greatly affected because they cannot have their father come eat lunch with them at school. They also cannot have their friends over because Mr. Doe #93 lives there.

253. Mr. Does 43-44, 55, 62-63, 68, 72, 76, 90, 94, 104, 110, 113, 125, 129, 132, 143, 145, 150-151 all have children who have been affected by TSORP 2017 restrictions by not allowing their father or mother be a part of their upbringing.

254. TSORP 2017 restrictions for Mr. Doe #111 are unclear due to those who notify him of what he is permitted to do and not permitted to do. He was told as long as he checked in with the school office, it would be fine for him to be on school campus. However, another time he was told he was not allowed to attend any school functions. He was also told that he can attend after school functions but school functions had to be approved of by the school.

255. Mr. Doe #127 has grandchildren and cannot go near them and is also not allowed to attend events with his family and school activities.

256. Mr. Doe #135 has not been able to attend any of his children's activities. He is not allowed to even see his children without approval and getting that approval is not easy. Once he gets that approval, he is forced to stay in one place, such as their home. He cannot take his children anywhere.

257. Mr. Doe #136 cannot attend any of his daughter's activities. He does not want his daughter to be associated with the registry in anyway so he has been deterred from attending anything that deals with her and her school.

258. Mr. Doe #140's children have both been bullied and degraded and Mr. Doe #140 himself is not allowed to really participate in activities with his children.

## I. Consequences Beyond TSORP 2017

259. Because the Plaintiffs are required to register as sex offenders under TSORP 2017, they are also subject to a vast and labyrinth array of laws and ordinances imposed on registered sex offenders by the federal government as well as other state and local municipalities. *See* Prescott Decl. and Logan Decl. (Exhibit B)

260. Because registration in one state generally triggers registration in another state, the fact that the Plaintiffs are subject to TSORP 2017 means they are also subject to the sex offender registration laws of other jurisdictions if they travel or move.

261. In addition, because the Plaintiffs are required to register as sex offenders under TSORP 2017, they are subject to policies by private entities that refuse to provide goods or services to registered sex offenders. But for the fact that the plaintiffs are labeled by the state as registered sex offenders, the goods and services provided by those private entities would generally be available to them.

## CLASS ACTION ALLEGATIONS

262. The named Plaintiffs seek certification of this complaint as a class action. Pursuant to Fed. R. Civ. P. 23(a), the class is quite numerous that joinder of all members is impracticable, there are questions of law or facts in common to the class, the claims of the representative parties are typical of the claims of the class, and the representative parties will fairly and adequately protect the interests of the class. This class consists of around 87,686. The named Plaintiffs seek to represent seven classes consisting of the following:

- **Class One**: All individuals with an Ex Post Facto claim with two subclasses of those whose conviction was disposed of prior to the enactment of the sex offender registry and those who receive extra restrictions each time a new provision is enacted into the registry.
- **Class Two**: All individuals with a Due Process claim who never received notice of the extra restrictions imposed by the provisions that were added to the registry.
- **Class Three**: All individuals with a Contract Clause claim who have been given deferred adjudication. Those with deferred adjudication should not be treated the same as those with a conviction for the purpose of TSORP 2017.
- **Class Four**: All individuals with an Equal Protection claim who have been given deferred adjudication. Those with deferred adjudication and treated the same as those with convictions retroactive to 1970 is arbitrary and capricious, and should not be treated the same as those with a conviction for the purpose of TSORP 2017.

- **Class Five**: All individuals with a Cruel and Unusual Punishment claim with subclasses of those whose conviction was disposed of prior to the enactment of the sex offender registry, those who received extra restrictions each time a new provision was enacted into the registry, and those forced to sign up for the registry as a condition of Parole or as a later added condition of Community Supervision.
- **Class Six**: All individuals with a Liberty Interest claim who have travel conditions and restrictions imposed on them.
- **Class Seven**: All individuals with a First Amendment claim who have to report on-line identifiers.

263. The Plaintiff Classes seek a declaration that the above statutory schemes are unconstitutional because they not only violate class members' constitutional rights but also ex post facto, and certain provisions should be void for vagueness.

264. The proposed classes are numerous with approximately 87,686 people on the Texas Sex Offender Registry.

265. Joinder of all class members is impracticable because not only are the classes numerous but the numbers in each class keep changing.

266. There are questions of law and fact that are common to all class members including but not limited to:

- Does the Texas Sex Offender Registry violate fundamental rights thereby violating class members' constitutional rights;
- Does retroactively applying subsequent amendments to Chapter 62 to class members violate Ex Post Facto;

267. All individuals who fall under the class definitions are subjected to the same statutory scheme. A single declaratory judgment will provide relief to each class member since the above questions are common to all class members.

268. Defendants have acted and continue to act in such a way that is adverse to the rights of the proposed classes which makes awarding final declaratory relief to the class as a whole appropriate.

269. Plaintiffs and the classes they seek to represent have been directly injured by the statutory schemes challenged in this complaint and are at risk for future harm from the continuation of these schemes.

270. Plaintiffs will adequately and fairly represent the interests of the class; and the claims of the Plaintiffs are typical of the claims of all members of the proposed class.

271. Plaintiffs' counsel will fairly and adequately represent the interests of the class.

**CLAIMS FOR RELIEF**

272. Plaintiffs allege and incorporate paragraphs 1 through 271, above, as if fully set forth herein:

## Count I: Violation of The Due Process Clause (Stigma Plus)

273. TSORP 2017 does not simply provide a registry of sex offenders, as past versions have.

274. TSORP 2017 categorizes sex offenders into three tiers of present dangerousness. Each of the Plaintiffs are categorized into a tier of present dangerousness which stigmatizes as well as publicly and falsely identifies the Plaintiffs among the public as dangerous sex offenders without any real empirical support.

275. TSORP 2017 categorizes Plaintiffs into three tier classifications of present dangerousness and publicizes the information over the Internet.

276. The extent, duration, and frequency of TSORP's reporting and notice requirements are based upon a registrant's tier classification of present dangerousness.

277. Plaintiffs' tier classification of their level of present dangerousness to the community is not based upon any meaningful social or psychological assessment.

278. Plaintiffs have no means to challenge or contest the tier classification of dangerousness to which they have been assigned.

279. Plaintiffs' tier classification of their dangerousness to the community has an unquestionable impact upon their reputation as well as plaintiff's ability to gain employment and housing.

280. TSORP 2017 does not provide or grant Plaintiffs any individualized consideration or hearing before each is classified to a tier of dangerousness.

281. TSORP 2017 violates each Plaintiff's fundamental right to due process because it does not afford them a hearing or individualized consideration before publicly classifying them as to their present-level of dangerousness.

## Count II: Violation of The Due Process Clause (Right to Travel)

282. The right to travel is a fundamental right that is protected under the Due Process Clause of the 14th Amendment to the U.S. Constitution.[84]

283. TSORP 2017 substantially interferes with the Plaintiffs' ability to travel.

284. TSORP 2017 does not provide for any individualized consideration before restricting the Plaintiffs' right to travel.

285. TSORP 2017 violates the Plaintiffs' fundamental right to travel because it is not narrowly tailored to serve a compelling state interest.

## Count III: Violation of The Due Process Clause (Work)

---

[84] *See* U.S. Const. amend. XIV, § 1, cl. 2.

286. The right to engage in the common occupations of life is a fundamental right that is protected under the Due Process Clause of the 14th Amendment of the U.S. Constitution.[85]

287. TSORP 2017 substantially interferes with the Plaintiffs' ability to engage in the common occupations of life by prohibiting Plaintiffs from engaging in those occupations listed in Texas Code of Criminal Procedure Article 62.063 which include positions in amusement parks, bus drivers, taxi and limousine drivers, and any unsupervised work to be performed on residential property.[86]

288. As such, TSORP 2017 creates a wholesale barrier to employment. That barrier is not based on the Plaintiffs' fitness or capacity to work in the jobs from which they have been excluded.

289. Further, TSORP 2017 does not provide for any individualized consideration before restricting the Plaintiffs' ability to engage in the common occupations of life.

290. TSORP 2017 violates the Plaintiffs' fundamental right to engage in the common occupations of life because it is not narrowly tailored to serve a compelling state interest.

**Count IV: Violation of The First Amendment**

291. The First Amendment of the U.S. Constitution prohibits abridgment of the freedom of speech.[87] The 14th Amendment incorporates the First Amendment against the states.[88]

292. TSORP 2017 requires the Plaintiffs to report information about their on-line accounts and activity to law enforcement, which substantially interferes with access to the Internet as a form for speech and eliminates the Plaintiffs' opportunities for anonymous online speech.

293. TSORP 2017's requirements to report information about online accounts and activity is invalid under the First Amendment both on its face and as applied because it is not narrowly tailored to serve a compelling state interest and because it prohibits a substantial amount of protected speech.

**Count V: Violation of The Due Process Clause**

**(Vagueness, Impossibility and Strict Liability)**

294. The Due Process Clause of the 14th Amendment prohibits states from enforcing laws that are unconstitutionally vague. As a matter of due process, statutory requirements must be written with sufficient specificity that persons of ordinary intelligence need not guess at their meaning and will not differ as to their application.

295. TSORP 2017 contains provisions that are invalid under the vagueness doctrine because those provisions fail to provide a person of ordinary intelligence fair notice of what is required and what is prohibited under the statute. This makes it impossible for the Plaintiffs to conform their conduct

---

[85] *See id.*
[86] *See* Tex. Code Crim. Proc. art. 62.063 (LexisNexis 2017).
[87] *See* U.S. Const. amend. I.
[88] *See* U.S. Const. amend. XIV, § 1, cl. 3.

to the statutory requirements making it likely that the statute will be enforced in different ways in different places or against different people.

296. The Due Process Clause of the 14th Amendment prohibits states from enforcing laws with which it is impossible to comply. TSORP 2017 contains provisions with which compliance is impossible.

297. The Due Process Clause also limits the use of strict liability in the criminal law. TSORP 2017, by the manner in which it has been interpreted by the Texas Court of Criminal Appeals, contains provisions that impose strict liability in violation of due process.

298. The parts of TSORP 2017 that are void for vagueness, that are impossible to comply with, or that wrongly impose strict liability include but are not limited to:

- the requirement to report changes in personal data within seven days;[89]
- The requirement to maintain a driver's license or state personal identification card with the current address;[90] and
- The requirement to report the temporary address of any location in which an individual visits three times a month for more than 48 hours.[91]

**Count VI: Violation of The Equal Protection Clause**

299. John Doe #3 resides in and is a citizen of the state of Minnesota. He has not resided in the state of Texas for over 10 years.

300. John Doe #3 does not fall under the jurisdiction of TSORP 2017 and is not required to register in the state of Texas as a sex offender.

301. John Doe #3 successfully completed the requirements placed upon him as a sex offender by the state of Minnesota and no longer required to register in Minnesota.

302. Notwithstanding, the state of Texas continues to require John Doe #3 to register under TSORP and publicizes his personal information as well as information about his nearly 25-year old charge, which he was never convicted of, over the Internet despite having no jurisdiction over him.

303. Even though the state of Texas does not have jurisdiction over John Doe #3, its actions of maintaining him on Texas' sex offender registry are arbitrary and capricious.

304. The state of Texas is treating John Doe #3 similarly to other sex offenders on its sex offender registry by allowing his information to be publicly disseminated over the Internet.

**Count VII: Violation of The Ex Post Facto Clause**

---

[89] *See* Tex. Code Crim. Proc. art. 62.055-62.0551 (LexisNexis 2017).
[90] *See* Tex. Code Crim. Proc. art. 62.060 (LexisNexis 2017).
[91] *See* Tex. Code Crim. Proc. art. 62.059 (LexisNexis 2017).

305. The retroactive application of TSORP 2017 violates the Ex Post Facto Clause of the U.S. Constitution[92] because it makes more burdensome the punishment imposed for offenses committed before the enactment of TSORP as well as applies it retroactively. Additionally, there is no rational basis for Article 62.002 retroactive date range of 1970 and forward.[93] It is an arbitrary range and therefore should be stricken from Article 62.002. Furthermore, Article 62.002 does not meet the *Kennedy* Factors[94] and hence is punitive in nature.

306. Those whose offense pre-dates the registry are forced to comply with TSORP 2017 when they already completed their sentences. John Does #1-2, 10, 38, 72, 77, 106, 115, 127, 129, 137, 139, 144, and 152 as well as Jane Doe #136 all had a disposition date from the 1970s, 1980s, and early 1990s. The disposition dates all pre-date the creation of the sex offender registry in Texas itself.[95] Therefore, forcing them to comply because of the retroactive application of the Texas Sex Offender Registry[96] subjects Mr. Does and Ms. Doe to the punitive and prejudice nature of the registry when they have already completed their sentences.

307. Then there are those who were to be on the registry for 10 years post discharge but are now having to register on TSORP for life because of the amendments made to TSORP in 1999.[97] John Does #3, 5, 7, 9, 11, 15, 28, 39, 43, 62, 64, 68-69, 83, 87, 92-93, 96, 104-105, 112, 124-125, 132-133, 140, 143, 145, and 150-151 all had been told to register for 10 years after being discharged at their criminal sentencing only to find out they now need to register for life.[98] Each one of them has a disposition prior to the year 1999 or earlier that year itself. Therefore, applying this amendment retroactively to them is a violation of Ex Post Facto.[99] Not only is this a violation of Ex Post Facto but also there is no rational basis for making those who once were told to only register for 10 years to now have to register for life. Consequently, the amendment made to TSORP in 1999 that requires lifetime registration is arbitrary.

## Count VIII: Violation of the Eighth Amendment

308. The punishment imposed by TSORP 2017 is quite excessive and arbitrary because of the acts committed by the public against the plaintiffs and other TSORP 2017 registrants.

## Count IX: Violation of Double Jeopardy

309. TSORP 2017 also violates Double Jeopardy by imposing additional punishment on a registrant even after they have completed their sentencing requirements.

---

[92] *See* U.S. Const. art. I, § 10, cl. 1.

[93] *See* Tex. Code Crim. Proc. art. 62.002(a) (LexisNexis 2017).

[94] *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963).

[95] *See supra* note 29.

[96] *See* Tex. Code Crim. Proc. art. 62.002 *reenacted and amended by* Acts 2005, 79th Leg., ch. 1008, § 1.01, 2005 Tex. Gen. Laws.

[97] *See supra* note 39.

[98] *See supra* note 55.

[99] *See supra* note 91.

**Count X: Violation of the U.S. Constitution Contracts Clause**

310. TSORP 2017 is also a violation of the contracts clause[100] in the federal constitution because it adds punishment conditions that are in violation of some of the terms of the plea agreements made by some registrants.

**Lack of Legal Remedy**

311. The Plaintiffs' harm is ongoing and cannot be alleviated except by injunctive relief.

312. No other remedy is available at law.

**Prayer for Relief**

Wherefore, the Plaintiffs request that this Court:

a. Issue a judgment, pursuant to 28 U.S.C. §§2201-2202,[101] declaring that TSORP 2017 unconstitutionally interferes with the Plaintiffs' fundamental rights to travel, engage in the common occupations of life and to engage in free speech, and issue a preliminary and permanent injunction restraining the Defendants from enforcing against the Plaintiffs those provisions of TSORP 2017 that interfere with these rights;

b. Issue a judgment, pursuant to 28 U.S.C. §§2201-2202[102] (1) declaring that retroactive application of TSORP 2017 violates the prohibition in the U.S. Constitution against ex post facto laws and cruel and unusual punishment laws, and issue a preliminary and permanent injunction restraining the Defendants from retroactively enforcing TSORP 2017 against the Plaintiffs without an individualized determination of dangerousness; and (2) declaring the treatment of persons having deferred adjudication the same as those with conviction under TSORP 2017 violates Equal Protection and the Contract clauses;

c. Issue a judgment pursuant to 28 U.S.C. §§2201-2202[103], declaring that TSORP 2017 is void under the Due Process Clause of the 14th Amendment to the U.S. Constitution due to vagueness, impossibility, and wrongful imposition of strict liability, and issue a preliminary and permanent injunction restraining the Defendants from enforcing against the Plaintiffs those provisions of TSORP 2017 that are unconstitutional;

d. Issue a judgment certifying this petition as a class action pursuant to Fed. R. Civ. P. 23(b)(2);

e. Issue and appoint this undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23(g);

---

[100] *See* U.S. Const. art. I, § 10, cl. 1.
[101] *See* 28 U.S.C. §§ 2201-2202 (LexisNexis 2017).
[102] *See id.*
[103] *See id.*

f. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988;[104] and

g. For such further relief as the Court deems just and proper.

Respectfully submitted,

Estes-Hightower PLLC
2001 Bryan Street, Suite 2110
Dallas, Texas 75201
832-220-9454 - Office
832-916-2410 – Fax
teri.ehpllc@gmail.com
By: /s/Terence Estes-Hightower
Terence Estes-Hightower
State Bar No. 24028746
Attorney-in-Charge for Plaintiffs

---

[104] *See* 42 U.S.C. § 1988 (LexisNexis 2017).

Exhibit A
Declarations of John Does

Declaration of John Doe #1

I, John Doe #1, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #1.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #1
                                            John Doe #1

Declaration of John Doe #2

I, John Doe #2, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #2.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #2
                                            John Doe #2

Declaration of John Doe #3

I, John Doe #3, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #3.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                              /s/John Doe #3
                                                John Doe #3

Declaration of John Doe #4

I, John Doe #4, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #4.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #4
                                      John Doe #4

Declaration of John Doe #5

I, John Doe #5, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #5.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #5
                                      John Doe #5

Declaration of John Doe #6

I, John Doe #6, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #6.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #6
                                            John Doe #6

Declaration of John Doe #7

I, John Doe #7, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #7.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #7
                                      John Doe #7

Declaration of John Doe #9

I, John Doe #9, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #9.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                          /s/John Doe #9
                                            John Doe #9

Declaration of John Doe #10

I, John Doe #10, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #10.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #10
                                      John Doe #10

Declaration of John Doe #11

I, John Doe #11, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #11.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #11
                                      John Doe #11

Declaration of John Doe #12

I, John Doe #12, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #12.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #12
                                            John Doe #12

Declaration of John Doe #13

I, John Doe #13, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #13.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #13
                                       John Doe #13

Declaration of John Doe #15

I, John Doe #15, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #15.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #15
                                      John Doe #15

Declaration of John Doe #16

I, John Doe #16, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #16.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #16
                                            John Doe #16

Declaration of John Doe #19

I, John Doe #19, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #19.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #19
                                       John Doe #19

Declaration of John Doe #20

I, John Doe #20, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #20.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                              /s/John Doe #20
                                                John Doe #20

Declaration of John Doe #22

I, John Doe #22, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #22.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                           /s/John Doe #22
                                             John Doe #22

Declaration of John Doe #23

I, John Doe #23, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #23.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #23
                                      John Doe #23

Declaration of John Doe #24

I, John Doe #24, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #24.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                            /s/John Doe #24
                                              John Doe #24

Declaration of John Doe #28

I, John Doe #28, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #28.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                         /s/John Doe #28
                                           John Doe #28

Declaration of John Doe #31

I, John Doe #31, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #31.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #31
                                            John Doe #31

Declaration of John Doe #32

I, John Doe #32, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #32.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                          /s/John Doe #32
                                            John Doe #32

Declaration of John Doe #34

I, John Doe #34, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #34.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                         /s/John Doe #34
                                           John Doe #34

Declaration of John Doe #38

I, John Doe #38, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #38.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #38
                                      John Doe #38

Declaration of John Doe #39

I, John Doe #39, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #39.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #39
                                      John Doe #39

Declaration of John Doe #40

I, John Doe #40, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #40.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #40
                                       John Doe #40

Declaration of John Doe #43

I, John Doe #43, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #43.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #43
                                            John Doe #43

Declaration of John Doe #44

I, John Doe #44, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #44.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #44
                                      John Doe #44

Declaration of John Doe #55

I, John Doe #55, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #55.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #55
                                            John Doe #55

Declaration of John Doe #62

I, John Doe #62, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #62.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #62
                                      John Doe #62

Declaration of John Doe #63

I, John Doe #63, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #63.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #63
                                      John Doe #63

Declaration of John Doe #64

I, John Doe #64, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #64.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #64
                                            John Doe #64

Declaration of John Doe #68

I, John Doe #68, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #68.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #68
                                       John Doe #68

Declaration of John Doe #69

I, John Doe #69, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #69.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #69
                                      John Doe #69

Declaration of John Doe #71

I, John Doe #71, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #71.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #71
                                            John Doe #71

Declaration of John Doe #72

I, John Doe #72, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #72.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #72
                                            John Doe #72

Declaration of John Doe #74

I, John Doe #74, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #74.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                          /s/John Doe #74
                                            John Doe #74

Declaration of John Doe #75

I, John Doe #75, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #75.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #75
                                       John Doe #75

Declaration of John Doe #76

I, John Doe #76, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #76.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                         /s/John Doe #76
                                           John Doe #76

Declaration of John Doe #77

I, John Doe #77, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #77.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #77
                                            John Doe #77

Declaration of John Doe #79

I, John Doe #79, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #79.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #79
                                            John Doe #79

Declaration of John Doe #83

I, John Doe #83, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #83.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #83
                                       John Doe #83

Declaration of John Doe #85


I, John Doe #85, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #85.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #85
                                            John Doe #85

Declaration of John Doe #87

I, John Doe #87, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #87.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                              /s/John Doe #87
                                                John Doe #87

Declaration of John Doe #89

I, John Doe #89, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #89.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                     /s/John Doe #89
                                       John Doe #89

Declaration of John Doe #90

I, John Doe #90, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #90.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #90
                                      John Doe #90

Declaration of John Doe #92

I, John Doe #92, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #92.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #92
                                      John Doe #92

Declaration of John Doe #93

I, John Doe #93, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #93.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #93
                                      John Doe #93

Declaration of John Doe #94

I, John Doe #94, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #94.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #94
                                            John Doe #94

Declaration of John Doe #96

I, John Doe #96, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #96.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #96
                                       John Doe #96

Declaration of John Doe #104

I, John Doe #104, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #104.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #104
                                      John Doe #104

Declaration of John Doe #105

I, John Doe #105, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #105.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #105
                                      John Doe #105

Declaration of John Doe #106

I, John Doe #106, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #106.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #106
                                      John Doe #106

Declaration of John Doe #110

I, John Doe #110, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #110.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #110
                                      John Doe #110

Declaration of John Doe #111

I, John Doe #111, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #111.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #111
                                      John Doe #111

Declaration of John Doe #112

I, John Doe #112, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #112.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #112
                                            John Doe #112

Declaration of John Doe #113

I, John Doe #113, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #113.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #113
                                      John Doe #113

Declaration of John Doe #115

I, John Doe #115, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #115.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #115
                                            John Doe #115

Declaration of John Doe #123

I, John Doe #123, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #123.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                                  /s/John Doe #123
                                                    John Doe #123

Declaration of John Doe #124

I, John Doe #124, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #124.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #124
                                      John Doe #124

Declaration of John Doe #125

I, John Doe #125, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #125.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #125
                                      John Doe #125

Declaration of John Doe #126

I, John Doe #126, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #126.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #126
                                      John Doe #126

Declaration of John Doe #127

I, John Doe #127, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #127.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                          /s/John Doe #127
                                            John Doe #127

Declaration of John Doe #129

I, John Doe #129, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #129.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #129
                                            John Doe #129

Declaration of John Doe #132

I, John Doe #132, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #132.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                    /s/John Doe #132
                                      John Doe #132

Declaration of John Doe #133

I, John Doe #133, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #133.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #133
                                      John Doe #133

Declaration of John Doe #135

I, John Doe #135, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #135.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                         /s/John Doe #135
                                           John Doe #135

Declaration of John Doe #136

I, John Doe #136, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #136.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #136
                                            John Doe #136

Declaration of John Doe #137

I, John Doe #137, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #137.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #137
                                      John Doe #137

Declaration of John Doe #139

I, John Doe #139, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #139.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #139
                                      John Doe #139

Declaration of John Doe #140

I, John Doe #140, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #140.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #140
                                      John Doe #140

Declaration of John Doe #143

I, John Doe #143, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #143.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                          /s/John Doe #143
                                            John Doe #143

Declaration of John Doe #144


I, John Doe #144, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #144.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.


Date: June 6, 2018                         /s/John Doe #144
                                           John Doe #144

Declaration of John Doe #145

I, John Doe #145, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #145.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #145
                                      John Doe #145

Declaration of John Doe #150

I, John Doe #150, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #150.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                                  /s/John Doe #150
                                                    John Doe #150

Declaration of John Doe #151

I, John Doe #151, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #151.
- 

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #151
                                      John Doe #151

Declaration of John Doe #152

I, John Doe #152, state as follows:

- I have reviewed the facts in the complaint that relate to me. I affirm that those facts are correct to the best of my knowledge, information, and belief.
- That I am John Doe #152.
-

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge, information, and belief.

I am signing this declaration using the pseudonym assigned to me in this litigation. A declaration under my real name and hand-written signature will be on file with my Attorneys should anyone need to authenticate this declaration. Also, a notarized affidavit bearing my real name and hand-written signature that attests to these statements in the Complaint will be on file with my Attorneys should anyone need to authenticate the statements in the Complaint.

Date: June 6, 2018                    /s/John Doe #152
                                      John Doe #152

Exhibit B

Declarations of Experts:

James J. Prescott

Wayne Logan

**Does v. Abbott and McCraw**

## EXPERT REPORT/DECLARATION OF JAMES J. PRESCOTT, J.D., PH.D.

I, James J. Prescott, J.D., Ph.D., state under penalty of perjury as follows:

## 1. Background, Education, and Qualifications

I am a professor of law at the University of Michigan Law School in Ann Arbor, Michigan, where I also have an appointment in the economics department. In addition, I co-direct the Empirical Legal Studies Center and the Program in Law and Economics. In 2006, I received my Ph.D. in Economics from the Massachusetts Institute of Technology. I earned my J.D. *magna cum laude* from Harvard Law School in 2002, and my B.A. in Public Policy and Economics with honors and distinction from Stanford University in 1996.

I teach and write in the areas of criminal law and criminal sentencing. Much of my work in the last decade (which is primarily empirical) centers on the consequences of sex offender post-release laws. I focus on the effects that sex offender registration and community notification laws have on sex offense rates. The attached c.v. provides further details, including cites to relevant papers and a list of institutions and conferences at which I have presented my research on measuring the effects of sex offender notification laws.

The goal of my empirical research and writing is to further refine our collective understanding of the consequences of registration and community notification on the number and nature of sex offenses. (Note: I use the term "registration" to refer to laws that require the *private* registration of released sex offenders with the police or other local authorities, and the term "notification" to refer to laws that mandate that registration information be made public—i.e., *public* registries.) For example, one of my projects studies whether registration and, particularly, notification laws (again, *public* registries) have any effect on the *location* of sex offenses (joint work with Amanda Agan, an economics professor at Rutgers University).[1]

A number of my recent projects distill and critically evaluate existing empirical work on the effects of sex offender post-release laws. These works concentrate on trying to understand the full scope of the consequences of these laws and, importantly, the mechanisms underlying the behavioral patterns that researchers—including myself—have detected.

## 2. The Effects of Sex Offender Registration and Notification Laws

Almost ten years ago, I began a series of large-scale empirical projects designed to identify and measure the consequences of sex offender post-release laws, including sex offender

---

[1] *See* Amanda Y. Agan & J.J. Prescott, *Sex Offender Law and the Geography of Victimization*, 11 J. Emp. Legal Stud. 786 (2014), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2614543.

registration and notification laws. Seven years ago, I published an article with Jonah Rockoff of Columbia University that offers comprehensive evidence on the relationship between sex offender notification laws (i.e., *public* registries) and the frequency and nature of sex offenses.[2] This peer-reviewed study, which analyzed data from 15 states (including Texas) over approximately ten years, provides compelling evidence that rather than reducing recidivism, notification laws may well have *increased* (and almost certainly have *not* reduced) the frequency of sex crimes committed by convicted sex offenders.

I describe this research in three parts. First, I report the empirical results of my research with Rockoff and explain their implications for evaluating Texas's sex offender registration and notification laws. Second, I describe our study's data and empirical methodology. Third, I explain how and why public registries (and, by implication, potentially other post-release laws that share similar characteristics), although intended to make people safer, may actually put people at greater risk of becoming victims.

A.  The Recidivism Consequences of Notification (i.e., *Public* Registration)

Registration and notification laws have the potential to influence sex-offending behavior in two primary ways. First, potential first-time sex offenders (or non-registered offenders more generally) could become less likely to commit offenses because they fear having registration and notification laws applied to them in the future if they are caught and convicted. We refer to this behavioral response as "deterrence." Second, convicted sex offenders who are presently subject to registration and notification could become less likely to commit offenses because these laws make doing so more difficult—by increasing the difficulty of finding a victim or the likelihood of detection, or by mitigating the risk factors that cause individuals to return to crime. We term this behavioral response "recidivism reduction."

While both deterrence and recidivism reduction can influence the overall frequency of sex crimes, proponents of sex offender registration and notification laws have always (and have almost exclusively) justified them on the grounds that they can reduce recidivism. This makes sense: the goal of enabling potential victims to protect themselves by learning the identities and criminal histories of potential recidivists requires, by assumption and design, the collection and sharing of such information. By contrast, generally deterring potential offenders may be achieved in many potential ways (e.g., increasing prison sentences).

With respect to reducing the recidivism of convicted sex offenders, the results of our empir-ical research do not support the use of notification (i.e., public registries). But our results do

---

[2] *See* J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. Law & Econ. 161 (2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100663.

provide some support (with the caveats detailed below) for the use of *private* registries to help the police and other authorities monitor convicted offenders.

Private Registration: To begin with, we find no discernible deterrent effect of private registries. This is not surprising—in the 1990s, private registries allowed only the police or other state officials to learn of a conviction. As a result, there was little public shame (so long as the records remained confidential), and the burdens of complying with registry requirements were very low by comparison with today's time-consuming, difficult, and expensive obligations. Texas law, for example, appears to require homeless registered sex offenders to re-register their location with law enforcement every 30 days if they reside in a single location; if they are more mobile, registrants may be required to register once a week.[3] We do, however, find evidence that these private registries reduce recidivism, at least with respect to sex offenses committed against family members, friends, acquaintances, and neighbors (but not against strangers), suggesting that closer monitoring by the police provides some protection for easily identifiable targets.

Public Registration: With respect to notification, however, we observe quite the opposite pattern. The threat of becoming subjected to a notification regime—and the shame and collateral consequences that accompany being publicly identified as a sex criminal—had a measurable deterrent effect (i.e., reducing offenses by non-registrants). But, once we take into account the number of individuals subjected to public notification, we find that the more people a state subjects to notification, the higher the relative frequency of sex offenses in that state. These results are highly statistically significant: our estimates indicate that it is very unlikely that these laws are reducing recidivism by registrants, and that it is likely that these laws are actually increasing recidivism (that is, that the laws are causing positive harm).

Specifically, we find a 0.86% increase in the number of sex offenses per year for every additional registrant per 10,000 people in a state with a notification regime in place. Using the average per capita registry size (i.e., adjusting for state population levels) across our sample of states, this economically and statistically significant increase in recidivism by registrants more than offsets the estimated gains from the deterrence of crimes by potential or non-registered offenders. On balance, for states with average-sized registries (or what was average during our sample years), we calculate that notification laws lead to an additional 0.144 sex offenses per 10,000 people (relative to the number of offenses that would have occurred with only a private registration law in place) or an additional offense or two per 100,000 people.

Thus, if Texas were a "typical" jurisdiction in terms of the per capita number of sex offenders it chose to subject to notification *during our sample years*, these findings would translate, given Texas's size, to hundreds of additional sex offenses per year in the state. Importantly, as per capita public registry sizes (including Texas's) have grown over the years,

---

[3] *See NewsChannel 10 Investigates: Homeless Sex Offenders*, NEWSCHANNEL 10 (last visited May 23, 2018), http://www.newschannel10.com/story/19015695/newschannel-10-investigates-homeless-sex-offenders.

what was once "typical" is now low (with more than 40 states now above the average per capita registry size of the 1990s and 2000s). This growth suggests that most public registries in the U.S. today are increasing sex crime rates, even in many states that publicly list comparatively few registered sex offenders. Indeed, if Texas had a public registry that was merely average in size in today's terms, our research indicates that the registry would nevertheless be the cause of many hundreds or thousands of additional sex crimes each year in the state.

Unfortunately, Texas's number of offenders per capita on its public sex offender registry (relative to the rest of the country) is not average—it is well above average. Estimates of the number of publicly registered offenders can vary. One reputable source, Family Watchdog,[4] puts Texas in the top five states in terms of the *per capita* number of publicly registered sex offenders. This seems a bit high when comparing to other available information that I have been able to consult, but these sources nevertheless consistently indicate that Texas today has a per capita registration rate markedly above the national average, somewhere between 30 and 35 registered offenders per 10,000 individuals (relative to an average of around 23 to 26 for the rest of the country—Texas is about 30% higher).[5] Specifically, making some simple calculations using information from Parents for Megan's Law, the National Center for Missing and Exploited Children, and World Population Review,[6] I am able to quickly estimate that Texas has approximately 30 to 33 (depending on the source) publicly registered sex offenders per capita in 2016 or 2017 (depending on the source) and ranks either 13th or 14th among states on this measure. In absolute terms, Texas ranks either first or second with respect to the total number of sex offenders it lists publicly on its registry.

Given size of Texas's public registry (approximately 30 to 33 registrants per 10,000 individuals in the state), notification-generated increases in recidivism are very likely to dwarf any deterrence gains, generating sex offense rates that could be significantly higher (on the order of 5% to 10%) than they would otherwise be. In fact, this estimate of the increase in the number of sex offenses resulting from notification is conservative given the results of our study. Nevertheless, our study provides evidence that can be used to show, strikingly, that Texas's notification regime is very unlikely to be *reducing* recidivism; to the contrary, our research suggests it accounts for at least hundreds of additional sex offenses each year.

We base these empirical conclusions on comparisons of sex offense frequencies over time and across states, carefully controlling for inherent geographic, economic, and social differences and trends over time. Changes in national mood would not generate these results; the study's

---

[4] *See* https://www.familywatchdog.us/offendercountbystate.asp (visited on May 23, 2018).

[5] For example, see https://www.cheatsheet.com/culture/sex-crimes-states-with-most-registered-sex-offenders.html/ (reporting that Texas has the 13th most registered sex offenders).

[6] https://www.parentsformeganslaw.org/public/meganReportCard.html, http://www.missingkids.com/ourwork/publications/exploitation/so-map, and http://worldpopulation review.com/states/ (visited on May 23, 2018), respectively.

findings also cannot be accounted for by arguing that states with large registries are just *different* from other states. For one, we control for county-level demographics and income over time and for other crime rates (e.g., the frequency of non-sex crime generally as well as the frequency of assaults). Therefore, when public registries grow, we find that even *relative to other kinds of crime*, the number of sex offenses rises under notification. For another, even within a state, if the number of publicly registered offenders grows faster than average (relative to other states), the frequency of sex offenses also grows relatively faster than average.

In the final published paper, we also address and reject a number of other explanations for our empirical findings. We consider, among others, changes in victim reporting behavior, strain on police resources, and public attention fatigue.

We also find evidence in our study that notification does *not*, in fact, make it much more difficult for registered offenders to commit new crimes. This result is at odds with the underlying theory that publicly identifying past offenders will alert potential victims to the presence of "nearby" offenders and allow these potential victims to protect themselves (see part C below). Specifically, we find that notification laws generate similar increases in the frequencies of sex offenses against each type of victim—i.e., against family members, neighbors, acquaintances, *and strangers*. Therefore, even in a relative sense, it does not appear that neighbors and acquaintances have benefited from the enactment of notification laws.

Finally, although our research indicates that *private* registration laws appeared to reduce recidivism in the 1990s, care is necessary in extrapolating those results to the effects of present regimes re-imagined as private registries. Leaving aside the fact that registration information is now public in Texas (and in all states for at least high-risk offenders), the procedures and requirements of registration in the 1990s were *significantly* less burdensome in time and money, and in terms of the difficulty of compliance, than they would be if a "private version" of the average public registry were used today.

### B. Empirical Methodology for Identifying the Effects of Notification

Because the effects of these laws depend a great deal on how they are structured (see part C below), and because the states and the federal government passed these laws with no in-depth investigation of their likely consequences, my research with Rockoff on notification employed well-known federal crime data covering many states over many years to generate reliable evidence on both how these laws influence recidivism levels and, even if crime frequency remains unaffected, how these laws alter sex offender behavior more generally.

Our approach builds on the fact that notification laws are designed to reduce recidivism by making individuals who are located "near" potential recidivists (like neighbors, acquaintances, etc.) safer by providing any potential victim with supposedly useful identifying information about released offenders who might pose a threat. Therefore, if notification works as its proponents suggest, we would expect to see relatively fewer attacks against neighbors and acquaint-

ances under a notification regime. To test this hypothesis, Rockoff and I made use of the federal government's National Incident-Based Reporting System (NIBRS) data, the only high-quality, multi-state crime data with details about offender-victim relationships. (We discuss the NIBRS data in detail in Section 4 and the Appendix of our article, including many advantages and disadvantages of the NIBRS program and the steps we took to ensure the reliability of the data we used in our analysis.)

NIBRS is a relatively new data collection effort, with only a few states participating at the outset in the early 1990s. As registration and notification laws were enacted primarily in the 1990s, we selected the 15 states that were participating in NIBRS as of 1998: Colorado, Connecticut, Idaho, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, North Dakota, Ohio, South Carolina, Texas, Utah, Vermont, and Virginia. This is a fairly representative group of states, both geographically and in terms of the evolution of their sex offender legislation. To enhance the reliability of our work, we limited our analysis to states that were part of NIBRS by 1998 to be sure that we had data for a significant period of time both before and after the states enacted their notification laws. We conducted our analysis using NIBRS data through 2005, giving us more than 10 years of data for some states and at least 7 years for all states.

Next, we characterized the content and timing of the registration and notification laws in each of these 15 states. We conducted painstaking legal analysis for more than a year to identify the precise times that statutes were enacted and when each became effective and operational. (Because NIBRS crime data is collected by month, we are able to make use of these precise legal details in our work.)

In coding these laws, we were careful to distinguish between private registries and notification (public registries) because they are meant to function in very different ways. We were also careful in how we described each notification law, as the content of these laws varies across states and over time. For example, early notification laws allowed the public merely to access paper registries; eventually, all notification laws required that sex offender data be posted to publicly accessible internet web-registries. Some states, including Texas, also enacted "active" notification laws in which government actors took affirmative steps to make sure individuals deemed to be at-risk by legislators (e.g., neighbors) were informed of relevant released offenders, for example, by written notice or a personal visit by a police officer.

Our research also took into account whether these laws had discretionary or mandatory features as they evolved over time. Finally, with respect to internet registries, we conducted a separate investigation to determine not only when each web registry law became effective, but when each site became operational *in fact* and largely complete in its coverage.

With data on individual sex offense incidents by county for 15 states over many years, we were in a position to conduct a fairly straightforward "program evaluation" had we wished to go that route. In effect, using multiple regression analysis, we could have proceeded by examining

how the frequency of sex offenses (and the types of sex offenses—in particular, the frequency of sex offenses between neighbors or acquaintances) changed in response to the implementation of registration and notification laws. With 15 states and a long stretch of years, we were able to control for national trends or a trend over time in a single state (one that might affect the number of sex offenses at just around the time a state passed a sex offender law) to ensure that neither was confounding our results. Our data allow us, for example, to account for state-specific trends in the number of sex offenses as well as trends in other crime levels.

If we were interested purely in whether registration and notification laws reduced crime *on the whole*, this would have been the appropriate strategy. But these laws have been defended as attempts to reduce sex offender *recidivism*, not merely as additional deterrents to "potential" or non-registered sex offenders. As described above, public registration laws could theoretically reduce new sex offenses in one of two ways: (1) by deterring non-registered offenders (who wish to avoid, for example, the burdens and shame of public notification should they be caught and convicted); and (2) by reducing the recidivism of registered offenders by providing information to and facilitating monitoring by the public. Our research design was constructed to assess each of these possibilities separately.

Separately identifying and measuring these two hypothetical consequences of notification laws is essential, but difficult to do persuasively with comprehensive federal crime data because these data do not indicate whether a crime was committed by a registered sex offender or a new, non-registered offender.

Our research solved this problem in an intuitive way. Although we, too, were unable to observe whether a crime in our data was committed by a registered sex offender or by a non-registered or potential offender, we made use of the following simple fact: registration and notification laws cannot reduce (or increase) the frequency of sex offenses through changes in recidivism levels (by, for example, improving police and public monitoring or by informing potential victims of nearby threats) when nobody or only a few convicted sex offenders are subject to these laws—i.e., when registries are close to "empty." On the other hand, both registration and notification laws *can*, in theory, reduce the frequency of sex offenses even when registries are "empty" by deterring potential sex offenders who fear becoming subject to these laws in the future if they are convicted of committing a sex crime.

We extend this logic in our research to take advantage of the significant variation in retroactive coverage of registration and notification laws across states. This coverage variation resulted in dramatic differences in the numbers of covered individuals as these laws became effective: some states applied their laws only prospectively; others made them retroactive, applying them to individuals convicted and/or released over a range of different time frames. Accordingly, as states began to enforce their registration and notification laws, some states had large registries while others had empty or nearly empty registries.

To operationalize this idea, we collected registry size data for each state at different points in time, and used county-level registry sizes in August 2007 to estimate the size of the registry in each county for each month. In effect, we studied how county patterns in the number and type of sex offenses vary with registry size over time. If these laws worked to reduce recidivism, we would have expected to see that counties with larger registry sizes had greater relative reductions in the number sex offenses, all else equal (i.e., after controlling statistically for other differences across counties, states, and time—crime rates and how they change, demographics and how they change, national trends and shocks, etc.). This pattern is not what we found, however.

### C.  Explaining Why Notification Laws, though Intended to Keep People Safe, May Actually Increase Recidivism

The conclusion of our research that notification appears to *increase* recidivism (see part A) may seem counterintuitive at first blush. After all, notification (i.e., the active identification of sex offenders through public registries) is designed to alert potential victims to the threat a nearby released sex offender may pose. But, for this approach to reduce the recidivism levels of released sex offenders, two separate conditions must be met.

First, for notification laws to reduce recidivism, the public identification of sex offenders must make it more difficult, on average, for an offender to commit a sex crime.

This condition, in turn, requires 1) that individuals who are likely to be victimized must be *newly* informed of an offender's status as a result of the operation of the notification law, 2) that potential victims are *newly* capable of acting in ways that reduce their exposure to victimization by registered offenders, and 3) that a released offender who becomes at risk for committing a new crime will not discover an alternative victim nearby who is either unaware of the offender's status or is unable to act on the basis of that information to reduce (or reduce by a lot) the risk of becoming a victim.

But, as ample research demonstrates, offenders are rarely strangers to their victims. Friends and family members will often already be aware of a sex offender's criminal history. When the potential victim of an offender is a stranger, it may be hard for the victim to determine the offender's status or to reduce her exposure. Even if the victim is able to reduce her exposure, a released offender who becomes at risk for reoffending may find himself surrounded by other potential victims, many or some of whom *are* unaware, in all or almost all cases. Neighbors seem most likely to benefit from notification so long as they receive the information and are able to behave in ways that reduce their risks. Neighbors, however, make up much less than 5% of all sex offense victims (Prescott & Rockoff (2011), at p.176).

Second, for notification to reduce recidivism, these laws must avoid aggravating the risk factors that significantly increase an offender's chance of reoffending.

Even if notification were to succeed at making it more difficult for sex offenders to reoffend, recidivism might still increase under notification regimes: after all, the difficulty of committing a crime is only one factor, among many, affecting an offender's likelihood of recidivating. Publicly identifying an individual as a sex offender (as well as imposing other significant burdens, as Texas does—residency restrictions, employment restrictions, frequent reporting requirements, etc.), on the other hand, influences *many* of these factors by dramatically changing a sex offender's daily life, future prospects, and psychological and financial burdens. While a law that imposes restraints and/or burdens on a released offender does have the potential to reduce recidivism if that law makes the commission of crime more difficult or if it mitigates risk factors, such a law also has the potential to *increase* recidivism if it exacerbates risk factors (e.g., unemployment, unstable housing) that are known to contribute to reoffending.

Notification regimes, with their attendant registration burdens, appear much more likely to *increase* the likelihood that affected individuals return to crime, all else equal. These laws and their application exacerbate recidivism risk factors. Many compelling studies have established that publicly identifying sex offenders makes it more difficult for them to find employment and housing, residency restrictions make everything more expensive and life less stable, and both make it harder for registered offenders to be with family. Life as a registered sex offender, by all accounts, is simply much more difficult than it otherwise would be—in no small part because of the operation of comprehensive sex offender post-release laws.

Notification schemes (as well as other post-release sex offender restrictions) are intended to reproduce an upside of incarceration, essentially by "incapacitating" potential recidivists *as if* they were still in prison. Public registration attempts to create a barrier between released sex offenders and potential victims. Unfortunately, the analogy of post-release laws to prison is too apt: the public identification of individuals as "sex offenders" reproduces many of the deprivations and burdens of prison in addition to the incapacitation effect. Plus, by making the world outside of prison more like being in prison, sex offender post-release laws reduce the value of any threat to return someone to prison should he commit another sex crime. Put another way, the more difficult, lonely, and unstable a registered sex offender's life is, the more likely he is to return to crime—and the less he has to lose by committing new crimes.

It is easy to see, therefore, that the effect on recidivism of public registration laws (and of most sex offender post-release laws generally) is an empirical question: the effectiveness of these laws will depend on how they are structured and applied.

If notification and its associated burdens make it more difficult for a registered sex offender to find victims, while at the same time not aggravating the risk factors known to lead to recidivism and not reducing a registered offender's desire to avoid prison, then crime rates should drop. But if these laws (and other post-release requirements that are combined with notification laws in Texas) impose significant burdens on a large share of former offenders, and if only a limited number of victims benefit from knowing who and where sex offenders are, then we

should not be surprised to observe more recidivism under notification, with recidivism rates rising as notification expands.

### 3. Evidence from a Compendium of Sex Offender Post-Release Laws

A. The Purposes and Process of Compilation

To carry out my empirical research into the consequences of sex offender post-release laws, and to create a resource for other researchers, I have compiled a comprehensive history (compendium) of such laws for each of the 50 states through the first 20 plus years of their operation.

In order to understand the consequences of these laws on health, crime, life prospects, etc., it is necessary to carefully distill the substantive provisions of these laws into categories that can be useful for analysis. Because my work is empirical and requires comparisons across states, I designed the compendium from the outset not only to include all substantive post-release laws that are applied specifically to sex offenders, but also to ensure consistent notation and organization across states. The compendium thus records and describes the establishment and subsequent evolution of all forms of laws targeted exclusively at controlling and supervising sex offenders—including sex offender registration, community notification, residency restrictions, employment restrictions, and civil commitment, among others.

The record begins for most states in the late 1980s or 1990s—Texas's story begins in 1991 with its first modern notification law being enacted in 1995—but in the intervening years, dozens of laws have been passed in every state, creating a complicated, constantly changing picture for released offenders subject to registration and notification. The compendium is current through the end of 2009. (This is sufficient for its primary purpose—facilitating empirical research on the effects of these laws—as any study of a post-release law's consequences requires a significant post-period for measurement.) The compendium contains over 1000 pages of concise descriptions of every state's sex offender post-release laws.

In the 2000s, states began developing and deploying a number of new post-registration restrictions (and imposing new duties) on released sex offenders. Most of these more recent post-release restrictions have been built "on top" of the basic registration framework laid down in the early 1990s. Texas fits this mold. For example, the state was an early adopter of residency restrictions, experimenting with them as early as 1997 (under the moniker of child safety zones).

A limitation of the compendium is that it focuses on "substantive" restrictions on behavior, not the many burdensome "procedural" requirements that must be satisfied for a released sex offender to remain free (such as registering changed residency information within a specified number of days, paying for updating registration information, etc.). Although the compendium does contain some of this information, and it is often easy to see how many new procedural obligations have been added to Texas's and other states' sex offender post-release laws, the

compendium is underinclusive in that it omits many of the complicated day-to-day requirements and fees that covered offenders are under pain of penalty to satisfy.

## B. Evidence from the Compendium

Analysis of the evolution of the sex offender laws of the 50 states shows that the number of post-release obligations, restrictions, constraints, and disabilities placed on sex offenders has exploded over the last twenty years and especially during the last decade.

With very few exceptions, sex offender post-release laws across the states have been caught for years in a one-way ratchet of imposing increasingly severe and burdensome restraints and disabilities on released sex offenders. In many states, these laws have become progressively more wide-reaching on an almost yearly basis, requiring more and more of an individual's time (and money) to remain in compliance. The regular changes and growing complexity of these laws make compliance more difficult and innocent errors more common. Furthermore, legislatures regularly broaden the scope of laws that had been previously on the books, adding new individuals to the class of "registered sex offenders," even though the crimes newly covered may have been committed many years in the past.

The structures undergirding the vast array of state sex offender laws are the basic sex offender registration statutes. Historically, a state identified those individuals it wished to register for the sake of monitoring (often by their crimes of conviction), and defined that category with the phrase "sex offenders" or some similar term. Registration statutes sometimes created two or more groups of offenders, differentiating one from the other and from non-sex offenders on the basis of the perceived seriousness of the crime of conviction and the perceived need, in particular, to register the groups in question.

Although these groups were demarcated for a particular purpose (i.e., for registration and police monitoring) at a particular point in time, subsequent sex offender post-release laws have in effect piggybacked on the existing structure and definitions. Yet it has never been made clear whether the individuals who the legislature originally determined ought to be publicly registered as sex offenders *also* ought to be subject to residency restrictions, employment restrictions, etc. Nor is it clear that those who are subject to residency restrictions ought to be subject also to employment restrictions, and vice versa.

In other words, the panoply of obligations and restrictions now knotted up with "sex offender" registration are premised on an individual's underlying status as a registrant regardless of whether those particular obligations and restrictions are appropriate for the wide range of individuals who are now classified as sex offenders. Consequently, registration requirements have become indistinguishable in many states from the package of myriad restrictions and obligations that legislatures have enacted in recent years.

Registration laws and the post-release laws that derive from them share, as a general matter, a number of other characteristics, as well.

First, failure to comply with the increasingly complex and confusing restraints and disabilities will not uncommonly return a registered individual to incarceration, and these failures are often considered strict liability offenses (see, e.g., TEX. CODE CRIM. PROC. ANN. art. 62.102). Considerable vagueness plagues many of the definitions of these constraints and obligations. There is often little discretion on the part of judges or others to loosen these restrictions, and the penalties for violations can be severe.

Second, while the basic categories of sex offender restrictions built on top of the early registration statutes seem straightforward enough in the abstract (e.g., residency restrictions), the vast web of sex offender post-release laws across the states are numerous, unpredictable, unexpected, burdensome, complicated, and often vague. It is worth emphasizing (as many have done in other work) the sheer volume of constraints and obligations this broad array of sex offender laws impose and the constant vigilance required of offenders to stay in compliance.

One serious set of difficulties for registered sex offenders arises from the fact that they face additional obligations in other states should they travel. Post-release laws allow only very small windows within which to comply, and because there is incredible variety in the procedures and substantive obligations across the states, confusion is certain, in addition to the time and effort the satisfaction of these obligations requires.

For example, consider an offender who must register in Texas because he maintains a residency or must register in the state (see TEX. CODE CRIM. PROC. ANN. art. 62.051 and TEX. CODE CRIM. PROC. ANN. art. 62.152, the latter of which requires even a non-resident offender who "is employed, carries on a vocation, or is a student in [Texas]" to register). If this offender visits Ohio for more than three days at a time, works there, or attends school there, he must register in Ohio as well (see OHIO REV. CODE. ANN. § 2950.04). In Indiana, an offender must register if he spends or intends to spend at least *seven* days, inclusive, in Indiana, or if he owns any real property in Indiana and returns to the state at any time (see IND. CODE. § 11-8-8-7). Registration laws are written such that individuals may have to be simultaneously registered in many states at a time and yet the rules and procedures for registration vary by enough to make complete compliance difficult and time-consuming. It does not help that many states require regular in-person registration.

A Texas registrant who travels regularly must also be aware of and comply with different states' post-release residency restrictions that apply to them. Continuing to use Ohio and Indiana as examples, Indiana prohibits certain registrants from residing (for a period longer than 3 nights in one location in any 30-day period) within 1,000 feet of a school, youth program center, or public park (see IND. CODE. § 35-42-4-11). Ohio prohibits offenders from residing within 1,000 feet of any school or child day care center (see OHIO REV. CODE. ANN. § 2950.034). All states

have residency restrictions, but who is subject to them, the procedures registrants must follow, and what areas are off-limits vary by state. Consequently, registered individuals in Texas travelling to other states where they also must register will be subject to a range of different regimes of post-release laws.

Finally, while post-release laws are typically defended as attempts by legislatures to reduce recidivism and improve public safety, the history of these laws across the states undermines this interpretation (and instead is suggestive of an interest in punishment):

- States enacted and implemented registration and notification laws with no sustained or rigorous study of their likely consequences, often doing so in response to a public outcry and anger following a particular crime.

- A significant body of empirical work has examined the behavior of convicted sex offenders and the likely consequences of sex offender registration and notification laws on recidivism. This evidence is consistent with my work, showing overwhelmingly that, at best, public registration does not improve recidivism rates, and it may well be counterproductive.

- Despite this research, most of these laws and their amendments remain non-evidence-based and do not reflect our current understanding of how sex offenders behave, or what research suggests works and does not work in reducing their recidivism levels.

- Research has also demonstrated that these laws are financially costly to states and local governments, create a great deal of useless fear among members of the public, and are financially, physically, and emotionally costly to covered offenders.

- Many states impose post-release laws on the basis of the crime of conviction, regardless of whether the offender presents any risk to anyone and regardless of the availability of accurate and cost-effective risk assessment protocols.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

James J. Prescott, J.D., Ph.D.

Dated: May 25, 2018

Alicia Lixey
Notary Public of Michigan
Washtenaw County
Expires 12/04/2018
Acting in the County of _____

13

# JAMES J. PRESCOTT

University of Michigan Law School
Ann Arbor, MI 48109
(Office: 734-763-2326)
jprescott@umich.edu

---

## EMPLOYMENT

**UNIVERSITY OF MICHIGAN LAW SCHOOL,**   Professor of Law (2011–).
Professor of Economics (2015–) (courtesy).
Co-Director, Program in Law and Economics (2012–).
Co-Director, Empirical Legal Studies Center (2014–).
Assistant Professor of Law (2006–11).

| | |
|---|---|
| Research: | Criminal Law |
| | Civil Litigation and Settlement |
| | Empirical Law and Economics |
| | Sentencing and Corrections |
| | Employment Law |
| Teaching: | Criminal Law |
| | Employment Law |
| | Law and Economics Workshop |
| | Negotiation |
| | Economic Analysis of Law |
| | Theory of Criminal Law |

## EDUCATION

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, Ph.D., Economics, 2006

| | |
|---|---|
| Honors: | MIT Department of Economics Fellowship (1997–99) |
| | Jacob K. Javits Fellowship (1998–2002) |
| Dissertation: | *Essays in Empirical Law and Economics* |
| | (Advisers: David Autor, Michael Greenstone, Christine Jolls) |

**HARVARD LAW SCHOOL**, J.D., 2002

| | |
|---|---|
| Honors: | Graduated *magna cum laude* |
| | John M. Olin Fellowship in Law and Economics (1999–2002) |
| | Treasurer (Vol. 115) and Editor, *Harvard Law Review* |
| Clerkship: | Hon. Merrick B. Garland, U.S. Court of Appeals for the D.C. Circuit (2002–03) |

**STANFORD UNIVERSITY**, B.A., Public Policy and Economics, 1996

| | |
|---|---|
| Honors: | Graduated with Honors and Distinction; Phi Beta Kappa (elected in junior year); Ethics-in-Society Honors Program; Presidential Award for Excellence in the Freshman Year; Truman Scholar Finalist (CA) |
| Thesis: | *Why Vote? Using Principles to Solve the Paradox of the Irrational Voter* |

## PUBLICATIONS & MANUSCRIPTS

Spier, Kathryn E., and J.J. Prescott, "Contracting on Litigation, "revise and resubmit at *RAND Journal of Economics*.

Prescott, J.J., "Assessing Access to Justice Outreach Strategies," *Journal of Institutional and Theoretical Economics* (JITE), 174(1) (2018), 34–63.

Prescott, J.J., "Improving Access to Justice in State Courts with Platform Technology," *Vanderbilt Law Review*, 70 (2017), 1993–2050.

Prescott, J.J., and Kathryn E. Spier, "A Comprehensive Theory of Civil Settlement," *New York University Law Review*, 91 (2016), 59–143.

Prescott, J.J., "Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism," *Connecticut Law Review*, 47 (2016), 1035–78 (symposium)

Bulinski, Maximilian A. and J.J. Prescott, "Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency," *Michigan Journal of Race and Law*, 21 (2016), 205–49 (symposium)

Prescott, J.J., Norman D. Bishara, and Evan Starr, "Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project," *MSU Law Review*, 2016, 369–464 (symposium)

Gerstein, Charlie, and J.J. Prescott, "Process Costs and Police Discretion," *Harvard Law Review Forum*, 128 (2015), 268–88.

Prescott, J.J., Kathryn E. Spier, and Albert H. Yoon, "Trial and Settlement: A Study of High-Low Agreements," *Journal of Law and Economics*, 57 (2014), 699–746.

Agan, Amanda Y., and J.J. Prescott, "Sex Offender Law and the Geography of Victimization," *Journal of Empirical Legal Studies*, 11 (2014), 786–828.

Prescott, J.J., "Do Sex Offender Registries Make Us Less Safe?" *Regulation*, 35:2 (2012), 48–55.

Prescott, J.J., "Child Pornography and Community Notification: How an Attempt to Reduce Crime Can Achieve the Opposite," *Federal Sentencing Reporter*, 24 (2011), 93–101.

Prescott, J.J., and Jonah E. Rockoff, "Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" *Journal of Law and Economics*, 53 (2011), 161–206.

Prescott, J.J., "The Challenges of Calculating the Benefits of Providing Access to Legal Services," *Fordham Urban Law Journal*, 37 (2010), 303–46 (symposium).

Prescott, J.J., and Sonja B. Starr, "Improving Criminal Jury Decision Making After the *Blakely* Revolution," *University of Illinois Law Review*, 2006, 301–56.

Jolls, Christine M., and J.J. Prescott, "Disaggregating Employment Protection: The Case of Disability Discrimination," *NBER Working Paper 10740* (2004).

## WORKS IN PROGRESS

Prescott, J.J., and Alexander Sanchez, "Platform Procedure: Using Technology to Facilitate (Efficient) Civil Settlement" (forthcoming edited volume from 4th Empirical Studies of Judicial Systems International Conference, Symposium, "Do Courts Rule Efficiently? Empirical Inquiries")

Starr, Evan, Norman D. Bishara, and J.J. Prescott, "Noncompetes in the US Labor Force," draft available.

Starr, Evan, J.J. Prescott and Norman D Bishara, "Noncompetes and Employee Mobility," draft available.

Prescott, J.J., and Sonja Starr, "Evaluating the Impact of Criminal Record Set-Aside Laws on Recidivism and Socioeconomic Outcomes," 15-page funding narrative available.

Garrett, Brandon L., and J.J. Prescott, "Determinants of Success in Post-Conviction Litigation by the Innocent," draft available.

Prescott, J.J., "The Possibilities of Offender Choice in Sentencing: Eliciting Forward-Looking Information," draft available.

Prescott, J.J., "Measuring the Consequences of Criminal Jury Trial Protections," revise and resubmit at *Journal of Legal Studies*.

Prescott, J.J., "Empirical Evidence of Prosecutorial Charging Manipulation: And What It Tells Us about What Prosecutors Are Trying to Do," draft available.

Klick, Jonathan, and J.J. Prescott, "The Effect of Sex Offender Laws on the Sexual Abuse and Health of Minors," 25-page funding narrative available.

Prescott, J.J., and Eric B. Laber, "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes," 15-page funding narrative available.

Bailey, Martha J., and J.J. Prescott, "The Regulation of Vice in the 1960s: The Case of Contraception as 'Obscene,'" précis available.

Prescott, J.J., "Data Set: New Orleans District Attorney's Office Data, 1988-1999," including arrest, charging, conviction, and sentencing data with judge, prosecutor, and defendant identifiers and over 30,000 defendant observations.

## OTHER WRITING & RESEARCH

Bulinski, Maximilian A., and J.J. Prescott, "Designing Legal Experiences: Online Communication and Resolution in Courts," *Legal Informatics* (Daniel Martin Katz, Michael J. Bommarito II & Ron Dolin, eds.) (Cambridge Univ. Press) (forthcoming)

Hou, Youyang, Cliff Lampe, Maximilian Bulinski, and J.J. Prescott, "Factors in Fairness and Emotion in Online Case Resolution Systems," *Proceedings of the 2017 ACM Conference on Human Factors in Computing Systems* (May 2017).

Prescott, J.J., Kathryn E. Spier, and Albert H. Yoon, "审判与和解：高低协议研究" [Trial and Settlement: A Study of High-Low Agreements] (translated by Yajie Xin. 比较)፡ *Comparative Studies*, no. 80 (2015), 154–189.

Prescott, J.J., "Unclogging Courts by Resolving Simple Cases Online," THE BRIDGE, May 19, 2016, available at http://bridgemi.com/2016/05/unclogging-courts-by-resolving-simple-cases-online/.

3

Prescott, J.J., "In Michigan, Access to Justice a Click Away," DETROIT NEWS, Mar. 12, 2015, at 3B, available at http://www.detroitnews.com/story/opinion/2015/03/11/prescott-court-innovations/70166738/?fb_ref=Default

Prescott, J.J., "Criminal Sanctions and Deterrence," *Encyclopedia of Law and Economics* (2015) (Jürgen Backhaus, ed.).

Agan, Amanda Y., and J.J. Prescott, "Sexual Offenses," *Encyclopedia of Law and Economics* (2015) (Jürgen Backhaus, ed.).

Prescott, J.J., "A Fifty-State Compendium of Sex Offender Regulation" (2010).

Prescott, J.J., "Tort as a Debt Market: Agency Costs, Strategic Debt, and Borrowing against the Future, *Harvard Law Review*, 115 (2002), 2294–316 (Student Note).

Prescott, J.J., "Prevailing Party—*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 121 S. Ct. 1835 (2001)," *Harvard Law Review*, 115 (2001), 457–67 (Student Supreme Court Case Comment).

Prescott, J.J., "Second Circuit holds that Punitive Damages are Unavailable against Municipalities—*Ciraolo v. City of New York*, 216 F.3d 236 (2d Cir. 2000)," *Harvard Law Review*, 114 (2000), 666–72 (Student Recent Case Comment).

## GRANTS AND AWARDS

University of Michigan, Poverty Solutions at Ford School of Public Policy ($25,000) (2017) ("Targeting Poverty in the Courts: Improving the Measurement of Ability to Pay") (Co-PI: Meghan M. O'Neil)

University of Michigan, Global Challenges for Third Century Initiative (Phase Two: $2,767,500) (2014) ("Technology-Aided Access to Courts through Enhanced Online Functionality")

University of Michigan, Office of the Vice President for Research ($15,000) (2013) ("A Survey of Employment Non-Competition Agreements: Incidence, Knowledge, Perceptions, and Mobility")

Distinguished Brief Award, Thomas M. Cooley Law Review ("recognizes the most scholarly brief filed before the Michigan Supreme Court, as determined by a panel of judges") (2013) (*People v. Cole*, No. 143046, opinion filed May 25, 2012)

University of Michigan, Global Challenges for Third Century Initiative (Phase One: $275,000) (2013) ("Technology-Aided Access to Courts through Enhanced Online Functionality")

University of Michigan, Office of the Vice President for Research ($15,000) (2011) ("The Role of the Prosecutor in Criminal Justice Outcome Disparities")

Population Studies Center, University of Michigan ($4,000) (2011) ("The Effects of Sex Offender Laws on Teenage Sexual Health and on the Geography of Crime Commission")

National Fellow, Hoover Institution, Stanford University, Stanford, CA (2010–11)

National Science Foundation, Law and Social Sciences Program ($145,000) (2010) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes") (Co-PI: Sonja Starr)

University of Michigan, Office of the Vice President for Research ($15,000) (2009) ("Evaluating the
Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

National Poverty Center, University of Michigan ($7,500) (2009) ("Evaluating the Impact of Set-
Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

ABA Section on Litigation, Litigation Research Fund ($12,000) (2008) (with Albert Yoon)
("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

## PROFESSIONAL ACTIVITIES

Affiliations:         Co-Editor-in-Chief, *American Law and Economics Review* (2017–)
Associate Editor, *International Review of Law and Economics* (2012–)
Research Affiliate, Population Studies Center, University of Michigan
Affiliate, University of Chicago Crime Lab (2016–)
Faculty Affiliate, National Archive of Criminal Justice Data (2017–)
Senior Academic Affiliate, Edgeworth Economics, LLC (2012–)
Faculty Expert, Poverty Solutions, University of Michigan (2017–)
Board of Directors, American Law and Economics Association (2015–18)
Board of Directors, Society of Empirical Legal Studies (2016–19)
Board of Directors, Innovations for Poverty Action (2010–)
Working Group, Nat'l Task Force on Fines, Fees, and Bail Practices (2016–)
ICLE (Inst. of Continuing Legal Educ.) Tech. Advisory Board (2016–)
Member, MI Advisory Comm., US Commission on Civil Rights (2013–17)
Editorial Board, American Law and Economics Review (2014–17)
Member, State Bar of California (admitted in 2002)
Member, American Bar Association
Member, American Economic Association
Member, American Law and Economics Association

Referee Service:      *Journal of Legal Studies*
*Journal of Law and Economics*
*Journal of Law, Economics, and Organization*
*Journal of Empirical Legal Studies*
*American Law and Economics Review*
*International Review of Law and Economics*
*Review of Law and Economics*
*Quarterly Journal of Economics*
*Review of Economics and Statistics*
*Journal of Labor Economics*
*American Economic Journal: Applied Economics*
*Journal of Public Economics*
*Economic Journal*
*Law and Society Review*
*Law and Social Inquiry*

5

*Crime and Delinquency*
*Justice Quarterly*

### TESTIMONY AND EXPERT REPORTS

*United States v. David Keith Wills*, U.S. District Court for the Southern District of Texas, Corpus Christi Division: expert declaration, Jan. 14, 2018; hearing testimony, Jan. 29, 2018.

*Lucinda J. Shuell v. Mobile Medical Response, Inc.*, American Arbitration Association, Case No. 01-16-0001-9155: expert report, Dec. 21, 2017.

*Southern Motors Chevrolet, Inc. v. General Motors*, U.S. District Court for the Southern District of Georgia, Savannah Division: expert report, June 30, 2015.

*State of Georgia v. Beverly Hall*, Superior Court of Fulton County for the State of Georgia: expert report, July 11, 2014.

*McGuire v. City of Montgomery, Alabama et al.*, U.S. District Court for the Middle District of Alabama: expert report, Sept. 13, 2013; deposition, Oct. 30, 2013; rebuttal expert report, Dec. 17, 2013; trial testimony, Mar. 31, 2014, and Apr. 1, 2014.

*John Does #1 – 5 and Mary Doe v. Richard Snyder and Col. Kriste Etue*, U.S. District Court for the Eastern District of Michigan: expert report, Mar. 16, 2012; deposition, Dec. 12, 2013.


### UNIVERSITY SERVICE

*University of Michigan*:  Digital Innovation Advisory Group (2014–16); Online Course Selection Committee (2013–14); UM Civil Liberties Board (2010–13).

*University of Michigan Law School*: Founder and Organizer, Student Research Roundtable (2007–); Alumni Survey (2014–); Technology Committee (2010–); Alumni Academic Placement Committee (2010–14; 2016–); Institutional Advancement Committee (2009–11; 2012–13); Graduate Programs and Foreign Affiliations (2011–12); Academic Standards and Practices Committee (2009–10); Clinical Committee (2008–09); Student Careers and Professional Affairs Committee (2007–08); Curriculum Committee (2006–07).


### OTHER EMPLOYMENT

Academic:           Visiting Lecturer, University of Tokyo Faculty of Law (Summer 2009)
                    Visiting Researcher, Georgetown University Law Center (2004–2006)
                    Special Guest, Brookings Institution, Economic Studies Program (2004–2005)
                    Fellow in Law and Economics, Univ. of Michigan Law School (Winter 2005)
                    Post-Graduate Olin Research Fellow, Harvard Law School (2003–2004)
                    Research Assistant, Brookings Institution, Economic Studies (1996–1997)


Law Practice:       Summer Associate, Gibson, Dunn & Crutcher, LLP, New York, NY (2002)
                    Summer Associate, Munger, Tolles & Olson, LLP, Los Angeles, CA (2001)
                    Summer Associate, Morrison & Foerster, LLP, San Francisco, CA (2001)
                    Summer Associate, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA (2000)

## SELECTED PRESENTATIONS

**2018:**  University of Haifa, Faculty of Law (Symposium: Alternatives to Incarceration) (Haifa, Israel) (May) ("Targeting Poverty in the Courts: Improving the Measurement of Ability to Pay Fines")

Stanford Law School (Law and Economics Workshop) (Palo Alto, CA) (February) ("Noncompetes in the U.S. Labor Force")

Supreme Court Economic Review Research Roundtable on the Economics of Legal Error (George Mason University Antonin Scalia Law School) (Arlington, VA) (February) (Discussant on Gregory DeAngelo and Bryan C. McCannon, "Judicial Compensation and Performance")

University of Virginia Batten School of Policy (Faculty Research Workshop) (Charlottesville, VA) (January) ("Noncompetes in the U.S. Labor Force")

**2017:**  Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (November) ("Noncompetes and Employee Mobility")

University of Toronto, Faculty of Law (Law and Economics Workshop) (Toronto, ON) (November) ("Noncompetes and Employee Mobility")

Empirical Studies of Judicial Systems International Conference (Symposium: Do Courts Rule Efficiently? Empirical Inquiries) (Institutum Iurisprudentiae Academia Sinica) (Taipei, Taiwan) (June) ("Platform Procedure: Using Technology to Facilitate (Efficient) Civil Settlement")

Seminar on Empirical Methods for the Law (Organizations: Journal of Institutional and Theoretical Economics, Max Planck Institute for Research on Collective Goods, Bonn, and the Univ. of Bonn, Germany) (Syracuse, Italy) (June) ("Assessing Access to Justice Outreach Strategies")

Duke Univ. School of Law (Culp Colloquium) (Durham, NC) (May) (Commentator on "Police Contract Status and Labor Unrest" by Andrea Chandrasekher and "Disentangling Disparity: Exploring Racially Disparate Effect and Treatment in Capital Charging" by Sherod Thaxton)

UC Irvine School of Law Civil Justice Research Institute (Symposium: Practitioners and Scholars in Dialogue: What Do We Know About the Civil Justice System?) (UC Irvine School of Law) (Irvine, CA) (April) (Panel: Innovative Practices)

Vanderbilt Law Review Symposium on State Courts (Nashville, MI) (March) ("Improving Access to Justice in State Courts with Platform Technology")

Michigan State University College of Law (Symposium: Empirical Legal Studies and Legal Analytics: Shall the Twain Meet?) (East Lansing, MI) (March) (Panel: "ELS and Legal Analytics: Partners in the Same Pursuit or Never the Twain Shall Meet?")

Univ. of Michigan Complexity and the Law Conference (Ann Arbor, MI) (February) ("UM's Online Court Project: Big Data, Analytics, and Research Opportunities")

University of Arizona James E. Rogers College of Law QuantLaw Conference (Tucson, AZ) (February) ("Noncompetes and Employee Mobility")

**2016:**    Conference on Empirical Legal Studies (Duke Univ. School of Law) (Durham, NC) (November) ("Noncompetes and Employee Mobility")

National Task Force on Fines, Fees, and Bail Practices Business Meeting (Lunch Presentation) (Arlington, VA) (November) ("Online Case Resolution")

National Association for Justice Information Systems 2016 Conference (Tucson, AZ) (November) ("Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency")

Georgetown University Law Center (Law and Economics Workshop) (Washington, DC) (October) ("Noncompetes and Employee Mobility")

George Mason University Antonin Scalia Law School (Law and Economics Workshop) (Arlington, VA) (October) ("Noncompetes and Employee Mobility")

John Jay College of Criminal Justice (Justice Codes Symposium) (New York, NY) (October) ("Citizens and Online Court Access")

Columbia Law School (Law and Economics Workshop) (New York, NY) (September) ("Noncompetes and Employee Mobility")

Concordia University School of Law (Criminal Justice Reform Conference) (Boise, ID) (June) ("Online Case Resolution Systems: Enhancing Access, Accuracy, and Fairness")

UC Irvine Department of Informatics (Friday Seminar Series) (Irvine, CA) (May) ("Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency")

Northwestern University School of Law (Colloquium on Law and Economics) (Chicago, IL) (April) ("Noncompetes and Employee Mobility")

University of Connecticut School of Law (Faculty Workshop) (Hartford, CT) (March) ("A Comprehensive Theory of Civil Settlement")

NYU Law School (Law and Economics Colloquium) (New York, NY) (March) ("A Comprehensive Theory of Civil Settlement")

UCLA Law School (Law and Economics Workshop) (Los Angeles, CA) (February) ("A Comprehensive Theory of Civil Settlement")

University of Michigan Law School (Symposium: Innocent Until Proven Poor) (Ann Arbor, MI) (February) ("Online Case Resolution Systems: Enhancing Access, Accuracy, and Fairness")

**2015:**    University of Texas School of Law (Law and Economics Workshop) (Austin, TX) (November) ("Noncompetes in the U.S. Labor Force")

University of Connecticut School of Law (Symposium: The Other One Percent: Prison Reform from Sentencing to Parole) (Hartford, CT) (November) ("Post-Release Regulations and Sex Offender Recidivism")

Conference on Empirical Legal Studies (Washington University Law School) (St. Louis, MO) (October) ("Noncompetes in the U.S. Labor Force")

Conference on Empirical Legal Studies (Washington University Law School) (St. Louis, MO) (October) (Discussant on Thomas H. Cohen, "Does Change in Risk Matter? Examining Whether Changes in Offender Risk Characteristics Influence Recidivism Outcomes")

Michigan State University College of Law (Symposium: Legal Quanta) (East Lansing, MI) (October) ("Noncompetes in the U.S. Labor Force")

University of Michigan School of Information (Information Alliance for Community Development (IACD) speaker series) (Ann Arbor, MI) (September) ("Michigan's Online Court Project: Improving Access, Accuracy, and Fairness")

American Law and Economics Association Annual Meetings (Columbia Law School) (New York, NY) (May) (Discussant on Andrea Cann Chandrasekher, "The Effect of Police Slowdowns on Crime")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) ("Tailored Suits: Contracting on Litigation")

Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (February) ("A Comprehensive Theory of Civil Settlement")

**2014:**   Third Annual Robina Conference: The Future of Criminal Law? (University of Minnesota Law School) (Minneapolis, MN) ("Policing Public Order without the Criminal Law")

University of Virginia School of Law (Law and Economics Workshop) (Charlottesville, VA) (March) ("Neighborhood Offending: Is Sex Offense Victimization Risk Higher Where Sex Offenders Reside?")

**2013:**   Conference on Empirical Legal Studies (University of Pennsylvania Law School) (Philadelphia, PA) (October) ("Neighborhood Offending: Do Sex Offenders Reside and Offend in the Same Places?")

Conference on Empirical Legal Studies (University of Pennsylvania Law School) (Philadelphia, PA) (October) (Discussant on Kuo-Chang Huang, "The Effect of Stakes on Settlement: An Empirical Lesson from Taiwan")

Tel Aviv Faculty of Law (Law and Economics Workshop) (Tel Aviv, Israel) (May) ("Criminal Choice in Sentencing")

Cornell-Tel Aviv Conference: Empirical Legal Studies (Tel Aviv, Israel) (May) (Discussant on Michael Frakes, "The Impact of Criminal Law on the Incidence of Crime: Evidence from Expansions in the Scope and Severity and Statutory Rape Laws")

Notre Dame Law School (Law and Economics Workshop) (South Bend, IN) (March) ("Criminal Choice in Sentencing")

**2012:**   NBER Law and Economics Meetings (Cambridge, MA) (July) (Discussant on Dara Lee, "The Digital Scarlet Letter: The Effect of Online Criminal Records on Crime and Recidivism")

American Law and Economics Association Annual Meetings (Stanford Law School) (Palo Alto, CA) (May) ("Criminal Choice in Sentencing")

University of Toledo College of Law (Faculty Workshop) (Toledo, OH) (March) ("Criminal Choice in Sentencing")

**2011:**   Conference on Empirical Legal Studies (Northwestern Univ. Law School) (Chicago, IL) (November) (Discussant on Jonah Gelbach, "The Effects of Heightened Pleading on Motion to Dismiss Adjudication")

University of Chicago Law School (Law and Economics Workshop) (Chicago, IL) (November) ("Criminal Choice in Sentencing")

Columbia Law School (Law and Economics Workshop) (New York, NY) (October) ("Settlement and Trial? A Study of High-Low Agreements")

Stanford Law School (Faculty Workshop) (Palo Alto, CA) (March) ("Settlement and Trial? A Study of High-Low Agreements")

Cornell Law School (Empirical Colloquium) (Ithaca, NY) (March) ("Settlement and Trial? A Study of High-Low Agreements")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Howard Chang & Hilary Sigman, "An Empirical Analysis of Cost Recovery in Superfund Cases: Implications for Brownfields and Joint and Several Liability")

**2010:**  Conference on Empirical Legal Studies (Yale Law School) (New Haven, CT) (November) ("Settlement and Trial?  A Study of High-Low Agreements")

Conference on Empirical Legal Studies (Yale Law School) (New Haven, CT) (November) (Discussant on Sasha Romanosky, Rahul Telang, and Alessandro Acquisti, "Do Data Breach Disclosure Laws Reduce Identity Theft?")

American Law and Economics Association Annual Meetings (Woodrow Wilson School of Public Policy) (Princeton, NJ) (May) ("Settlement and Trial?  A Study of High-Low Agreements")

University of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (May) ("Settlement and Trial? A Study of High-Low Agreements")

University of Virginia Law and Economics of Crime Conference (Charlottesville, VA) (March) ("Determinants of Success in Post-Conviction Litigation by the Innocent")

Rice University and University of Houston (Applied Economics Workshop) (Houston, TX) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (Atlanta, GA) (January) ("Empirical Evidence of Prosecutorial Charging Manipulation" and Discussant on Richard Boylan and Naci Mocan, "Intended and Unintended Consequences of Prison Reform")

**2009:**  Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (October) ("Settlement and Trial? A Study of High-Low Agreements")

University of Michigan, Population Studies Center (Brown Bag) (Ann Arbor, MI) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Toronto, Faculty of Law (Law and Economics Workshop) (Toronto, ON) (September) ("Settlement and Trial?  A Study of High-Low Agreements")

NBER Law and Economics Summer Institute (Cambridge, MA) (July) ("Settlement and Trial?  A Study of High-Low Agreements")

Hastings Law School Faculty Workshop (San Francisco, CA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Stanford Law School (Law and Economics Workshop) (Palo Alto, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (San Francisco, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" and "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

**2008:**   American Bar Association Litigation Section Access to Justice Symposium (Atlanta, GA) (December) ("The Challenges of Calculating the Benefits of Providing Access to Legal Services")

Searle Center Research Symposium on Empirical Studies of Civil Liability (Northwestern Univ. Law School) (Chicago, IL) (October) ("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

Conference on Empirical Legal Studies (Cornell Law School) (Ithaca, NY) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Conference on Empirical Legal Studies (Cornell Law School) (Ithaca, NY) (October) (Discussant on John F. Pfaff, "The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program on Sentencing Practices")

Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (September) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Law and Society Annual Meetings (Montreal, Canada) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

American Law and Economics Association Annual Meetings (Columbia Law School) (New York, NY) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

University of Chicago Law School (Criminal Law Colloquium) (Chicago, IL) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Brooklyn Law School (Faculty Workshop) (Brooklyn, NY) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Virginia School of Law (Law and Economics Workshop) (Charlottesville, VA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Betsey Stevenson, "Beyond the Classroom: Using Title IX to Measure the Return to High School Sports")

**2007:**   Northwestern University Law School (Law and Economics Colloquium) (Chicago, IL) (December) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Conference on Empirical Legal Studies (NYU Law School) (November) (Discussant on Stéphane Mechoulan, "The External Effects of Black-Male Incarceration on Black Females")

NBER Working Group on Crime (Cambridge, MA) (September) ("Do Sex Offender

11

Registration and Notification Laws Affect Criminal Behavior?")

National Federal Sentencing Guidelines Seminar (Salt Lake City, UT) (May) ("Using U.S. Sentencing Commission Data in Empirical Research")

American Law and Economics Association Annual Meetings (Harvard Law School) (Cambridge, MA) (May) ("The Effects of Sex Offender Notification laws")

**2006:**    Conference on Empirical Legal Studies (Univ. of Texas Law School) (Austin, TX) (October) ("Empirical Evidence of Prosecutorial Charging Manipulation")

Conference on Empirical Legal Studies (Univ. of Texas Law School) (Austin, TX) (Discussant on Brandon Garrett, "Judging Innocence")

Junior Empirical Legal Scholars Conference (Cornell Law School) (Ithaca, NY) (September) ("Empirical Evidence of Prosecutorial Charging Manipulation")

Law and Society Annual Meetings (Baltimore, MD) (July) ("Measuring the Consequences of Criminal Jury Trial Protections")

Various Job Talks (January and February) ("Measuring the Consequences of Criminal Jury Trial Protections") (Michigan; Harvard; Stanford; NYU; Columbia; Univ. of Pennsylvania; UCLA; Georgetown; USC; Washington University; Univ. of Texas)

**2005:**    Various Job Talks (September through December) ("Measuring the Consequences of Criminal Jury Trial Protections") (Yale; Univ. of Virginia; Duke; Cornell; Boston Univ.; Minnesota; Univ. of Colorado; William and Mary; Univ. of Miami)

MIT Department of Economics Labor Seminar (Cambridge, MA) (November) ("Measuring the Consequences of Criminal Jury Trial Protections")

Florida State College of Law (Faculty Enrichment Series) (Tallahassee, FL) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

Brookings Institution, Economic Studies Program (Brown Bag Lunch Talk) (Washington, DC) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

American Law and Economics Association Meetings (NYU Law School) (May) ("Measuring the Consequences of Criminal Jury Trial Protections")

STATE OF FLORIDA        §
                               §
COUNTY OF LEON         §

## DECLARATION OF WAYNE A. LOGAN

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

"My name is Wayne A. Logan. I am over the age of eighteen, of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated:

1. I am the Gary and Sallyn Pajcic Professor of Law at Florida State University College of Law. I am an elected member of the America Law Institute and the past chair of the Criminal Justice Section of the Association of American Law Schools.

2. I have a bachelor's degree in Anthropology from Wesleyan University; a master's degree in Criminology from the State University of New York at Albany; and a Doctor of Jurisprudence from the University of Wisconsin. (My curriculum vitae is attached.)

3. I am a leading legal academic authority on sex offender registration and notification laws and policies.

4. I am the author of *Knowledge as Power: Criminal Registration and Community Notification Laws in America* (Stanford University Pres, 2009), which is widely considered the most authoritative work on the subject and was cited by the U.S. Supreme Court in *United States v. Kebodeaux*, 570 U.S. 387 (2013). I am also the co-editor and a contributing author of *Sex Offender Registration and Community Notification Laws: An Empirical Evaluation* (Cambridge University Press, forthcoming 2019), the first book-length empirical analysis of sex offender registration and community notification laws.

5. I am the author of over two dozen journal articles and book chapters regarding sex offender registration and community notification laws and policies, and the co-author of *Collateral Consequences of Criminal Conviction: Law, Policy and Practice* (Thomson Reuters, 3d ed., forthcoming 2018) (with Margaret Love & Jenny Roberts), the nation's leading treatise on the subject.

6. I am an authority on the constitutional history and purposes of the Ex Post Facto Clause, with a book-length manuscript in progress, now under publication consideration at Oxford University Press.

7. I have reviewed the Class Action Complaint files in John Does #1-7 v. Greg Abbott et al., Case No.: 3:18-cv-629 (N. D. Texas, filed March 16, 2018).

8. I have reviewed the several legal claims made in the instant action; without regard to the merits of other claims, I will limit my focus to those alleging violation of procedural due process, guaranteed by the Fourteenth Amendment, and the prohibitions contained in the Ex Post Facto Clause of the U.S. Constitution.

*Procedural Due Process*

9. The Fourteenth Amendment guarantees that individuals be afforded procedural due process before being deprived of a liberty interest. Meza v. Livingston, 607 F.3d 392, 399 (5th Cir. 2010). The U.S. Supreme Court in Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 7-8 (2003) [hereinafter *CDPS*] held that subjecting individuals to registration and community notification by means of a publicly accessible internet website does not violate procedural due process.

10. My understanding of the requirements of and burdens imposed by the Texas Sex Offender Registration Program (TSORP) and the Texas Public Sex Offender Registry [hereinafter Texas Registry] is that they materially differ from those associated with the Connecticut regime upheld by the Supreme Court in *CDPS*.

11. In *CDPS*, the Court concluded that, assuming arguendo a liberty interest existed with respect to being subject to registration and public notification, the Connecticut law challenged did not entitle the petitioner to a hearing. *Id.* at 7. This was because the Connecticut website registry at issue simply disclosed that a registrant was convicted of a registration-eligible offense, and made no representation that any individual posed a public safety danger. *Id.* Indeed, Connecticut's website contained a disclaimer explicitly stating that government authorities had "'made no determination that any individual included in the registry is currently dangerous.'" *Id.* (citation omitted).

2

12. Because of the foregoing, the Court concluded that affording the petitioner in *CDPS* a hearing to assess his dangerousness would be a "bootless exercise." *Id.* The State of Connecticut already afforded the petitioner due process regarding the sole material fact in issue: his conviction. *See id.* ("the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest.").

13. The TSORP and the Texas Registry take a very different approach. In Texas, registrants are publicly designated in terms of "risk level": "low," "medium," and "high" (with risk level for some registrants "not reported"). Moreover, the Texas Registry, unlike that of Connecticut, provides no disclaimer that registrants have not been individually assessed for risk; nor can the Texas Registry do so because it in fact does expressly classify registrants in terms of risk.

14. And, unlike in *CDPS*, the fact at issue is not simply whether Plaintiff-Does were lawfully convicted. It is the distinct question of the "risk level" they allegedly present. The fact that Texas draws distinctions among individuals' risk levels itself makes clear that this is a contestable discretionary decision. (A fact highlighted by the "not reported" risk designation.) It is well-established that persons convicted of sex offenses are not monolithic in terms of re-offense risk, but rather vary quite considerably. *See, e.g.,* R. Karl Hanson *et al., Reductions in Risk Based on Time Offense-Free in the Community: Once a Sexual Offender, Not Always a Sexual Offender*, 24 Psychology, Pub. Pol'y, and Law 48 (2018).

15. It is also well-established that registration and notification laws, such as that of the State of Texas, are predicated upon a basic misunderstanding of the recidivism risk posed by convicted sex offenders. While certain subgroups of the population do recidivate at relatively higher rates, compared to other convicted offender sub-populations, as a group sex offenders recidivate at considerably lower rates. *See* Ira M. Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 CONST. COMMENT. 495, 508 (2015). I am aware of no basis to conclude that the TSORP and Texas Registry are informed by these findings.

16. In *CDPS*, as noted, the Supreme Court assumed without deciding that petitioner possessed a protectable liberty interest sufficient to warrant procedural due process protection. In the instant case, the TSORP and the Texas Registry negatively affect a liberty interest of the Plaintiff-Does, based

on the "stigma-plus" applied by the Supreme Court in *Paul v. Davis*, 424 U.S. 693, 711 (1976).

17. It is acknowledged that being publicly designated as a registered sex offender, and certainly a "high risk" sex offender, has stigmatizing effect. *See, e.g.,* Meza v. Livingston, 607 F.3d 392, 402 (5th Cir. 2010); United States v. Jimenez, 275 Fed. Appx. 433, 442 (5th Cir. 2008); Coleman v. Dretke, 409 F.3d 665, 668 (5th Cir. 2005).

18. Furthermore, based on the allegations contained in the Complaint, Plaintiff-Does have been subject to a variety of hardships that satisfy the "plus" required by *Paul v. Davis*.

19. In addition to facing the specter of felony prosecution for failing to satisfy the in-person updating, verification and reporting requirements of the TSORP, the Complaint alleges that Plaintiff-Does have suffered *inter alia* loss of housing and employment, including a career in the U.S. Air Force (resulting in a general rather than honorable discharge). *See, e.g.,* Complaint, ¶¶ 19, 42, 52. Public display on the Texas Registry has also resulted in denial of access to a small business loan, and precluded participation in parent-teacher conferences at school. *See* Complaint, ¶¶ 72-73.

20. The harms experienced by Does do not result from the fact of their criminal convictions, as the Supreme Court concluded in *Smith v. Doe*. *See Smith*, 534 U.S. at 98-99. It is alleged that Doe #3, for instance, pled guilty under the Texas provision allowing for deferred adjudication, and thereafter satisfied all court-ordered requirements, purportedly resulting in the sealing and dismissal of his case. *See* Complaint, ¶¶ 34-36. Public knowledge of Doe's criminal history, and the resulting stigmatization he is alleged to have experienced, stem from the State's insistence that he be placed on the Texas Registry. Even more problematic, it is alleged that Doe is subject to the public stigmatization and harm he has suffered as the result of a technical error, admitted by the State, which the State has refused to rectify. *Id.* at ¶ 40.

21. The significant adverse consequences that the Complaint alleges have been experienced by Plaintiff-Does, as a result of the increasingly onerous requirements of the TSORP and Texas registry imposed over time, are not a matter of "conjecture," as they were to the Supreme Court in 2003. *See Smith*, 538 U.S. at 101.

22. The stigmatizing effect of being publicly designated as a sex offender and the many serious negative consequences that Plaintiff-Does have allegedly experienced as a result of their public designations and being subject to the TSORP, satisfy the stigma-plus test.

*Ex Post Facto*

23. The Ex Post Facto Clause prohibits States from retroactively increasing the punishment imposed on an individual convicted of a crime. Calder v. Bull, 3 U.S. (Dall.) 386, 390 (1798).

24. In order for the Clause to apply, a reviewing court must first establish that a law challenged, either by intent evidenced by the legislature or the effects the law imposes, qualifies as "punishment." Smith v. Doe, 538 U.S. 84 (2003).

25. Based on the allegations contained in the Complaint, the cumulative effect of the TSORP and Texas Registry, retroactively imposed, qualify as punishment for ex post facto purposes.

26. The requirements and conditions of the TSORP and the Texas Registry are similar to those deemed punitive by a growing number of state and lower federal courts, which have distinguished challenged laws from the "first-generation" registration and notification Alaska law deemed non-punitive fifteen years ago by the Supreme Court. *See, e.g.,* Does #1-5 v. Snyder, 834 F.3d 696 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017); Millard v. Rankin, 265 F. Supp. 3d 1211 (D. Colo. 2017), appeal filed, Sept. 21, 2017; Wallace v. State, 905 N.E.2d 371 (Ind. 2009); Starkey v. Oklahoma Dep't of Corrections, 305 P.3d 1004 (Okla. 2013); Commonwealth v. Muniz, 164 A.3d 1189 (Pa. 2017).

27. Like the Michigan law unanimously struck down by the Sixth Circuit in *Does #1-5 v. Snyder, supra*, the TSORP requires that subject individuals report, update and verify their personal information in person. In *Smith v. Doe*, the only instance when the Supreme Court has addressed an ex post facto challenge to a sex offender registration and notification law, the Court was at pains to acknowledge the absence of an in-person reporting requirement in the Alaska law challenged. *See Smith*, 538 U.S. at 101. *See also, e.g.,* State v. Letalien, 985 A.2d 4 (Maine 2009) (attaching importance to in-person reporting requirement); Doe v. State, 111 A.3d 1077 (N.H. 2017); Commonwealth v. Muniz, 164 A.3d 1189 (Pa. 2017).

5

28. Other effects of complying with the TSORP and being placed on a public registry have likewise been deemed punitive in nature, resembling, and indeed in several respects exceeding, incidents of probation and parole, historically regarded as punishment. *See* Smith v. Doe, 538 U.S. 84, 101 (2003); *Snyder*, 834 F.3d at 703.

29. In *Snyder*, the Sixth Circuit concluded that the consequences flowing from posting registrants' photos and personal information had punitive effect. In the instant case, not only is such information publicly posted on the Texas Registry, but Plaintiff-Does are designated as particular public safety risks, which should generate corresponding greater constitutional concern.

30. Nor can it be asserted that the opprobrium experienced flows solely from the fact of a criminal conviction. *See supra*, ¶ 21 (discussing Doe #3, whose criminal history would not be public knowledge if not for TSORP and the Texas Registry). This too highlights the punitive nature of the TSORP and Texas Registry. *See Snyder*, 834 F.3d at 703.

31. Finally, in assessing whether a law has punitive effect, the court must assess whether the challenged law has a "rational relation to a non-punitive purpose" and is "excessive." As noted by the Sixth Circuit, registration and notification laws, such as those of Texas, not only lack social science evidence supporting their efficacy, but rather "actually increase the risk of recidivism." *Snyder*, 834 F.3d at 704 (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & ECON. 161 (2011); *see also id.* at 705 ("The requirement that registrants make frequent, in-person appearances...appears to have no relationship to public safety at all.").

32. Furthermore, as noted earlier, *see* Hanson et al., cited in *supra* ¶ 14, it is known that risk of re-offense significantly declines in tandem with the number of years a person remains law-abiding, further highlighting the excessiveness of TSORP, which requires registration for ten years or life, based on the offense of conviction.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT."

SIGNED this _25th_ day of May 2018, in Leon County, Florida.

X_____

Declarant – Wayne A. Logan

STATE OF FLORIDA
COUNTY OF LEON

On this 25th day of May, 2018, I attest that the preceding or attached document is a true, exact, complete, and unaltered photocopy presented to me by the document's custodian, WAYNE A. LOGAN, and, to the best of my knowledge, that the photocopied document is neither a public record nor a publicly recordable document, certified copies of which are available from an official source other than a notary public.

Wayne A. Logan (document custodian): _____

Produced Identification: Personally Known

Notary Signature: _Derinda G Kirkland_

Notary Name: Derinda G. Kirkland

Notary Seal:

Notary Public State of Florida
Derinda G Kirkland
My Commission FF 940500
Expires 12/14/2019

# WAYNE A. LOGAN

Gary & Sallyn Pajcic Professor of Law
Florida State University College of Law
425 West Jefferson Street, Tallahassee, Florida 32306-1601
Telephone: 850.644.7215; Email: wlogan@law.fsu.edu

## LEGAL ACADEMIC APPOINTMENTS

**Florida State University College of Law, Tallahassee, Florida**
- Gary and Sallyn Pajcic Professor of Law (2007-present)
- Associate Dean for Academic Affairs (2008-2011)
- Faculty Advisor, FLORIDA STATE UNIVERSITY LAW REVIEW (2012-present)
- Courses Taught:  Criminal Procedure: Police Investigation; Criminal Procedure: Adjudication; Criminal Law; Sentencing Law and Policy; Capital Punishment
- Recipient of University Teaching Award (2015); student body-elected graduation "hooder" (2009, 2011, 2014, 2018)

**College of William and Mary, Marshall-Wythe School of Law, Williamsburg, Virginia**
- Visiting Professor of Law (fall 2006)

**William Mitchell College of Law, St. Paul, Minnesota**
- William Mitchell Research Professor of Law (2005-2007)
- Professor of Law (2004-2005, awarded early tenure); Associate Professor of Law (2000-2004)

## PUBLICATIONS CONCERNING SEX OFFENDER LAWS AND POLICIES

### BOOKS

THE EX POST FACTO CLAUSE:  ITS HISTORY AND PURPOSES (in progress and under review before Oxford University Press editorial board)

SENTENCING LAW, POLICY AND PRACTICE (Foundation Press, under contract, forthcoming 2020)

SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION LAWS: AN EMPIRICAL EVALUATION (Cambridge Univ. Press, under contract, forthcoming 2018) (Ed., with J.J. Prescott)

COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTION: LAW, POLICY AND PRACTICE (Thomson Reuters, Third Ed., forthcoming 2017) (with Margaret Love and Jenny Roberts)

KNOWLEDGE AS POWER: CRIMINAL REGISTRATION AND COMMUNITY NOTIFICATION LAWS IN AMERICA (Stanford University Press, 2009)
- Cited by majority in *United States v. Kebodeaux*, 133 S. Ct. 2496 (2013); reviewed in: CRIMINAL LAW BULLETIN (vol. 46, 2010); CHAMPION MAGAZINE (July 2010); PUNISHMENT & SOCIETY (vol. 10, 2010); LAW & POLITICS (Nov. 2009); THE CHRONICLE REVIEW (Chronicle of Higher Education) (Oct. 2009)

## ARTICLES, CHAPTERS AND ESSAYS

*Challenging the Punitiveness of "New Generation" SORN Laws*, 21 NEW CRIMINAL LAW REVIEW ___ (forthcoming 2018) (also served as symposium organizer and guest editor)

*Chapter One: Origins and Evolution of SORN Laws,* in SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION LAWS: AN EMPIRICAL EVALUATION (Cambridge Univ. Press, under contract, forthcoming 2018) (Wayne A. Logan & J.J. Prescott, eds.)

*Chapter Eleven: SORN'S Growth and Staying* Power, in SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION LAWS: AN EMPIRICAL EVALUATION (Cambridge Univ. Press, under contract, forthcoming 2018) (Wayne A. Logan & J.J. Prescott, eds.)

*Sex Offender Registration and Notification, in* ACADEMY FOR JUSTICE, A REPORT ON SCHOLARSHIP AND CRIMINAL JUSTICE REFORM (Erik Luna ed., 2017)

*SCOTUS Invalidates Law Criminalizing Sex Offender Access to Social Media*, COLLATERAL CONSEQUENCES RESOURCE CENTER BLOG, June 20, 2017, available at http://ccresourcecenter.org/2017/06/20/scotus-invalidates-law-criminalizing-sex-offender-access-to-social-media/#more-13112

*"When Mercy Seasons Justice": Interstate Recognition of Ex-Offender Rights,* 49 U.C.-DAVIS LAW REVIEW 1 (2016)
- Reprinted in VOLUME 2, PRISONERS AND THE LAW (Ira P. Robbins, ed., 1985, Supp. 2016) (Thomson West); selected by CHAMPION MAGAZINE as featured "must read" article in its "Getting Scholarship into the Courts" Project

*Sex Offender Consequences*, in COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTION: LAW, POLICY AND PRACTICE (Margaret E. Love et al. eds., West Pub., 2013; revised and updated 2014 & 2016)

*Database Infamia: Exit from the Sex Offender Registries,* 2015 WISCONSIN LAW REVIEW 219

*Informal Collateral Consequences*, 88 WASHINGTON LAW REVIEW 1103 (2013)
- Selected by CHAMPION MAGAZINE as featured "must read" article in its "Getting Scholarship into the Courts" Project

*Information and Social Control*, 137 in THE CONSTITUTION AND THE FUTURE OF CRIMINAL JUSTICE IN AMERICA (John Parry & Song Richardson eds., Cambridge University Press, 2013)

*Prospects for the International Migration of U.S.-Style Sex Offender Registration and Community Notification Laws*, 34 INTERNATIONAL JOURNAL OF LAW AND PSYCHIATRY 233 (2011)

*Megan's Laws as a Case Study in Political Stasis*, 61 SYRACUSE LAW REVIEW 371 (2011)

*"Mosaic Theory" and Megan's Laws*, 2011 CARDOZO LAW REVIEW DE NOVO 95

*Populism and Punishment: Sex Offender Registration and Community Notification in the Courts,* 26 CRIMINAL JUSTICE 37 (magazine of the ABA Criminal Justice Section) (spring 2011)

*The Adam Walsh Act and the Failed Promise of Administrative Federalism,* 78 GEORGE WASHINGTON LAW REVIEW 993 (2010)

*Criminal Justice Federalism and National Sex Offender Policy*, 6 OHIO STATE JOURNAL OF CRIMINAL LAW 51 (2008) (also served as symposium guest editor)

*Sex Offender Registration and Community Notification Policy: Past, Present, and Future,* 34 NEW ENGLAND JOURNAL OF CRIMINAL AND CIVIL CONFINEMENT 3 (2008) (keynote address)

*State Criminal Justice and the Challenge of Ex-Offender Mobility*, 4 OHIO STATE JOURNAL OF CRIMINAL LAW 587 (2007)

*Federal Prosecution of State Sex Offenders*, NATIONAL LAW JOURNAL, Mar. 5, 2007, at 23

*Constitutional Collectivism and Ex-Offender Residence Exclusion Laws,* 92 IOWA LAW REVIEW 1 (2006)

*Crime, Criminals and Competitive Crime Control*, 104 MICHIGAN LAW REVIEW 1733 (2006)

*Horizontal Federalism in an Age of Criminal Justice Interconnectedness*, 154 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 257 (2005)

*Sex Offender Registration and Community Notification: Emerging Legal and Research Issues*, in SEXUALLY COERCIVE BEHAVIOR: UNDERSTANDING AND MANAGEMENT 337 (Annals of the New York Academy of Sciences) (2003)

*Jacob's Legacy: Sex Offender Registration and Community Notification Laws, Practice and Procedure in Minnesota*, 29 WILLIAM MITCHELL LAW REVIEW 1287 (2003)

*Federal Habeas in the Information Age*, 85 MINNESOTA LAW REVIEW 147 (2000)

*A Study in "Actuarial Justice": Sex Offender Classification Practice and Procedure*, 3 BUFFALO CRIMINAL LAW REVIEW 593 (2000) (peer reviewed)

*Liberty Interests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws*, 89 JOURNAL OF CRIMINAL LAW & CRIMINOLOGY 1167 (1999)

## PRESENTATIONS CONCERNING SEX OFFENDER LAWS AND POLICIES

"Past, Present and (Possibly) Future Constitutional Challenges to SORN Laws," University of Michigan School of Law, Sept. 8, 2017

3

"An Overview of U.S. Sex Offender Registration and Community Notification Laws," Government Law College, Trivandrum, India, Aug. 4, 2017

"Reforming Registries," Bridging the Gap: A Conference on Scholarship and Criminal Justice Reform, Arizona State University College of Law, Feb. 11, 2017

"Megan's Laws: Emerging Legal and Policy Questions," National Association of Criminal Defense Lawyers Meeting, Denver, Colorado, July 25, 2015

"Database Infamia: Exit from the Sex Offender Registries," Law and Society Association Annual Meeting, Seattle, Washington, May 30, 2015

"Database Infamia: Exit from the Sex Offender Registries," N.Y.U. School of Law, April 8, 2015 (via Skype)

"Against the Grain: Challenging the Constitutionality of New-Era Megan's Laws," Annual Meeting of the National Legal Aid and Public Defenders Association, Virginia, Nov. 12, 2014 (via teleconference)

"Database Infamia: Exit from the Sex Offender Registries," University of Wisconsin Law School, Madison, Wisconsin, Oct. 3, 2014

"Current and Emerging Legal and Policy Issues Concerning Sex Offender Registration and Community Notification," Annual Meeting of West Virginia Public Defender Services, Wheeling, West Virginia, June 13, 2014

"Informal Collateral Consequences," University of Minnesota Law School, Mar. 2, 2013

"The Racial Geography of Juvenile Sex Offender Registries," Southern University Law Center, Feb. 23, 2012

"Megan's Law as a Case Study in Political Stasis," Annual Meeting of American Academy of Psychiatry and the Law, Boston, Massachusetts, Oct. 28, 2011

"Information Empowerment as Social Control," Florida State College of Law/American Constitution Society, Constitution in 2020: The Future of Criminal Justice Conference, Oct. 8, 2010

"Author Meets Readers: Knowledge as Power: Criminal Registration and Community Notification Laws in America," Annual Meeting of the Law and Society Association, Chicago, Illinois, May 30, 2010

"Animal Rights, Registration Wrongs?," University of Chicago Law School, May 11, 2010

"Social and Political Catalysts Driving Modern-Day Registration and Community Notification Laws," University of Houston Law Center, Apr. 7, 2010

4

"The Adam Walsh Act and the Failed Promise of Administrative Federalism," ABA Section of Administrative Law & Regulatory Practice, 2009 Administrative Law Conference, Oct. 22, 2009

"Criminal Justice Federalism and National Sex Offender Policy," Southeastern Association of Law Schools Annual Conference, Palm Beach, Florida, Aug. 3, 2009

"Sex Offender Registries: Constitutionality and Federalism," National Conference of State Legislatures, Atlanta, Georgia, Dec. 12, 2008

"Sex Offender Policy: Past, Present, and Future," New England College of Law, Symposium: Probation and Parole in Massachusetts," New England Journal of Criminal and Civil Confinement, Mar. 16, 2007 (keynote speaker)

"Horizontal Federalism in an Age of Criminal Justice Interconnectedness," Marquette University School of Law, Oct. 25, 2005

"Horizontal Federalism in an Age of Criminal Justice Interconnectedness," University of Pennsylvania Law Review Luncheon, Oct. 7, 2005

"Sex Offender Community Notification Laws: Process and Procedure," Annual Meeting of the American Society of Criminology, Toronto, Canada, Nov. 1999

"Sexual Offenders and Sexual Assaults: Reforming New York's Laws," Warren M. Anderson Legislative Discussion Series, Government Law Center of Albany Law School, Mar. 11, 1998) (moderator)

## OTHER PUBLICATIONS

### BOOKS

FLORIDA SEARCH AND SEIZURE LAW (LexisNexis, forthcoming 2019)

CRIMINAL PROCEDURE: THE POST-INVESTIGATIVE PROCESS (Carolina Academic Press, 5th ed., under contract, forthcoming 2018) (with Stanley Adelman et al.)

QUESTIONS AND ANSWERS, Q & A: CRIMINAL PROCEDURE I-POLICE INVESTIGATION (Carolina Academic Press, 3d ed., 2016) (with Neil Cohen & Michael Benza); QUESTIONS AND ANSWERS, Q & A: CRIMINAL PROCEDURE II-PROSECUTION AND ADJUDICATION (Carolina Academic Press, 2016) (with Neil Cohen & Michael Benza)

VOLUMES 10, 10A MINNESOTA JURY INSTRUCTION GUIDE-CRIMINAL (5th ed. Thomson West, 2006) (with Stephen E. Forestell)

NORTH CAROLINA TORTS, Second Edition (Carolina Academic Press, 2004); First Edition (Carolina Academic Press, 1996 & Supp. 1999) (both with David A. Logan)

CRIMINAL LAW (Aspen Press, 2000) (with James R. Acker & David C. Brody)

## ARTICLES AND ESSAYS

*Policing Police Access to Criminal Justice Data,* 104 IOWA LAW REVIEW __ (forthcoming 2019)

*Fourth Amendment Localism,* 93 INDIANA LAW JOURNAL __ (forthcoming 2017/2018)

*Policing Criminal Justice Data,* 101 MINNESOTA LAW REVIEW 541 (2016) (with Andrew Ferguson)
   • Reviewed in Jotwell:  http://crim.jotwell.com/data-mistakes-and-data-justice/

*A House Divided: When State and Lower Federal Courts Disagree on Federal Constitutional Rights*, 90 NOTRE DAME LAW REVIEW 235 (2014)

*Mercenary Criminal Justice*, 2014 ILLINOIS LAW REVIEW 1175 (with Ronald F. Wright)
   • Reviewed in Jotwell: http://crim.jotwell.com/making-people-pay-and-pay-and-pay/

*After the Cheering Stopped:  Decriminalization and Legalism's Limits,* 24 CORNELL JOURNAL OF LAW & PUBLIC POLICY 319 (2014)

*Dirty Silver Platters: The Enduring Challenge of Intergovernmental Investigative Illegality*, 99 IOWA LAW REVIEW 293 (2013)

*Constitutional Cacophony: Federal Circuit Splits and the Fourth Amendment*, 65 VANDERBILT LAW REVIEW 1137 (2012)

*Policing Identity*, 92 BOSTON UNIVERSITY LAW REVIEW 1561 (2012)
   • Selected by CHAMPION MAGAZINE as featured "must read" article in its "Getting Scholarship into the Courts" Project

*Police Mistakes of Law*, 61 EMORY LAW JOURNAL 69 (2011)

*Erie and Federal Criminal Courts*, 63 VANDERBILT LAW REVIEW 1243 (2010)

*Contingent Constitutionalism: State and Local Criminal Laws and the Applicability of Federal Constitutional Rights*, 51 WILLIAM & MARY LAW REVIEW 143 (2009)

*Confronting Evil: Victims' Rights in an Age of Terror*, 96 GEORGETOWN LAW JOURNAL 721 (2008)

*The Political Economy of Application Fees for Indigent Criminal Defense*, 47 WILLIAM & MARY LAW REVIEW 2045 (2006) (with Ronald F. Wright)

*Creating a "Hydra in Government": Federal Recourse to State Law in Crime Fighting*, 86 BOSTON UNIVERSITY LAW REVIEW 65 (2006)

*Civil and Criminal Recidivists: Extraterritoriality in Tort and Crime*, 74 CINCINNATI LAW REVIEW 1609 (2005)

*Democratic Despotism and Constitutional Constraint:  An Empirical Analysis of Ex Post Facto Claims in State Courts*, 12 WILLIAM & MARY BILL OF RIGHTS JOURNAL 439 (2004)

*Criminal Law Sanctuaries*, 38 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REVIEW 221 (2003)

*Substantive Due Process and the Involuntary Confinement of Sexually Violent Predators*, 35 CONNECTICUT LAW REVIEW 319 (2003) (with Eric S. Janus)

*Casting New Light on an Old Subject: Death Penalty Abolitionism for a New Millennium*, 100 MICHIGAN LAW REVIEW 1336 (2002)

*Street Legal:  The Court Affords Police Constitutional Carte Blanche to Arrest*, 77 INDIANA LAW JOURNAL 419 (2002)

*The Shadow Criminal Law of Municipal Governance*, 62 OHIO STATE LAW JOURNAL 1409 (2001)

*An Exception Swallows a Rule: Police Authority to Search Incident to Arrest*, 19 YALE LAW & POLICY REVIEW 381 (2001)
   • Reprinted in abbreviated form in 19 SEARCH AND SEIZURE LAW REPORT (West, Jan.-Feb. 2002)

*Opining on Death:  Witness Sentence Recommendations in Capital Trials*, 41 BOSTON COLLEGE LAW REVIEW 517 (2000)

*A Study in "Actuarial Justice": Sex Offender Classification Practice and Procedure*, 3 BUFFALO CRIMINAL LAW REVIEW 593 (2000) (peer reviewed)

*When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials,* 33 UNIVERSITY OF MICHIGAN JOURNAL OF LAW REFORM 1 (2000)

*Declaring Life at the Crossroads of Death:  Victims' Anti-Death Penalty Views and Prosecutors' Charging Decisions*, 18 CRIMINAL JUSTICE ETHICS 41 (Fall 1999) (peer- reviewed)

*Through the Past Darkly:  A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials*, 41 ARIZONA LAW REVIEW 143 (1999)
   • Reprinted in THE INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND SOCIETY,
      VOLUME I, CAPITAL PUNISHMENT (Austin Sarat ed., Ashgate Publishing, 2005);
      VICTIMS:  A JURIDICIAL APPROACH (A. Sabitha ed., Amicus Books, 2008)

*The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 AMERICAN CRIMINAL LAW REVIEW 1261 (1998)

*Frank Miller and the Decision to Prosecute*, 69 WASHINGTON UNIVERSITY LAW QUARTERLY 159 (1991) (with Frank J. Remington)

*A Proposed Check on the Charging Discretion of Wisconsin Prosecutors*, 1990 WISCONSIN LAW REVIEW 1695

## BOOK CHAPTERS

*Victims, Survivors and the Decisions to Seek and Impose Death*, in WOUNDS THAT DO NOT BIND: VICTIM-BASED PERSPECTIVES ON THE DEATH PENALTY 161 (James R. Acker & David R. Karp, eds., Carolina Academic Press) (2006); Second Edition (2009)

*Duress as a Defense to Criminal Liability*, ENCYCLOPEDIA OF CRIMINOLOGY (J. Miller & R. Wright eds., Routledge) (2005)

## INVITED SYMPOSIUM CONTRIBUTIONS

*What the Feds Can Do to Rein in State and Local Mercenary Criminal Justice*, 2019 ILLINOIS LAW REVIEW ___ (forthcoming 2019)

"False *Massiah*: *The Sixth Amendment Revolution That Wasn't*," 50 TEXAS TECH LAW REVIEW 153 (2017)

*Government Retention and Use of Unlawfully Secured DNA,* 48 TEXAS TECH LAW REVIEW 269 (2016)

*Taz: The Legal Academy's Happy (and Erudite) Warrior,* 58 HOWARD LAW JOURNAL 577 (2015) (*festschrift* in honor of the late Professor Andrew Taslitz)

Florence v. Board of Chosen Freeholders: *Police Power Takes a More Intrusive Turn*, 46 AKRON LAW REVIEW 413 (2013)

*Litigating the Ghost of Gideon in Florida: Separation of Powers as a Tool to Achieve Indigent Defense Reform*, 75 MISSOURI LAW REVIEW 885 (2010)

*Reasonableness as a Rule: A Paean to Justice O'Connor's Dissent in* Atwater v. City of Lago Vista, 79 MISSISSIPPI LAW JOURNAL 115 (2009)

*Victim Impact Evidence in Federal Capital Trials*, 19 FEDERAL SENTENCING REPORTER 5 (2006)

*Civil Liberties in a Post-9/11 World*, 40 CRIMINAL LAW BULLETIN 547 (2004)

*The Importance of Purpose in Probation Decision Making*, 7 BUFFALO CRIMINAL LAW REVIEW 171 (2003)

*Reflections on Kalven and Zeisel's The American Jury*, 39 CRIMINAL LAW BULLETIN 4 (2003)

*Policing in an Intolerant Society*, 35 CRIMINAL LAW BULLETIN 334 (1999)

## POPULAR PRESS/ON-LINE JOURNALS

*The Honorable Robert R. Merhige, Jr.: A Judge Ahead of His Time*, 52 UNIVERSITY OF RICHMOND LAW REVIEW ONLINE 23 (2017) (solicited essay commemorating fortieth anniversary of Judge's appointment to the federal bench)

*Cutting Cops Too Much Slack*, 104 GEORGETOWN LAW JOURNAL ONLINE 87 (2015)

*Piling on Criminal Fees*, HUFFINGTON POST, May 20, 2015 (with Ronald F. Wright)

*U.S. Supreme Court: Testing Some Arrests*, NATIONAL LAW JOURNAL, Nov. 8, 2004, at 27

## OTHER PRESENTATIONS AND PANELS (SELECTED)

"Bridging the State-Local-Federal Policing Divide," University of Illinois College of Law, Apr. 4, 2018

"The Collateral Consequences of Criminal Conviction in Florida and Beyond," Florida Constitution Revision Commission, Nov. 30, 2017

"Felon Disenfranchisement Law and Policy in Florida," Florida Constitution Revision Commission, Nov. 1, 2017

"False *Massiah*: The Sixth Amendment Revolution That Wasn't," Texas Tech School of Law, Lubbock, Texas, March 31, 2017

"*The Challenge of Crime in a Free Society:* Fifty Years Later," Association of American Law Schools Annual Meeting, San Francisco, California, Jan. 5, 2017 (panel organizer and moderator)

"Fourth Amendment Localism," Northeastern University School of Law, Boston, Massachusetts, Nov. 1, 2016

"Fourth Amendment Localism," Roger Williams University School of Law, Bristol, Rhode Island, Oct. 31, 2016

"The Anatomy of a Wrongful Conviction," FSU College of Law, Oct. 19, 2016 (panel moderator; part of National Innocence Project Executive Board Annual Meeting)

"What Was Once a Stream Is Now a River:  Ongoing Limits to the Exclusionary Rule," First District Court of Appeals, Tallahassee, Florida, Sept. 20, 2016

"False *Massiah*: What Forty-Five Years of Case Law Tells Us About Sixth Amendment Limits on Police Authority to Secure Confessions," Southeastern Association of Law Schools (SEALS) Annual Meeting, Amelia Island, Florida, Aug. 6, 2016

"The Fourth Amendment and Non-Trespassory Tracking of Individuals," Florida Conference of District Court of Appeal Judges Annual Education Program," Ponte Verde Beach, Florida, Sept. 9, 2015

"Government Retention and Use of Unlawfully Secured DNA," Texas Tech University School of Law, Lubbock, Texas, April 17, 2015

"Taz: The Legal Academy's Happy (and Erudite) Warrior," Howard University Law School, Washington, D.C., Sept. 19, 2014

"Fourth Amendment Cases from the Supreme Court's 2013 Term," First District Court of Appeal, Tallahassee, Florida, Sept. 4, 2014

"A House Divided: When State and Lower Federal Courts Disagree on Federal Constitutional Rights," Southeastern Association of Law Schools (SEALS) Annual Meeting, Amelia Island, Florida, Aug. 4, 2014

"A House Divided:  When State and Lower Federal Courts Disagree on Federal Constitutional Rights," Emory Law School, Feb. 5, 2014

"Mandatory Minimum Sentences," National Board Meeting of the Federal Bar Association, Orlando, Florida, Jan. 24, 2014

"Sentencing in America: 1975-2025," by Professor Michael Tonry, Robina Center for Criminal Justice, University of Minnesota Law School, November 15, 2013 (commenter)

"The Fourth Amendment and False Positives," Association of American Law Schools Criminal Justice Section Mid-Year Meeting, San Diego, California, June 11, 2013

"Crime and Punishment," Florida College of Advanced Judicial Studies, May 6-8, 2013 (with the Honorable Terry Lewis)

"Dirty Silver Platters," Southwestern Law School, Oct. 19, 2012

"Constitutional Cacophony:  Federal Circuit Splits and the Fourth Amendment," University of Pittsburgh School of Law, Mar. 27, 2012

"Constitutional Cacophony:  Federal Circuit Splits and the Fourth Amendment," Vanderbilt Law School, Mar. 12, 2012

"Policing Identity," University of Miami School of Law, Feb. 16, 2012

"Warrantless Searches of Smartphones," Annual Meeting of the National Conference of State Legislatures, Tampa, Florida, Dec. 1, 2011

"Police Mistakes of Law," Vanderbilt Criminal Justice Roundtable, Vanderbilt Law School, Dec. 10, 2010

Junior Scholars Roundtable, University of Florida School of Law, Dec. 3-4, 2010 (commentator)

"Developing Technologies and the Fourth Amendment," ABA Criminal Justice Section, Criminal Justice Educators Colloquium, Washington, D.C., Nov. 5, 2010 (moderator and panel organizer)

"Why Do We Have the Fourth Amendment?," Southeastern Association of Law Schools (SEALs) Annual Conference, Palm Beach, Florida, Aug. 3, 2010

"Fourth Amendment Developments and Issues to Come," Florida Bar Criminal Trial and Appellate Certification Program, Orlando, Florida, Apr. 22, 2010

"The Fourth Amendment and the Values It Seeks to Serve," Texas Tech University School of Law, Apr. 10, 2010 (moderator)

"Litigating the Ghost of *Gideon* in Florida: Separation of Powers as a Tool to Achieve Indigent Defense Reform," University of Missouri School of Law, Feb. 26, 2010

"Great Fourth Amendment Dissents: Justice O'Connor's Dissent in *Atwater v. City of Lago Vista*," National Center for Justice and the Rule of Law, University of Mississippi Law School, Oxford, Mississippi, Feb. 12, 2009

"Victim Participation in the Proceedings of the International Criminal Court," Florida State University International Center, Conference on International Criminal Tribunals, Jan. 30, 2009 (respondent)

"Pedagogy and Personalization: The Role of Empathy in Teaching Criminal Law," Southeastern Association of Law Schools Annual Conference, Palm Beach, Florida, Aug.1, 2008
"Confronting Evil: Victims' Rights in an Age of Terror," Stanford University Law School Criminal Justice Center, Jan. 25, 2008

"Confronting Evil: Victims' Rights in an Age of Terror," College of William and Mary, Marshall-Wythe School of Law, Williamsburg, Virginia, Oct. 18, 2006

"Opining on Death: Witness Sentence Recommendations in Capital Trials," Minnesota Advocates for Human Rights, Dorsey & Whitney, LLP, Minneapolis, Minnesota, Jan. 31, 2006

"Civil and Criminal Recidivists: Extraterritoriality in Tort and Crime," Hofstra University School of Law, Oct. 2004

"The Public Policy Debate on Guns: The Minnesota Personal Protection Act," William Mitchell College of Law, featuring John Lott, Ph.D. and David Lillehaug, Esq., Nov. 19, 2003 (panel moderator)

"The Importance of Purpose in Probation Decision Making", Criminal Law Center, State University of New York at Buffalo School of Law, "Model Penal Code: Sentencing," Apr. 25-27, 2003

"Extended Juvenile Jurisdiction and Blended Sentencing," William Mitchell College of Law, Feb. 26, 2003 (panelist)

"On the Home Front: Protecting Our National Security, Preserving Our Individual Liberties," William Mitchell College of Law, Dec. 19, 2001 (panelist)

"Civil Liberties Implications of the Terrorist Attacks of September 11, 2001," William Mitchell College of Law, Oct. 3, 2001 (panelist)

"Lessons from the Diallo Case: A Public Forum," School of Criminal Justice, State University of New York at Albany, Feb. 28, 2000 (panelist)

"Victims with Disabilities Workshop:  Hate Crime Laws," National Research Council, National Academy Sciences, University of California at Irvine, Oct. 28-29, 1999

"Hate Crimes: Their Definition and Measurement," School of Criminal Justice, State University of New York at Albany, Apr. 22-23, 1999 (funded by the U.S. Bureau of Justice Statistics) (panelist and conference co-organizer)

"Hate Crimes Legislation: Targeting Bias at the Expense of the Constitution?," School of Criminal Justice, State University of New York at Albany, featuring syndicated Columnist Nat Hentoff, Apr. 22, 1999 (moderator)

"Zero Tolerance Policing Initiatives: Legal and Policy Perspectives," School of Criminal Justice, State University of New York at Albany, Apr. 24, 1998 (moderator)

## SERVICE

### EXTERNAL

American Law Institute (elected 2004):
- Member, Members Consultative Group for the Model Penal Code:  Sentencing
- Member, Members Consultative Group for the Model Penal Code:  Sexual Assault & Related Offenses
- Member, Members Consultative Group for Principles of the Law, Police Investigation
- Member, Members Consultative Group for the Restatement (Third) of Torts

Association of American Law Schools:
- Standing Committee on Membership Review (2016-present)
- Committee on Research:  Chair, Awards & Recognition Subcommittee (2009-2011); Member (2009-2012)
- Criminal Justice Section:  Chair (2006-2007); Chair-elect (2005-2006); Secretary (2004-

2005)
- AALS Reporter on ABA-AALS sabbatical site inspection (University of Denver School of Law, Nov. 2018)

American Bar Association:
- Committee on Sentencing and Corrections (2009-preesent)
- Florida Representative, State Policy Implementation Project (2011-2013)

Advisory Board Member, "Getting Scholarship into the Courts" Task Force, National Association of Criminal Defense Attorneys (2012-present)

Co-Reporter, Minnesota Pattern Criminal Jury Instructions (Thomson West) (2001-2007)

Member, Supreme Court of Minnesota Advisory Committee on Rules of Criminal Procedure (2002-2005)

Symposium Editor, Criminal Law Bulletin (Thomson West) (1998-2004)

Advisory Board Member, Collateral Consequences Resources Center (2018-present)

Publication Referee:
- Aspen Publishing; Oxford University Press; University of Chicago Press; Criminology & Public Policy; Justice Research & Policy; Law & Social Inquiry; Law & Society Review; New Criminal Law Review; Psychology, Crime & Law; Punishment & Society; Sexual Abuse: A Journal of Research and Treatment; Stanford Law Review; Yale Law Journal

Grant Reviewer:
- U.S. Department of Justice, Office of Justice Programs

Solicited Promotion and Tenure Evaluations of Law Faculty:
- University of Kansas, University of Kentucky, University of Minnesota, UNC-Chapel Hill, University of Oklahoma, Tulane University, SUNY-Buffalo, University of Pittsburgh; William Mitchell College of Law

### INTERNAL

Florida State University College of Law:
- Associate Dean for Academic Affairs (2008-2011)
- University Faculty Senate Representative (2010-2012); University Budget Crisis Committee (appointed by University President) (2010-2012)
- Chair, Faculty Promotion and Tenure Committee (2015-2016); Chair, Faculty Appointments Committee (2013-2014); Chair, Admissions Committee (2012-2013); Chair, Academic Waivers Committee (2011-2012); Chair, Student Affairs Committee (2010-2011); Chair, Judicial Clerkship Committee (2007-2008); Chair, Joint Ad Hoc Committee on Public Safety (2017); Member, Committee to Assess Bar Passage (2017-

present); Member, Student Admissions and Recruitment (2015-present); Member, Faculty Appointments Committee (2007-2008, 2012-2013, 2016-2018), Student Affairs Committee (2008-2009)
- Faculty Advisor, FLORIDA STATE UNIVERSITY LAW REVIEW (2012-present)
- Teaching Faculty, Oxford University Summer Law Program (summer 2013)
- Research Affiliate, FSU Institute for Successful Longevity (2016-present)

William Mitchell College of Law:
- Chair, Judicial Clerkship Committee (2005-2006); Chair, Tenure Review Committee, Lateral Candidates (2005-2006); Member, Strategic Plan and ABA Self-Study Committee (2003-2004); Member, Admissions Committee (2003-2004); Member, Faculty Appointments Committee (2001-2003); Member, Academic and Student Affairs Committee (2000-2001)

## EDUCATION

University of Wisconsin at Madison, J.D., 1991
- Senior Articles Editor, WISCONSIN LAW REVIEW; Recipient of William Herbert Page Award (Faculty-Designated Award for Best Student Work Published in the WISCONSIN LAW REVIEW); Research Assistant to Professor Frank J. Remington, Mortimer Jackson Professor of Law

State University of New York at Albany (Criminology), M.A., 1986
- Rockefeller College Graduate Fellowship

Wesleyan University (Anthropology), B.A., 1983
- Graduated with University and Departmental Honors; Frank H. Cushing Award for Distinguished Achievement

## PRIOR EMPLOYMENT

School of Criminal Justice, Rockefeller College of Public Affairs and Public Policy, State University of New York at Albany
- Assistant Professor (1997-2000)

Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.--Greensboro and Raleigh, North Carolina
- Litigation associate (1993-1997)

Honorable Robert R. Merhige, Jr., U.S. District Judge for the Eastern District of Virginia--Richmond, Virginia
- Law Clerk (1992-1993)

Honorable Louis B. Meyer, Senior Associate Justice, N.C. Supreme Court--Raleigh, North Carolina
- Law Clerk (1991-1992)

## MEDIA INTERVIEWS

ABA Journal, ABC News.com, Bloomberg BNA News, Chicago Tribune, Miami Herald, New York Times, St. Louis Post-Dispatch, Tampa Bay Times, USA Today, Wall Street Journal, Washington Times, among others

## BAR ADMISSIONS (inactive)

District of Columbia, North Carolina, Wisconsin